UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CONTENDER FARMS,  L.L.P.,<br>LEE MCGARTLAND, MIKE<br>MCGARTLAND and SHOW, INC. | §<br>§<br>§<br>§ | |
| Plaintiffs | § | Case No. _____ |
| vs. | §<br>§ | |
| UNITED STATES DEPARTMENT<br>OF AGRICULTURE | §<br>§<br>§ | |
| Defendant | § | |

# Plaintiffs' (1) Complaint for Declaratory and Injunctive Relief, (2) Application for a Preliminary Injunction and (3) Brief in Support. Submitted with Separate Appendix of Supporting Exhibits

Respectfully submitted by:

_s/_  *Karin Cagle* _____
Karin Cagle
Texas State Bar No. 24043588
1619 Pennsylvania Avenue
Fort Worth, Texas 76104
E-mail:  kcaglelaw@gmail.com
Tel.:  817.721.5127

David Broiles
Texas State Bar No. 03054500
2400 Indian Cove
Fort Worth, Texas 76108
Email: davidbroiles@gmail.com
Tel. 817.246.7801

**TABLE OF CONTENTS**

I.      INTRODUCTION   ………………………………………….…………………9

II.     FEDERAL STATUTES AND USDA REGULATIONS PRESCRIBE
        THE ADJUDICATORY REQUIREMENTS FOR ENFORCEING
        CIVIL PENALTIES FOR HPA VIOLATIONS OF THE HPA …………………12

        A.      HPA §1825 Authorizes Civil Penalties and Prescribes
                Adjudicatory Due   Process Procedures for HPA Enforcement …………12

        B.      Adjudicatory Requirements Mandated Under the Administrative
                Procedures Act ……………………….……………………….……………13

        C.      USDA Regulations Provide Due Process Procedures for
                Adjudication of Alleged Violations………………………………………14

        D.      The USDA Considers Civil Enforcement Under §1825
                Too Costly and Time Consuming…..………………………………………14

III.    THE USDA CREATES TWO ADMINISTRATIVE
        ENFORCEMENT SCHEMES SEPARATE FROM HPA §1825(b)……………..15

        A.      Penalties Are Assessed Under the USDA's
                "Protocol for Foreign Substance Penalty"  …………………………....15

        B.      The USDA Assesses Penalties Under the
                "IES Investigative and Enforcement Process"…………………….…..16

        C.       Official Warning Letters on Form 7060 are Agency
                 Enforcement Actions and Penalties  …..……………………………………18

        D.      The USDA Publishes Lists Identifying People
                It Has Determined Violated the Act …..……………………………………19

IV.     THE MCGARTLANDS ARE PENALIZED AS
         VIOLATORS OF THE ACT  ..……………………………………………20

        A.      Inspections at the 2012, 2013 and 2014 National Celebration Events…..20

        B.      The McGartlands Were Assessed Public Reprimands
                 Identifying Them as Violators of the Act………………………………..23

        C.      The McGartlands Protested the USDA's Determination
                 and Publication that they Violated the Act…..…………………………...24

V.     THE USDA'S ADMINISTRATIVE ENFORCEMENT
       POLICIES ARE UNLAWFUL…..……………………………………………28

       A.     The Protocol for Foreign Substance Penalty Is
              Unauthorized and Unlawful  ..……………………………………………28

       B.     The USDA's IES Investigation and Enforcement
              Process for Penalizing Entrants is Not Authorized
              by the HPA and is Unlawful Under HPA §1825(b)…..…………………38

       C.     The Protocol For Foreign Substance Penalty and the
              IES Investigative and Enforcement Process that the USDA
              Follows in Order to Determine Violations, Identify Violators
              and Assess Penalties are  not Authorized and are Unlawful…..………..40

       D.     The USDA's Public Reprimands Violate the
               McGartlands' Privacy Rights…..………………….…………………….43

       E.     SHOW is Unlawfully Listed as a "Violator" of the Act…………………..45

VI.    THE USDA'S UNLAWFUL PRIVATE PARTY
       ENFORCEMENT SCHEME ……………………………………………………47

       A.     Operating Plans Required HIOs Penalized Entrants ..…………………..48

       B.     Adopting New Enforcement Regulations for HIOs  ……………………..51

              1.     Adopting new regulations compelling HIOs to enforce the Act…..51

              2.     Providing lists to HIOs in order to prohibit entry
                      and to assess enhanced penalties…………………………………52

       C.     HPA §1825(b) Precludes Private Party Enforcement Schemes..…………55

       D.     Penalties by Public Reprimand Continue to be Assessed……..………..58

       E.     The McGartlands' Object to APHIS' Publication
               of the HIO Penalty Lists…………..……………………..……………...59

       F.     The USDA's Demands for and Publication of SHOW's
               Records Are Unlawful  …………………………………………………60
              1.     No lawful regulation requires HIOs to produce
                     ticketing or penalty records  …….…..…………….………………61

              2.     HPA §1825(d) provides the exclusive means
                      to obtain SHOW's private records  ……………………….……..63

3.      IES' demands for SHOW's records violate the
         Constitution's Fourth Amendment ………………………………64

VII.    APPLICATION FOR A PRELIMINARY INJUNCTION  ……………………..66

A.      There is a Substantial Likelihood Plaintiffs Will Prevail on the Merits…...66

B.      There Exists a Substantial Threat that Plaintiffs Will Suffer
         an Irreparable Injury if an Injunction is Not Issued ……………………67

C.      The Injury to the Plaintiffs Outweighs Any Harm the Injunction
         Will Cause the USDA……………………………………………………67

D.      Granting the Injunction Will Not Disserve the Public …………………..68

VII.   CONCLUSION…………………………………………………….…..……...69

## TABLE OF SUBMITTED APPENDIX

| TAB NUMBER | DESCRIPTION | BEGINNING PAGE |
|---|---|---|
| 1. | Protocol for Foreign Substance Penalty | 1 |
| 2. | IES Investigative and Enforcement Process | 2 |
| 3. | USDA Factsheet "Enforcement Process Streamlining" | 3 |
| 4. | USDA Tech Note | 5 |
| 5. | USDA\|APHIS Enforcement Actions 2010-2015 | 6 |
| 6 | USDA's website, "Horse Protection Act" | 59x |
| 7. | "USDA-APHIS-Animal Care Horse Protection Enforcement Actions" searchable website printed 6/21/15 | 59 |
| 8. | Official Warning Letters on Form 7060 | 138 |
| 9. | "USDA APHIS \| Enforcement Actions" 2010 – 2015 | 148 |
| 10. | Email to USDA attorney, 6/8/15 | 215 |
| 11. | McGartlands' Letter to IES, 6/12/15 | 224 |

4

12.    IES Letter to McGartlands. 8/26/15                                              228

13.    "USDA-APHIS-Animal Care Horse Protection
       Enforcement Actions: 2009-2013" list printed October 6, 2015                   229

14.    No Webpage Found documents                                                      273

15.    FOSH Public Database and Emails                                                283

16.    SHOW's March 2008 Response to Foreign Substance Protocol                       293

17.    USDA's Response to HIOs                                                         295

18.    SHOW's Reply to USDA                                                           303

19.    "USDA-APHIS Animal Care Horse Protection Enforcement
       Actions 2009-2013" list for "Foreign Substance" violations                    309

20.    USDA Annual Reports on Foreign Substance tests, 2008-2014                      326

21.    May 2013, Humane Society of the United States press release                    388

22.    January 2014, Humane Society of the United States press release                390

23.    January 2014 report of the Performance Show Horse Association
       addressing "Foreign Substance Issues"                                          392

24.    Searchable "USDA-APHIS-Animal Care Horse Protection
       Enforcement Actions 2009-2013" list for scar rule violations                  403

25.    USDA/APHIS–1, describing the USDA's record system                             415

26.    Investigative and Enforcement Records Regarding Regulatory
       Activities, USDA/APHIS                                                         418

27.    The USDA's Instructions about obtaining information                           428

28.    The USDA Docket No. 14-0056: decertification proceedings against SHOW         431

29.    "Horse Protection Act and its Administration" summary
       of the Agency's administration of the Act                                      446

30.    Cover page June 12, 2015, report: "Responsible Parties
       for the Horses Found in Violation"                                             448

31.    USDA Horse Protection Program Fine Reports, June 21, 2015                      450

32.   USDA Horse Protection Program Active Suspension Report, June 21, 2015        460

33.   2010 "USDA HORSE PROTECTION PROGRAM
      Responsible Parties for Horses Found in Violation" report, June 21, 2015        465

34.   2011 "USDA HORSE PROTECTION PROGRAM
      Responsible Parties for Horses Found in Violation" report, June 21, 2015        695

35.   2012 "USDA HORSE PROTECTION PROGRAM
      Responsible Parties for Horses Found in Violation" report, June 12, 2015        870

36.   2013 "USDA HORSE PROTECTION PROGRAM
      Responsible Parties for Horses Found in Violation" report, June 21, 2015        1056

37.   2014 "USDA HORSE PROTECTION PROGRAM
      Responsible Parties for Horses Found in Violation" report, June 21, 2015        1182

38.   USDA (IES) demand for SHOW's records 8/24/15        1261

39.   SHOW's response to IES demand        1262

40.   David Broiles' Declaration        1267

41.   Mike Inman's Declaration        1275

42.   Lee McGartland's Declaration        1303

# TABLE OF AUTHORITIES

**Cases:**

*City of Los Angeles, California v. Patel*, 135 S. Ct. 2443 (2015)…………………..……………65

*Contender Farms v. USDA*, 779 F. 3d 258 (5th Cir. 2015) ………………………10, 39, 58-59, 67

*Deerfield Medical Center v. City of Deerfield Beach,* 661 F. 2d 328 (5th Cir. 1981) …………67

*E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Cair Div.*, 821 F. 2d 1085 (5th Cir. 1987) …………67

*In re Primus*, 436 U.S. 412 (1978) ..……………….…………………………………………24

*Lagrone v. Johnson*, 2002 WL 87465 (N.D.Tex. Jan. 22, 2002) ………….……………………24

*Matter of Galvan*, 92 F. 3d 583 (7th Cir. 1996) ..………….…………………………………24

*National Pork Producers Council v. EPA*, 635 F. 3d 738 (5th Cir. 2011) ..…………..……………40

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ……………………………………………39

*PCI Transp. V. Fort Worth & W.R.R.*, 418 F.3d 535 (5th Cir. 2005) ……..………….……………66

*Polk v. State Bar of Texas*, 374 F. Supp. 784 (N.D. Tex. 1974) …………….………………24

*Spiegel v. City of Houston, 6*36 F. 2d 997 (5th Cir. 1981) ……………..…….…..……………66

*Thomas v. Capital Sec. Services, Inc.,* 836 F. 2d 866, 878 (5th Cir. 1988) (*en banc*) ……………24

*Williams v. Illinois*, 137 S. Ct. 2221 (2012) ……………….……………………………39

*Young v. USDA*, 53 F. 3d 728 (5th Cir. 1995).…………….…………………………………38, 61

**Statutes and Regulations:**

Administrative Procedures Act:  5 U.S.C. §§301 *et seq.* (2012)……………………………*passim*

Horse Protection Act, 15 U.S.C. §1821 (2012) ……………………………………………*passim*

Privacy Act, 5 U.S.C. §552a. (2012) ………….……………………………………11, 43-46

7 C.F.R. §1.130 *et seq.* …………….……………….…………………………………*passim*

## GLOSSARY OF TERMS AND ABBREVIATIONS

AWA – Animal Welfare Act

Act – the Horse Protection Act, 15 U.S.C. §1821 *et seq.*

Agency – the United States Department of Agriculture

ALJ – Administrative Law Judge

APA – Administrative Procedures Act 5 U.S.C. §301 *et seq.*

APHIS – Animal Plant Health Inspection Service

Department – The United States Department of Agriculture

DQP – Designated Qualified Person (licensed to inspect horses)

GC/MS -- Gas Chromatography/Mass Spectrometry; an analytical method that combines the features of gas-chromatography and mass spectrometry to identify different substances within a test sample

HIO – Horse Industry Organization (certified by USDA to license DQPs)

HPA – Horse Protection Act, 15 U.S.C. §1821 *et seq.*

IES – Investigative and Enforcement Service office of the USDA

JO – Judicial Officer of the USDA

Secretary – Cabinet level official of the USDA

SHOW – Plaintiff, HIO certified to license DQPs.

USDA – United States Department of Agriculture.

VMO – Veterinarian Medical Officer of USDA.

# Plaintiffs' (1) Complaint for Declaratory and Injunctive Relief, (2) Application for a Preliminary Injunction and (3) Brief in Support[1]

## I.   INTRODUCTION

1.      Tennessee walking horses and other gaited breeds are prized for and judged on their unique and smooth strides, indicative of pedigree breeding and successful training.  In the 1950's and 1960's, horse owners and event sponsors became concerned that some trainers used cruel and inhumane methods to enhance their horses' gaits, giving those trainers an unfair advantage in competitions, fraudulently increasing a horse's value and leaving horses lame, crippled and scarred.  In response, utilizing its Commerce Clause powers, in 1970 Congress enacted the Horse Protection Act, 15 U.S.C. §§1821 *et seq.* (HPA or Act), which it amended in 1976, to eliminate cruel techniques used by some trainers and participants.  T41:1277, ¶5.

2.      HPA § 1824 prohibits people from entering or allowing the entry of "sore" horses in shows, competitions and auctions.  HPA §1821 defines "Sore" to mean

> (A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse, (B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse, (C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or (D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse, and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term

---

[1] Plaintiffs' complaint is directed against USDA policies and actions that are often contained in lengthy documents published on the USDA's website, copies of which Plaintiffs have filed in a separate Appendix. These documents support and verify Plaintiffs' Application for a Preliminary Injunction. The documents, marked with exhibit numbers, are behind tab with corresponding numbers and consecutive page numbers appear at the bottom right corner of each Appendix page. The Appendix documents are referred herein using "T__:__". Referenced information is highlighted, underlined or bracketed where possible. The exhibits are authenticated at T40:1267-73, ¶¶1-23.

does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

3.      The Act generally has been effective in eliminating visibly maimed horses from being exhibited at the major shows.  However, there is no objective test currently employed to determine whether a horse is sore if it is not visibly lame, wearing prohibited devices, or bearing cuts or burns.  The inspection techniques are "more art than science," and expert inspectors often "disagree as to whether a horse is actually sore."  *Contender Farms v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015); T41:1277, ¶6.

4.      Defendant United States Department of Agriculture (USDA, Agency or Department), administers and enforces the HPA through its Animal and Plant Health Inspection Service (APHIS). Under the Act, when a horse is entered into an event, if it is identified as sore by a government inspector or a licensed private inspector, the event manager must disqualify the horse from showing.  Horses are disqualified from events based solely on the opinion of an authorized inspector.  Under HPA §1825(b), the Secretary of Agriculture may also initiate civil enforcement proceedings against violators of the Act. However, before a civil penalty can be assessed against the owner, trainer or entrant, HPA §1825(b) prescribes that "[n]o penalty shall be assessed unless such person is given notice and opportunity for a hearing before the Secretary with respect to such violation." T41:1277-78, ¶7.

5.      Contrary to requirements in HPA §1825(b), the USDA penalizes people for alleged violations without giving notice or providing an opportunity for a hearing before the Secretary. Plaintiffs challenge the USDA's use of three enforcement schemes that are not authorized under the HPA, and which directly contravene the requirement in §1825(b). Plaintiffs challenge the USDA's use of two administrative enforcement schemes: the "Protocol for Foreign Substance

Penalty" and the "IES Investigative and Enforcement Process," under which the USDA decides that entrants, trainers and owners have violated the Act's prohibition against entering sore horses. T1:1; T2:2. Plaintiffs also challenge the USDA's acquisition of private party information about private inspectors' activities, which the USDA uses to inaccurately identify people as having violated the Act.  Since none of these enforcement schemes is authorized by a Department regulation or by the HPA, this suit does not involve a challenge to any provision of the HPA or USDA regulation. T41:1277-78, ¶7.

6.     Plaintiffs Mike and Lee McGartland (McGartlands) are partners in Plaintiff Contender Farms L.L.P. (Contender), a Mississippi limited partnership that owns Tennessee walking horses that the McGartlands enter into competitive events. The McGartlands are United States citizens who reside in Fort Worth, Texas. The McGartlands have been penalized under all three of the challenged enforcement schemes. The McGartlands have been, and, in the future may be, adversely affected by the USDA's violation of their rights under the Privacy Act, 5 U.S.C. §552a. T42:1303-04, ¶¶1 and 2.

7.     Plaintiff SHOW, Inc. was incorporated by the Tennessee Walking Horse National Celebration, the sponsor of the premier annual Tennessee walking horse competition in the nation (the Celebration). SHOW is a §501(c)(3) not-for-profit corporation that promotes the Tennessee walking horse industry. In 2009, it began operating as a Horse Industry Organization (HIO) certified by the USDA,  pursuant to 9 C.F.R. §11.7, to  train and license Designated Qualified Persons (DQPs) as private inspectors who can be appointed pursuant to HPA §1823(a) and (c) by Tennessee walking horse event management to inspect horses. T41:1276, ¶4. SHOW complains that the USDA unlawfully demands SHOW's private records of enforcement efforts, and uses

these records to publish lists that falsely identify people as having been determined by SHOW to have violated the Act.

8.      HPA §1825(d)(6) vests this court "with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter." The Privacy Act, 5 U.S.C. §552a(g)(d)(1)(D) grants this court jurisdiction of the McGartlands' Privacy Act complaints. The Administrative Procedures Act (APA), 5 U.S.C. §702 and §703, grant Plaintiffs the right of judicial review seeking injunctive relief in a district court when the Plaintiffs have suffered a legal wrong because of the agency's actions or have been adversely affected or aggrieved by the agency's action within the meaning of the relevant statute. Plaintiffs seek a court order to prevent and restrain the USDA from continuing to engage in practices that are unauthorized by and in violation of the HPA.

9.      Under 28 U.S.C. §1331, this court has federal question jurisdiction because the Plaintiffs' claims arise under federal statutes and the Constitution. Venue is proper in this court under 28 U.S.C. §1391 and 5 U.S.C. §552a(g)(5) because the McGartland plaintiffs reside in Fort Worth, Texas.

## II.      FEDERAL STATUTES AND USDA REGULATIONS PRESCRIBE THE ADJUDICATORY REQUIREMENTS FOR ENFORCING CIVIL PENALTIES FOR HPA VIOLATIONS.

### A.      15 U.S.C. §1825 Authorizes Civil Penalties and Prescribes Adjudicatory Due Process Procedures for HPA Enforcement.

10.      Congress prohibited entering sored horses into Tennessee walking horse events in the 1970 HPA. Under the Act, managers of events were criminally liable if they permitted a sore horse to compete. The HPA, 15 U.S.C. § 1821, *et seq.*, was amended in 1976, with three amendments related specifically to civil enforcement.  Section §1824 was amended to prohibit participants from entering sore horses into events and to prohibit event management from permitting entry of sored horses. Any person believed to have engaged in conduct prohibited by §1824 could be criminally

prosecuted under §1825(a), or sanctioned by civil penalties under §1825(b) and (c). T41:1278, ¶10.

11.     In §1825, titled "Violations and penalties," Congress authorized civil penalties that could be administratively assessed against participants by the USDA for violations of §1824.    The relevant subsections in §1825(b) establish that

> (1) **Any person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation. No penalty shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation.** The amount of such penalty shall be assessed by the Secretary by written order. In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent, and gravity of the prohibited conduct, and with respect to the person found to have engaged in such conduct, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require. (Emphasis added)
>
>                                  \*\*\*
>
> (4) The Secretary may, in his discretion, compromise, modify, or remit, with    or without conditions, any civil penalty assessed under this subsection.

12.     Section 1825(c) authorizes the Secretary to disqualify people from entering events for a period of time who have been found in violation of §1825(b). The procedural requirements of subsection (b) apply to disqualification proceedings.

13.     Section 1825(d) provides due process safeguards for the administrative proceedings, like subpoenas for attendance of witnesses and production documents, and empowers district courts to aid in implementing the procedures. Section 1825(b)(2) guarantees any person determined liable for a civil penalty the right to appeal to a United States Court of Appeals.

###     B.     Adjudicatory Requirements Mandated in the Administrative Procedures Act.

14.     Congress directed that the APA shall apply to an agency's assessment of a sanction, which includes the "imposition of penalty or fine." 5 U.S.C. §551(10)(c). An "agency action" includes an agency "sanction." 5 U.S.C. §551(13). When an agency seeks to assess a civil penalty, the

proceedings must be held in the agency's administrative court, where an Administrative Law Judge (ALJ) shall "preside at the taking of evidence." 5 U.S.C. §556(b).  Any proceeding that could result in a sanction must be on the record; the accused must receive adequate notice and be afforded the opportunity to present evidence and arguments. 5 U.S.C. §554.  Detailed procedural requirements that are mandated afford the accused due process. 5 U.S.C. §556. "A sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b).

## C.     USDA Regulations Provides Due Process Procedures for Adjudication of Alleged Violations.

15.     The USDA implemented the due process requirements under the authority of 5 U.S.C. §301, by adopting "Rules of Practice Governing Formal Adjudicatory Administrative Proceedings Initiated by the Secretary." 7 C.F.R. §1.130 *et seq.*  These rules provide that administrative hearings to determine liability and assess civil penalties shall be conducted by an ALJ under the authority of  5 U.S.C. §3105 and 7 C.F.R. §1.144.   The ALJ's decision is reviewable by the Department's Judicial Officer (JO), who is delegated the Secretary's authority under §1825(b) and (c) pursuant to 7 U.S.C. §450(e) and (g) and 7 C.F.R. §1.145. The JO's decision can be appealed to a United States Court of Appeals. 15 U.S.C. §1825(b)(2).

## D.     The USDA Considers Civil Enforcement Under §1825 Too Costly and Time Consuming.

16.     In 2011, the USDA complained that §1825(b) enforcement "proceedings may be time-consuming and expensive, and our resources for prosecuting such cases are limited." 76  Fed. Reg. 30865 (May 27, 2011). This was reflected by the fact that in 2010, the Agency filed no administrative complaints under HPA §1825. T5:6, ¶¶10-12.  By 2012, APHIS reported it took an average of "about 600 days to resolve an investigation of alleged violations and to pursue formal

enforcement action, such as an official warning or stipulated monetary penalty," while §1825(b) proceedings "can take considerably longer." T3:4; T41:1279, ¶12.

17.     The USDA sought to boast its HPA enforcement numbers. Rather than filing more complaints under §1825(b), the Agency decided to adopt less time-consuming and less expensive policies and practices under which it could penalize alleged violators. T42:1304, ¶5. First, it established two internal enforcement schemes separate from the one Congress prescribed in §1825(b); and, secondly, it compelled private entities to enforce the Act. APHIS' enforcement numbers skyrocketed. However these enforcement schemes were less costly and time consuming solely because they ignored the due process requirements mandated by Congress.

## III.     THE USDA CREATES TWO ADMINISTRATIVE ENFORCEMENT SCHEMES SEPARATE FROM HPA §1825(b).

### A.     Penalties Are Assessed Under the USDA's "Protocol for Foreign Substance Penalty."

18.     Beginning June 1, 2008, the USDA adopted a "Protocol for Foreign Substance Penalty." T1:1. These penalties would be assessed "for a foreign substance violation detected by a USDA inspector through the use of the Gas Chromatography/Mass Spectrometry (GC/MS) Test." T1: 1. "Foreign Substance" is not defined in the Act or the regulations.   By regulation the USDA addresses "Substances" in 9 C.F.R. § 11.2(c):

> All substances are prohibited on the extremities above the hoof …except lubricants such as glycerine [sic], petrolatum and mineral oil or mixtures thereof: Provided That … management agrees to furnish all such lubricants … shall be applied only after the horse has been inspected … [and] management makes such lubricants available to Department personnel for inspection and sampling.

For the first and second offenses, the penalty would be the issuance of a Form 7060 Warning Letter.   For the third offense, the offender would be issued a stipulation, which, if not accepted, would lead to a complaint for civil penalties under HPA §1825(b). For a fourth offense, "the USDA

will initiate an administrative enforcement action (commonly known as a 'Federal Case')." T1:1; T41:1279, ¶13; T42:1304-05, ¶7.

19.     The GC/MS test would be randomly administered to horses by USDA officials. The horse's forelimbs would be swabbed and the sample would be sent to Ames, Iowa for GC/MS analysis. It would take time to receive the results, so the USDA's policy would be "to notify the alleged violator of the specific foreign substance or substances detected concurrently with the notification of the penalty." T1:1.   How the USDA justified calling the accused an "alleged violator" when it concurrently assessed a penalty for the violation is not explained. T41:1279, ¶14; T42:1305, ¶7.

20.     Penalties for foreign substance violations are automatically assessed based solely on a qualitative, not quantitative, basis of whether the GC/MS test results are positive. There is no notice of an alleged violation, no opportunity to examine any USDA evidence and no opportunity for a hearing before an impartial decision maker. T42:1305, ¶8.

> **B.     The USDA Assesses Penalties Under the "IES Investigative and Enforcement Process."**

21.     In order to address its backlog of investigations, and to bolster its enforcement numbers, the USDA adopted a procedure establishing a second departmental enforcement scheme, not authorized by and separate from the one in HPA §1825. T2:2.   Under this scheme, the USDA would investigate possible violations of the HPA through its regional Investigative and Enforcement Services offices (IES).   The new enforcement program directed IES to sanction people its investigators decided had violated the Act.   T42:1305, ¶9.

22.     HPA §1823(e) authorizes the Secretary's duly appointed representatives to attend events to inspect for and report possible violations of the Act. These Veterinarian Medical Officers (VMOs) are authorized to inspect horses and to inform management if a horse is sore. If management receives such a report, the horse must be disqualified from the class under §1825(a).

No statutory or regulatory provisions authorize VMOs to punish a person the VMO believes entered a sore horse.  T41:1279-80, ¶15; T42:1305-06, ¶10.

23.     The VMOs report the results of their inspections to the IES inspectors, who open investigations into possible violations of the statutes within APHIS' jurisdiction, including the Animal Welfare Act (AWA) and the HPA. T2:2. The IES investigators decide whether a person has violated HPA §1824.  If the IES investigator believes a violation has occurred that warrants a sanction less than a fine, then the investigator issues a Form 7060, an "Official Warning," which is published on the USDA website identifying the person as a violator of the Act. This, in itself, is a sanction or penalty by a public reprimand. T2:2; T42:1305-06, ¶11.

24.     Without going through the APA rulemaking process, the USDA published its "Investigative and Enforcement Process," describing the procedures governing IES investigations and enforcement decisions. T2:2. In conducting an investigation, the IES investigator may interview witnesses, and "[a]s part of its investigative process, IES provides alleged violators with the opportunity to submit any evidence that they did not violate an APHIS-administered law." T2:2.

25.     IES' investigation procedures provide that "[o]nce the investigation is complete, the investigator prepares a report of investigation (ROI), which summarizes the investigative findings." T2:2. The report and any evidence are then sent "to IES' enforcement staff for review." T2:2.

26.     The "Enforcement Process" commences with the receipt of the report and evidence, when "a specialist reviews and analyzes this information to determine if the violation is substantiated by the evidence provided." T2:2. The enforcement specialist "determines whether an enforcement action is appropriate."  T2:2; T42:1306, ¶14.

27.     The specialist, "[w]hen preparing penalty recommendations … relies on the penalty provisions contained in the relevant APHIS-administered law … and applies penalty adjustments for aggravating and mitigating factors."   T2:2.

28.     According to the USDA Factsheet "Enforcement Process Streamlining," if the investigator decides an alleged non-compliance does not warrant an enforcement action, "letters of information" are issued with the aim of educating an individual to correct a noncompliance in non-egregious cases. T3:4. These letters of information are not considered an "official enforcement action," in contrast to the issuance of a Warning Letter. T2:2; T42:1307, ¶16.

29.     If the IES investigator concludes there have been substantiated violations, the possible "[e]nforcement actions may include an official warning, a voluntary settlement agreement, [or] a referral to the USDA's Office of General Counsel (OGC) to institute an administrative proceeding" under HPA §1825(b). T2:2; T42:1307, ¶16.

### C.     Official Warning Letters on Form 7060 are Agency Enforcement Actions and Penalties.

30.     Official Warning Letters on Form 7060 are issued for violations the USDA decides have occurred under either the "Protocol for Foreign Substance Penalty" or under the "IES Investigative and Enforcement Process."  The legal significance of an Official Warning Letter on Form 7060 is set forth in an April 2013, "USDA Tech Note." T4:5. The "legal effect of a Form 7060" is that it "is an administrative action…routinely used for minor infractions instead of other forms of legal enforcement such as civil penalties, sanctions or criminal prosecutions." T4:5; T42:1307, ¶18.

31.     APHIS' policy is that this "administrative action" is one "used when APHIS determines that it would not be an effective use of its limited resources to pursue other forms of legal enforcement." T4:5; T42:1307, ¶19.

32.     APHIS' position is that "[a]lthough official warning letters do not include a monetary penalty, they are official enforcement actions and will be considered as part of a person's enforcement history if additional action is deemed necessary in the future." T3:4. HPA §1825(b) authorizes the Secretary to consider "prior offenses" when assessing a penalty. The USDA uses the Form 7060 Warning Letters as evidence of "prior offenses," even though the Secretary has not issued an order after notice and hearing determining the person has violated the Act. T.4:3; T42:1308, ¶20.

33.     According to its "USDA|APHIS Enforcement Actions" report on its website, printed October 5-6, 2015 and January 30, 2016, the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process, both of which  determine violations and penalize violators outside of the requirements of §1825(b), have been  remarkable successes.  From 2010 through 2015, the USDA initiated or completed 2,369 enforcement actions.  Of these, 2,279 were enforcement actions resulting in Form 7060s, or 95% of APHIS' total enforcement actions. T5:9; T40:1270-71, ¶¶4, 5, 11.

     **D.**     **The USDA Publishes Lists Identifying People It Has Determined Violated the Act.**

34.     The USDA's website, "Horse Protection Act," provides a link to "Horse Protection Act Inspection and Enforcement." T6:59x; T40:1270, ¶3. That link, under the heading "HORSE PROTECTION ACT INSPECTION AND ENFORCEMENT," at the paragraph headed "Enforcement," provides a link to an archived "Searchable HPA Federal Enforcement Actions." T6:62x-64x.  On June 21, 2015, opening this link produced a 79 page report titled "USDA/APHIS-Animal Care Horse Protection Violations 2009-2013." T7:59-137.  This document lists the "Violator" by name, the horse's name, the "Violation date," and identifies the "Violation." T7:59; T42:1308, ¶22.

35.     Opening the icon in the column under "View" usually produces a copy of Form 7060. The Form is headed "Official Warning Violation of Federal Regulations," and states that "[t]he U.S. Department of Agriculture has evidence that … you… committed the following violation(s) of Federal law." T8:138; T40:1270, ¶3. The Form 7060 identifies the violation by referring to a subsection of HPA §1824 and a regulation. T8:138-147.5; T42:1308, ¶23.

36.     Additionally, on the USDA's website under "Horse Protection Act," there is a link under "Horse Protection Act Inspection and Enforcement" to "HPA Enforcement Actions." T6:59.  That link opens the site for "USDA APHIS | Enforcement Actions" for each year 2010 through 2015. T9:148-214; T40:1270, ¶3; T42:1308, ¶24.

37.     Opening a link to a specific year makes available links to the USDA's AWA and HPA enforcement actions by month, which, when opened, contain links to Official Warnings, Stipulations, Complaints, and Decisions and Orders. On the June 21, 2015 version of the list, opening the HPA line for each year and each month produced 67 pages that identify all Form 7060s that have been issued from 2010 through May 2015.  T40:1270, ¶3; T42:1309, ¶25.

38.     The published lists, together with the attached Form 7060 Official Warnings, constitute a sanction or penalty that the USDA imposes against those people it has determined to have violated the Act. Together with the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process, the lists create the appearance that, under authorized and lawful proceedings, the government found the listed person to have violated HPA §1824.  T42:1309, ¶26.

## IV. THE MCGARTLANDS ARE PENALIZED AS VIOLATORS OF THE ACT.

### A.      Inspections at the 2012, 2013 and 2014 National Celebration Events.

39.     The McGartlands do not sore their horses, nor do they hire trainers that sore horses, and they monitor their horses and trainers to ensure HPA compliance. Nonetheless, the McGartlands

have had VMOs disqualify their horses.  The VMOs' opinions were wrong, but there is no appeal or redress from a VMO's decision that results in a horse's disqualification.  That is the way the Act works. T42:1309-10, ¶28.  Despite the VMO disqualifications, APHIS has never proceeded under §1825 against the McGartlands.  It has taken a different course.

40.     On August 23, 2012, Mike and Lee McGartland, and their trainer Chris Alexander, entered the Contender Farms' horse "Low on Gin" in a class at the Celebration. After passing the DQP inspection, a VMO inspected the horse and diagnosed it as sore. The horse was disqualified. The horse was also subjected to the GC/MS foreign substance swab test. T42:1309, ¶27.

41.     On October 18, 2013, the USDA sent Mike and Lee McGartland and the trainer Chris Alexander each a copy of an Official Warning on Form 7060, issued in Case No. TN130373-AC. T8:138-40; T40:1270, ¶3. The USDA informed the McGartlands that on August 23, 2012, when entering "Low on Gin," they had violated 15 U.S.C. §1824(7) and 9 C.F.R. §11.2(c), because the horse allegedly tested positive in a GC/MS test for a substance.   T42:1310, ¶30.

42.     On August 30, 2012, the McGartlands and their trainer Chris Alexander entered Contender Farms' horse "He's Shady in Black" in a Celebration class. After the horse passed the DQP inspection, a VMO inspected the horse and deemed it not in compliance with the scar rule. The horse was disqualified from the event. T42:1309, ¶28.

43.     On July 7, 2014, the USDA sent each McGartland a Form 7060, in Case No. TN130155-AC, informing them that they violated 24 U.S.C. §1824(2) and 9 C.F.R. §11.3, the Scar Rule, on August 30, 2012, when entering "He's Shady in Black" at the Celebration.  T8:141-45. The trainer, Chris Alexander, in the same case, was also determined to have violated the Act, and a Form 7060 was issued. T8:147-48; T40:1270. ¶3; T42:1310, ¶31.

44.     In August 2013, the McGartlands again entered Contender Farms' horse "He's Shady in Black" in a class at the annual Celebration. After passing the DQP inspection, the horse was selected for a VMO inspection. The inspector informed management that the horse was sore, and it was disqualified from the event. T42:1310, ¶29.

45.     On August 24, 2014, the McGartlands entered Contender Farms' horses "She's A Shady Sister" and "Blue's Master" in classes at the Celebration. After both horses had passed DQP inspections, both were selected for VMO inspections. The VMOs said both horses were sore, reported this to management, and both horses were disqualified. T42:1310, ¶32.

46.     On February 22, 2016, both Lee and Mike McGartland received an Official Warning Letter dated February 17, 2016, with a Form 7060 for Lee McGartland in case number TN150128-AC, informing her that the USDA had evidence she violated HPA §1824(2)(A), the scar rule when entering "She's A Shady Lady" on August 24, 2014. Mike McGartland received an identical Form 7060, in cases nos. TN150127-AC and TN150128-AC. T8:147.1-147.8; T40:1273, ¶23. The McGartlands received no notice of any such pending cases against them. T42:1310, ¶33.

47.      Since VMOs inspected and disqualified the McGartlands' horses, "He's Shady on Black" in 2013 and "Blues Master" in 2014, the USDA's procedures under the IES Investigation and Enforcement Process indicate that an IES inspector has opened other cases and has conducted or is conducting investigations. T2:2. The McGartlands have received no notice of any such pending cases against them. T42:1310, ¶33.

48.     The McGartlands received no prior notice of the cases that resulted in the October 2013, July 2014, and February 2016 Warning Letters, had no opportunity to challenge the evidence relied

on by the USDA or the IES enforcement specialist and had no opportunity to present a defense proving their horses were not in violation of the Act.  T42:1310-11, ¶34.

**B.   The McGartlands Were Assessed Public Reprimands Identifying Them as Violators of the Act.**

49.     Mike and Lee McGartlands' administrative enforcement penalties were published on the USDA's website. The "USDA-APHIS-Animal Care Horse Protection Enforcement Actions" searchable website, as it existed and was printed on 6/21/15, listed them under the column "Violator Name." T7:118, 119,134; T40:1270, ¶3. Their two horses are named.  The website lists the "Violation Date." Under "Violation" it lists "Foreign Substance" and "Scar Rule."  Clicking the icon under the "View" column beside their names opened the underlying four Forms 7060. T8:111-47; T40:1270, ¶3. Chris Alexander is also listed as a "violator" for scar rule and foreign substance "Violations."  T42:1311, ¶35.

50.     On the USDA website "HPA Enforcement Actions," the report printed on 6/21/15 lists the McGartlands as having been subject to enforcement actions issued October 2013 and July 2014. T9:193, 194, 200; T40:1270, ¶3. The Official Warning Letters on Form 7060 could be opened, viewed and printed. Chris Alexander was likewise listed, and his Form 7060 could be opened. T8:141-47; T42:1311, ¶36.

51.     The USDA's actions in publishing lists on its website that identify a person as having violated federal law is a penalty by a public reprimand. The McGartlands are both attorneys, actively practicing law in several federal jurisdictions where they apply for permission to appear and they sign forms representing that they have not been found to have violated the law. They are specifically asked whether they have received reprimands in disciplinary proceedings. T42:1311, ¶37.

52.     Most lawyers, and certainly the McGartlands, take seriously reprimands made by a government agency that identifies them as having violated a law. Many court cases about public reprimands involve attorneys complaining of the severity of this form of penalty. T42:1312, ¶38., The Supreme Court vacated and set aside private and public reprimands against an attorney that had been administratively assessed as a penalty for an alleged violation of the state's disciplinary rules. *In re Primus*, 436 U.S. 412 (1978); and see *Matter of Galvan*, 92 F. 3d 583 (7th Cir. 1996)(approving a public reprimand as an appropriate penalty for violating the Federal Rules.)

53.     The Fifth Circuit recognizes that a judge, in "choosing the appropriate penalty" for an attorney's violation of Rule 11, may consider  "a less severe alternative to monetary sanctions, [thus] district courts may choose to admonish or reprimand attorneys who violate Rule 11." *Thomas v. Capital Sec. Services, Inc.,* 836 F. 2d 866, 878 (5th Cir. 1988) (*en banc*).

54.     In the Northern District of Texas, the district court enjoined the publication of a reprimand based on its conclusion that the plaintiff had not violated the Code of Judicial Conduct. *Polk v. State Bar of Texas*, 374 F. Supp. 784 (N.D. Tex. 1974).  Finally, in a decision from the Fort Worth Division of the Northern District of Texas, the district court affirmed an attorney's suspension from practice and issued a public reprimand where the attorney had failed to disclose to the court two prior public reprimands. *Lagrone v. Johnson*, 2002 WL 87465, No. Civ.A. 4:99–CV–521–X. (N.D. Tex. Jan. 22, 2002).

### C.     The McGartlands Protested the USDA's Determination and Publication that they Violated the Act.

55.     On June 8, 2015, the McGartlands found on the USDA's website that they were listed as having violated the Act on August 23 and 30, 2012.  The USDA was immediately contacted and informed of the McGartlands' concern that they were listed as having violated the Act, even though they had received no notice and had not been afforded a hearing in which they could defend

themselves. The McGartlands requested that the USDA remove the website and inform the world that it was a mistake to have said they had violated the Act. T10:215-23; T40:1270, ¶6; T42:1312, ¶39.

56.     On June 12, 2015, the McGartlands wrote the USDA complaining of the lists the Agency was publishing identifying them as having violated the Act, pointing out that the USDA was violating HPA §1825(b) and the Privacy Act.  The McGartlands requested the Agency cease any publication about them. T11:224-27; T40:1270, ¶6; T42:1312, ¶40.

57.     On August 26, 2015, the Director of IES wrote the McGartlands acknowledging their letter and saying that IES "will take further action, as appropriate and necessary, based upon the result of [its] review." T12:268; T40:1270, ¶6. Though IES has not notified the McGartlands of any action it has taken, an October 2015 review of the enforcement reports on the USDA's website indicates that some limited action was taken. T42:1312, ¶41.

58.     On the "USDA-APHIS-Animal Care Horse Protection Enforcement Actions: 2009-2013" list printed on October 6, 2015, the McGartlands' names still appear under the column "Violator Name," while the Contender Farms' horse is identified, as is the "Violation Date" and "Violation." T13:262-63; T40:1270, ¶3.  However, clicking the icon beside their names in the column under "View" no longer produces copies of the Form 7060, but instead brings up a page saying "The webpage cannot be found." T14:273-79; T40:1270, ¶3; T42:1312-13, ¶42.

59.     On this list, only the McGartlands' Forms 7060 have been deleted, as evidenced by the fact that Chris Alexander, the trainer for the McGartlands, who also received a Form 7060 for the entry of "Low on Gin," still has his name appearing directly above the McGartlands' on the list of "Violators," and he is listed with the same case numbers as the McGartlands, but when the icon in

the column under "View" by his name is opened, the Form 7060 appears. T14:279-82; T42:1313, ¶42.

60.    The list at "USDA APHIS | Enforcement Actions" has also been changed with regard to the McGartlands. For the Form 7060 issued in October 2013, on the June 2015 list of Form 7060 enforcement actions, the McGartlands and C. Alexander are listed as violators in case TN130373. T9:194. On the list printed in October 2015, only C. Alexander is listed as a violator, and one can open and print his Form 7060.   T5:40. The McGartlands have been deleted from this list. T40:1270, ¶3; T42:1313, ¶43.

61.    The list at "USDA AHIS | Enforcement Actions" has been changed with regard to the McGartlands for the Form 7060 issued in July 2014. On the June 2015 list of Form 7060 enforcement actions, the McGartlands are listed as violators in case TN130155-AC,  along with Chris Alexander and four other people. T9:200. On the list printed October 2015, only C. Alexander and the other parties to Case No. 130155-AC are listed as violators, and one can open and print their Form 7060. T5:45. The McGartlands have been deleted from this list.  However, the McGartlands still remain identified on the searchable list as "Violators" for both warning letters. T42:1313, ¶44. At the time of this filing, the USDA has not posted its lists for February 2016.

62.    The USDA's deletion of the McGartlands' names from Enforcement Actions List, and blocking retrieval of the Form 7060 from the Searchable List, fails to address the problems created by the Agency's actions. One problem is that the USDA continues to publically and falsely report that the McGartlands sored two horses in violation of the Act.  The USDA's published IES Investigative and Enforcement Process may look fair to the public, but, in fact, the procedures are never followed in foreign substance cases, and were not followed in the alleged scar rule violation

affecting the McGartlands, who received no notice of the cases, and were afforded no opportunity to defend before being labeled as "violators." T42:1313-14, ¶45.

63.     A second problem arises if in the future the McGartlands have a civil enforcement action filed against them under §1825. Based on the IES Investigative and Enforcement Process, the penalty of the Form 7060 enforcement action will be considered in determining their punishment if they are found liable by the Secretary. To avoid this, the USDA's records of these "enforcement actions" must be expunged. T42:1314, ¶47.

64.     A third problem is that the Department has made available electronic copies of these lists, and other lists naming alleged violators based on HIO records, to private horse industry organizations. For example, Friends of Sound Horses (FOSH), maintains "a public database of violators, www.hpaadata.us," containing the names of violators taken from the USDA's official disqualification lists and the HIOs' suspension lists. T15:283-84; T40:1270, ¶7. FOSH's database permits searches by name; and searching "McGartland" brings up the purported IES violations of August 23 and 30, 2012. T15:283-92; T42:1314, ¶48.

65.     A final problem is that according to the practices followed in the IES Investigative and Enforcement Process, IES has pending cases from the McGartlands' disqualified entries at the 2013 and 2014 Celebration events.  Under IES practices, these cases will result in decisions about whether the McGartlands violated the Act. T2:2. Based on their past experience, these decisions will be made with no notice to the McGartlands or any opportunity to be heard.  T42:1314, ¶49.

66.     Two actions by this court would address these problems. Plaintiffs request that the court declare the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process  together with  the published lists of 7060 Form recipients unauthorized under the HPA and unlawful under §1825(b). Secondly, Plaintiffs request the court direct the USDA to remove

the lists from its website and to publish in their place the court's order declaring the procedures and the lists previously published as unauthorized and unlawful. This will allow those identified on the lists to point to incontrovertible evidence that the lists are false. T42:1314-15, ¶50.

## V.   THE USDA'S ADMINISTRATIVE ENFORCEMENT POLICIES ARE UNLAWFUL.

67.     The McGartlands have been assessed three penalties each for two different types of alleged violations of the Act.  The first penalty, for the entry of "Low on Gin" on August 23, 2012, was for a foreign substance violation. This determination of liability was made pursuant to the Protocol for Foreign Substance Penalty adopted in 2008.  The second and third penalties, for the entry of "He's Shady in Black" on August 30, 2012, and the entry of "She's A Shady Sister" on August 24, 2014, were for alleged scar rule violations. These determinations of liability were made under the IES Investigative and Enforcement Process. Both of these administrative enforcement procedures are unauthorized and unlawful. T42:1315, ¶5.

### A.     The Protocol for Foreign Substance Penalty Is Unauthorized and Unlawful.

68.     Plaintiffs complain that penalties issued under the Protocol for Foreign Substance Penalty are not authorized by the HPA and are unlawful because they contravene §1825(b). From its adoption, the Protocol for Foreign Substance Penalty has been a subject of controversy between show sponsors, management, HIOs and participants, on the one hand, and the USDA on the other. Part of the disagreement arises from the definition of sore in the statute and its contrast with a regulation adopted by the USDA penalizing people for the presence of foreign substances. T41:1280, ¶16; T42:1315, ¶52.

69.     HPA §1821 defines "sore" to include "an irritating or blistering agent … applied internally or externally, by a person to the limb of a horse…or…any other substance…used by a person on any limb of a horse…and, as a result of such application…or practice, such horse suffers, or can

reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving…." For a person to violate this provision, the substance must be foreign as opposed to one occurring naturally in the horse, it must be applied by a person, not something the horse came in contact with, and it must result in irritating the limb by causing pain or inflammation that would affect the horse's gait.

70.     HPA §1824(2) defines an unlawful act as "(A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore (B) entering for the purpose of showing or exhibiting in any horse shoe or horse exhibition, any horse which is sore…." Section 1824 (7) prohibits showing or entering "any horse which is wearing or bearing any …substance which the Secretary by regulation under section 1828 of this title prohibits to prevent the soring of horses."

71.     The USDA, by regulation, defines "sore" in identical language to the Act.  9 C.F.R. §11.1. Thus, the application of a substance by a person to a horse's limb must have the result that the horse "suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving…." T41:1280, ¶17: T42:1315, ¶53.

72.     Under the authority of HPA §1828, the Secretary adopted a regulation identifying "prohibitions concerning exhibitors."  9 C.F.R. §11.2. The "general prohibition" provides that no "substance shall be used with respect to any horse…if such use causes or can reasonably be expected to cause or can reasonably be expected to cause such horse to be sore." T41:1280, ¶18; T42:1316, ¶54.

73.     Section 11.2(c), "Substances," specifically provides that "[a]ll  substances are prohibited on the extremities above the hoof on any Tennessee Walking Horse…while being shown…at any horse show, except lubricants such as glycerine [sic], petrolatum, and mineral oil, or mixtures thereof,"  unless they are provided by management and applied after the inspection. This regulation

does not explicitly state that the substance must be foreign and applied by a person. Nor is it explicitly limited only to foreign substances that cause pain or inflammation that would affect the horse's gait. T41:1280-81, ¶19; T42:1316, ¶55.

74.     The regulation's prohibition of all substances authorizes management to disqualify a horse where the DQP has, by inspection of the horse, smelled, seen or touched a substance, even though the inspector cannot determine if the substance will irritate or inflame the horse's limb and probably affect the horse's gait. However, under these circumstances, only the horse is disqualified from showing, the person is not determined to have violated the Act. T41:1281.

75.     The Protocol for Foreign Substance Penalty is different. The USDA performs a chemical analysis on a swab taken from the horse's limb.  If the test is positive for any substance in the analysis, then under the Protocol for Foreign Substance Penalty, the USDA considers the entrant in violation of the Act. The Agency makes no effort, and has no published criteria, by which it seeks to determine the quantity,  whether the alleged substance was or was not applied by a person or whether the substance could reasonably be expected to cause inflammation that would affect the horse's gait. T41:1281, ¶ 21; T42:1316, ¶56.

76.     When the USDA announced the Protocol for Foreign Substance Penalty in 2008, SHOW, along with other organizations in the industry, immediately questioned whether the protocol for penalizing people was reasonable or fair. In March 2008, SHOW complained that the lack of any lists that would identify for trainers what substances and in what amounts would constitute a violation resulting in a penalty. T16:293-94; T40:1270, ¶3. Without such information, trainers and entrants might be held in violation of the Act if the test showed a substance that might not be foreign and that might not cause soring, like grooming and health items used on a horse.  T41:1281, ¶22.

77.     The USDA responded to the HIOs' comments about the Protocol for Foreign Substance Penalty, asserting that "[w]e believe that the protocol, with its two-warning (with specificity about the detected foreign substance) provision, provides fair notice and specificity for owners and trainers to adjust their practices before they face significant penalties." T17:298; T40:1270, ¶3. There is no explanation why the USDA believes it has the authority to find someone a "violator" of the Act without some semblance of due process, or on what basis APHIS could legally ignore the requirements of HPA §1825(b). T41:1281-82, ¶23.

78.     When the McGartlands and Contender Farms received notice of the result of the GC/MS test on "Low on Gin," which was over a year after the August 2012 Celebration, they could not reasonably be expected to recall what the horse may have come in contact with or ingested that might have caused the horse to allegedly test positive for Sulphur, though any number of innocent causes are possible. Sulphur is a common element that could arise from many sources.  The McGartlands could testify that they had not applied any substance to the horse that would inflame the horse's limb and possibly affect its gait. T42:1316-17, ¶ 57. The McGartlands had no opportunity to challenge the chain of custody, or the USDA's criteria of zero tolerance, or whether there was any casual connection to soring.

79.     The USDA takes the following position on Sulphur detected by the GC/MS test:

> We recognize that there are legitimate uses for sulphur and that not every use is intended for improper purposes. However, we are considering elemental sulfur to be a foreign substance that would warrant a penalty because experience and investigation tell us that it is sometimes used to prevent scaring on the pasterns of a horse's front limbs. Therefore, we must consider elemental sulfur to be a masking agent.

T17:300. Thus, because the USDA believes that other people may have used Sulphur to mask soring, the McGartlands have been determined to have acted illegally because some unknown

quantity of Sulphur, from some unknown source, was allegedly detected in a GC/MS test. T41:1282, ¶24; T42:1317, ¶58.

80.     SHOW replied to the USDA's  position by pointing out that the HPA defines "sore" to include "any other substance …used by a person on any limb of a horse… and as a result of such application…such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving…." T18:305; T40:1270, ¶3. SHOW pointed out to the USDA that "the intent of the Act and the regulations is to prohibit substances that would be applied for the purpose of causing pain or discomfort to the horse. The intent is not to prohibit non-injurious salves or lotions that may be used for other reasons." T18:306; T41:1282, ¶25.

81.     SHOW also pointed out that in 2007, a year used by the USDA to justify the 2008 protocol, that 42% of the substances detected involved Sulphur, but the USDA had produced no evidence showing that Sulphur was a masking agent, or even identified what condition it masked. SHOW observed that it is "clear that the proposal to issue penalties for the presence of sulphur needs to be revisited." T18:306-07; T41:1282-83, ¶26.

82.     The USDA did not revisit the issue. Indeed, it continues to issue Form 7060 warnings based solely on a "positive" test result and then publish lists with the names of those it represents violated the Act. The single largest category of HPA violations found in the searchable "USDA-APHIS Animal Care Horse Protection Enforcement Actions 2009-2013" is "Foreign Substance." T19:309-25; T40:1270-71, ¶¶3 and 13. There are about 956 entries for foreign substance violations, listing the names of the "violator," the horse's name and the violation date. T19:321; T40:1271, ¶13; T41:1283, ¶27. Mike and Lee McGartland are listed as foreign substance violators for entering "Low on Gin" on August 23, 2012. Mike McGartland is also separately listed for a

foreign substance "violation" for the entry on August 30, 2012, of "He's Shady in Black," though Mr. McGartland has never received notice of this alleged violation. T19:320; T42:1317, ¶59.

83.     In addition to the lists identifying foreign substance violators, the USDA's website has a dedicated link to "Foreign Substances." That link opens the annual reports on the results of the GC/MS test results for the years 2008 through 2015. T20:326-86. The reports initially identified the HIO providing inspectors at the event. Most of the events where samples were taken by the USDA were events where SHOW was the HIO. The annual reports identify the number of horses tested and whether the test results were positive or negative. The reports do not state that a positive result indicates a violation of the Act. But since a Form 7060 is issued for positive results, the consequence is that the public and entrants are informed that a positive result has been determined by the USDA to be a violation of the Act. T41:1283, ¶28.

84.     The USDA's decisions under the Protocol for Foreign Substance Penalty, which make it appear that that hundreds and hundreds of people have been caught violating the HPA's foreign substance prohibition, have had a severe continuing effect on the Plaintiffs. For example, in May 2013, the Humane Society of the United States (HSUS) issued a press release titled the "USDA Indicates 76 Percent of the Horses Tested at 2012 Walking Horse Celebration Found Positive For Foreign Substances." T21:388-89; T40:1270, ¶8. That is the event where the McGartlands entered "Low on Gin," who allegedly tested positive for Sulphur. T41:1283-84, ¶30; T42:1318, ¶60.

85.     Based on this 2012 USDA report about foreign substance violations, HSUS requested that the Tennessee Attorney General initiate an investigation of the Celebration, which contracted with SHOW as the inspecting HIO, to determine whether fraud had been committed on the public and if the Celebration had conspired to violate the HPA. The alleged fraud was the assurance by SHOW that based on its HIO's inspections the entrants complied with the Act. HSUS complained that the

foreign substance results reported by the USDA revealed that "caustic substances" and "evidence of cruelty" may have been concealed at the event. T42:1318, ¶61.

86.     In January 2014, HSUS issued a press release titled "Soring Violations Abound Among Walking Horse Industry Leaders, Competitors." T22:390-91; T40:1270, ¶8. HSUS relied on the 2013 USDA report on "testing of show horses' legs for illegal substances used to sore horses or hide the evidence of soring."  HSUS, based on the USDA's 2013 foreign substance test results report, stated that more than half the horses tested "were found in violation of the Horse Protection Act," but noted that while letters of warning had been issued to the violators, a "case has never been prosecuted by USDA." T22:1390-91; T41:1284, ¶31; T42:1318-19, ¶62.

87.     To address the false impression created by the foreign substance reports published by the USDA, and the misleading lists of alleged foreign substance violations, SHOW includes on its website a January 2014 report of the Performance Show Horse Association addressing "Foreign Substance Issues." (the "PSHA report") T23:392-402; T40:1270, ¶9. The report points out that "Foreign Substances listed in the USDA's Report are found in personal care products such as cosmetics, shampoos, conditioners, lotion, ointments and general over the counter first aid products." T23:393; T41:1284-85, ¶32; T42:1319, ¶63.

88.     As relevant to the McGartlands, the report notes that "sulfur is present in every cell and is structurally and functionally important in more than 150 compounds in the body including tissues, enzymes, hormones, antibodies and antioxidants."  T42:1319, ¶64.

89.     The PSHA report criticizes the USDA's use of a zero tolerance criteria to determine a result is positive, since this standard assumes, without evidentiary support, that the presence of any detectable substance was applied with the intention of soring the horse and probably had that effect. The USDA has never provided any scientific evidence establishing at what levels any substance

would be irritating, numbing or masking or would affect performance so as to provide a competitive advantage. T23:394-97; T41:1285, ¶33.

90.    The PSHA report concludes that "it is impossible to say that each 'positive' swab result reported by the USDA was the result of the application of a substance to the horse's limb which was intended to alter the horse's gait or mask inspection."  T23:393; T41:1285, ¶35; T42:1319, ¶65.

91.    On February 11, 2014, the Vice President of HSUS sent an email to APHIS' top administrators urging a press release rebuttal to the PSHA report posted on SHOW's website, because it was his "belief that this time the USDA/APHIS needs to come to its own defense in public and explain why foreign substance testing is a well thought out, carefully administered, and scientifically viable way of detecting chemicals on horses" that are prohibited. T23:402.1. HSUS noted "that the USDA has never chosen to prosecute a case when foreign substances are found certainly makes it more difficult to assert that this is a viable deterren" and suggested "[t]hat surely one of the USDA scientists that has helped develop this protocol could explain how this testing works… in order to refute [PSHA's] disinformation…."  T23:402.1;T40:1273, ¶22.  HSUS asserted that "[i]f allowed to stand without reply" the public might question the methods and "might even come to believe that the USDA is being unfair in citing horses on the basis of junk science…." T23:402.2.  The USDA never issued any defense or justification of the foreign substance protocol in response to the PSHA report.

92.    The USDA has never filed a complaint under §1825(b) seeking penalties for the use of illegal foreign substances based solely on the GC/MS test results. T23:397. No person has been found to have violated the illegal substance prohibition  of the Act based solely on the GC/MS test results, after notice and hearing before the Secretary, and, on order of the Secretary, under the due

process procedures of the HPA, APA and 7 C.F.R. §1.130 *et seq*. Because no person has been afforded the opportunity to challenge a USDA charge claiming that a GC/MS detected foreign substance sored a horse, no ALJ, JO or United States Court of Appeals has had the opportunity to decide whether the USDA's Protocol for Foreign Substance Penalty practice and policy establishes that a horse is sore, as defined by the Act. A conclusion that the GC/MS test is "junk science" stands unrefuted. T42:1319-20, ¶66.

93.     The Protocol for Foreign Substance Penalty based on the GC/MS test results creates an enforcement scheme under which the Agency penalizes people for conduct not prohibited by HPA §1824. It imposes a penalty against people outside of the statutory requirements of HPA §1825(b) by deciding the HPA has been violated and assessing a penalty without notice and an opportunity for a hearing before the Secretary that accords the due process protections of that provision. T42:1320, ¶67.

94.     The Foreign Substance Penalty Protocol violates the APA requirement that a proceeding for "imposition of penalty or fine" be on the record, where the accused may present evidence and arguments. 5 U.S.C. §551(10)(A),(C) and (G). The penalty protocol violates the statutory requirement that "[a] sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b). Finally, the administrative penalty protocol ignores the Agency's own procedures in 7 C.F.R. §1.130 *et seq*. T42:1320, ¶68.

95.     The USDA's Protocol for Foreign Substance Penalty, imputing a violation of the Act based solely on the uncontestable GC/MS test results, is not authorized by the Act, is contrary to §1824 of the Act, is arbitrary and capricious and thus invalid under APA §706(2).  T41:1285, ¶36; T42:1320, ¶69.

96.     The USDA's foreign substance enforcement protocol punishes people for conduct that is not unlawful.  HPA §1824 sets forth the conduct that is prohibited. Section 1824(2) prohibits entering "any horse which is sore." Sore, as defined in §1821(3), includes the application of any substance to a horse's limbs, as a result of which, "such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting or otherwise moving…." T41:1286, ¶37.

97.     The USDA's Protocol for Foreign Substance Penalty does not distinguish between substances that occur naturally, as opposed to being applied by a person; it does not distinguish between substances that probably will sore the horse and affect its gait, as opposed to those that will not; it does not distinguish between substances that could inflame the horse's limb if applied in sufficient quantity, as opposed to those detected in such minute amounts as to have no adverse effect on the horse.  The USDA applies the protocol's penalty for all tested substances, regardless of quantity, and irrespective of whether the substance was applied in violation of §1824(2). The USDA has no authority to create a prohibition other than those Congress specified in §1824. T41:1286, ¶38.

98.     The McGartlands, Contender Farms and SHOW have been, and will in the future be, adversely affected by the USDA's adoption of and administration of the Protocol for Foreign Substance Penalty. Plaintiffs seek a declaration that the penalty protocol is unauthorized and unlawful under the Act, is unlawfully administered in violation of the HPA and APA, and is arbitrary and capricious. Plaintiffs seek injunctive relief prohibiting the Defendant from enforcing and administrating the Protocol for Foreign Substance Penalty, and enjoining it from publishing the test results and lists so as to indicate that a positive test result establishes that an identified person has violated the Act. T41:1286, ¶39; T42:1320-21, ¶70.

**B.** **The USDA's IES Investigation and Enforcement Process for Penalizing Entrants is Not Authorized by the HPA and is Unlawful Under HPA §1825(b).**

99.     On August 30, 2012, when the McGartlands entered "He's Shady in Black" in a Celebration class, a VMO inspector reported to management that the horse was sore, and it was disqualified. On July 7, 2014, the USDA sent both McGartlands a Form 7060, in Case No. TN130155-AC, informing them that they violated 24 U.S.C. §1824(2) and 9 C.F.R. §11.3, the Scar Rule, when entering "He's Shady in Black" at the Celebration. T8:141-44; T42:1321, ¶71.

100.     The McGartlands' liability for violating the Act on August 30, 2012, was decided by IES's enforcement specialists. Under USDA policy, IES enforcement employees are supposed to make their decisions under the IES Investigative and Enforcement Process. Under that process, before liability can be determined and a penalty assessed, the accused is supposed to receive notice and be afforded an opportunity to present evidence. T2:2; T42:1321, ¶72.

101.     When the USDA enforcement specialist decided the McGartlands violated the Act, and included their names on the USDA's lists stating that they had violated the Act, it appeared the McGartlands were provided notice of the case and had an opportunity to defend themselves.  But this did not happen. T42:1321, ¶73.

102.     The opportunity to defend against any USDA claim that the McGartlands violated the scar rule is an important right.  Under APHIS's general practice, the IES investigator's decision that the McGartlands violated the HPA is based solely on the VMO's report about the inspection. Inspectors make their decisions about HPA violations based on the subjective inspection and digital palpation of the horse's forelegs.  If a VMO decides a horse is in violation, the VMO completes a form report, and, then later on an affidavit to be submitted to IES for enforcement determination. *See Young v. USDA*, 53 F. 3d 728, 729-30 (5th Cir. 1995).

103.    The Fifth Circuit recognizes that these reports and affidavits 1) "are created with a bias towards the Government's position; and 2) the conclusions reached in them are based on an unreliable method of determining whether a horse has been sored." *Id*.at 730, see *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); and *Williams v. Illinois*, 137 S. Ct. 2221 (2012) (recognizing in criminal cases the right to confront and cross examine preparer of expert reports).

104.    A decision by the USDA that a person has sored a horse based solely on the VMO's hearsay report does not constitute substantial evidence that will sustain a penalty under HPA §1825. Standing alone, the VMO's report is "lacking in probative value and reliability." *Id*. The determination that the McGartlands violated the scar rule was based solely on an unreliable hearsay VMO report, relied on by the IES investigating officer without according the McGartlands an opportunity to rebut or offer contradicting evidence. See also *Contender Farms v. USDA*, 779 F. 3d 258, 265 (5th Cir. 2015) ("As the record indicates, inspections are far more art than science. In many cases, inspectors, veterinarians, and other professionals will disagree as to whether a horse is actually sore.")

105.    The McGartlands were never informed of the case against them, had no opportunity to defend; therefore, the decision that they had violated the Act and the assessment of a penalty is void and of no effect. This court should so declare, expunge the McGartlands' records, and order the USDA to publish on its website that its determination that  the McGartlands sored their horses was based on no evidence, afforded them no due process, and, under APA §706(2) was arbitrary and capricious. T42:1321, ¶74.

C.     **The Protocol For Foreign Substance Penalty and the IES Investigative
       and Enforcement Process that the USDA Follows in Order to Determine
       Violations, Identify Violators  and Assess Penalties are  not Authorized and
       are Unlawful.**

106.    Plaintiffs complain not only that the McGartlands and Contender Farms were denied due

process under IES Investigative and Enforcement Process and the Protocol for Foreign Substance

Penalty, but, more fundamentally, that there is no statutory authority for the Agency to adopt either

process or protocol, and that administratively determining liability for a violation and assessing a

penalty under either policy or protocol is unlawful under the HPA. T42:1322, ¶75.

107.    A cursory reading of the Act, specifically §1825(b), shows that the Protocol for Foreign

Substance Penalty and the IES Investigative and Enforcement Process contravene the HPA. The

only civil penalties that can be assessed for an HPA violation must be assessed by an order of the

Secretary under HPA §1825(b). The Act does not authorize the USDA to declare that every horse

that tests positive for a substance is sore, or to publicize that the owner, trainer and entrant have

violated HPA §1824. Nor does the Act authorize an IES "enforcement specialist" to determine

whether a person has violated §1824, or to impose a "penalty" on any person by issuing a warning

letter that is published on the USDA's website. T42:1322, ¶76.

108.    The USDA's administrative enforcement schemes exemplify the type of scheme the Fifth

Circuit invalidated in *National Pork Producers Council v. EPA*, 635 F. 3d 738 (5th Cir. 2011).

There the EPA tried to impose a duty on producers to apply for a permit and imposed

administrative penalties for failure to apply. The court ruled that where Congress created a

comprehensive liability enforcement scheme, an agency's "attempt to supplement th[e] scheme is

in excess of its statutory authority." *Id*. at 749.

109.    While Congress limited the fine the Secretary could assess under §1825(b) to not more

than $2,000, any lesser sanction is exclusively within the discretion of the Secretary, including

remitting any fine. Thus, a lesser penalty than a fine, like a determination of a violation sanctioned by a public reprimand, is vested solely with the Secretary.  T42:1322, ¶77.

110.     Congress required that the Secretary "shall" take into account aggravating or mitigating factors. It did not authorize IES enforcement specialists to decide if an offense was not severe enough to warrant a fine by applying the mitigating factors listed in §1825(b) and then penalize entrants with something less than a fine, like a public reprimand. T43:1322, ¶78.

111.     It is no accident that the USDA adopted the Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process. The Agency directly benefits from its unauthorized and unlawful actions.  The USDA makes it appear that it is vigorously enforcing the Act based on the number of violators it identifies and penalizes. T42:1323, ¶79.

112.     The searchable "USDA-APHIS-Animal Care Horse Protection Enforcement Actions 2009-2013" list consists of approximately 2,509 "Violator" entries, of which 956 of the "Violations" are for foreign substance and 591 for scar rule, a total of 1,547 violations, or 62% of all listed violations. T6:59-137; T19:309-25: T24:403-14; T40:1271, ¶13. The list also shows that none of these scar rule or foreign substance violations were the subject of a §1825(b) determination by the Secretary resulting in a fine or suspension, as shown by the absence of information in the columns under "Suspension" and "Settlement ($)."   T40:1271, ¶13; T42:1323, ¶80. The lists also contain redundant and errant entries, further exaggerating the number of "violators" and "violations."

113.     Another benefit to the USDA from enforcing the Act using the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process is that in these uncontested proceedings, that invariably result in a decision the person has violated the Act, the number of successful enforcements begins to add up. Listing these "violators" and their "violations" by name makes for an impressive record of Agency enforcement. The USDA Enforcement Actions 2010-

2015 list identifies 2,369 enforcement actions. T5:6-58.  However, the vast majority (2,279) of those enforcement actions were Form 7060 warning letters. T5:6-9; T40:1271, ¶11. It is less expensive and less time consuming for the USDA to decide a person has violated the Act when it does not have to provide notice or a hearing, which §1825(b) requires. T40:1271, ¶11; T42:1323, ¶81.

114.    The USDA's published lists make it appear that the Agency's enforcement officers catch thousands of violators and relentlessly enforce the Act against them. This may make the Agency look good to Congress, but it completely misleads the public into mistakenly believing this industry is dominated by cheaters—as evidenced by the thousands of violators the USDA reports it catches and penalizes. T42:1323-24, ¶82.

115.    The court should grant the McGartlands and Contender Farms relief from the USDA's policies and actions that employ the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process enforcement schemes. As provided by HPA §1825(d) and APA §706(2), the McGartlands and Contender Farms request this court declare that the USDA determinations that the McGartlands violated the Act, for which they were penalized, were arbitrary and capricious. T42:1324, ¶83.

116.    As provided by HPA §1825(d) and APA §706(2), the McGartlands and Contender Farms request that this court declare unauthorized, unlawful, and in contravention of HPA §1825(b), the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process enforcement policies and practices of administratively determining that people have violated the Act and then issuing public reprimands for alleged violations of the Act. T42:1324, ¶84.

117.    The McGartlands and Contender Farms request that the court enjoin and restrain the Agency from further violations, order the USDA to withdraw all such lists identified above that

indicate people have violated the Act and order the Agency to publish on its website the court's order. T42:1324, ¶85.

**D.      The USDA's Public Reprimands Violate the McGartlands' Privacy Rights.**

118.    The USDA's published lists of its enforcement actions are compiled from information accumulated in its "Investigative and Enforcement Records Regarding Regulatory Activities, USDA/APHIS" system of records. ("System of Records") T26:415-17; T40:1270, ¶3. Accumulation and dissemination of information in this system of records is governed by the Privacy Act, 5 U.S.C. §552a. T42:1324, ¶86.

119.    The USDA has adopted regulations covering the accumulation and dissemination of information in this system.  See 7 U.S.C. §1.110 et seq. T26:418-27; T40:1270, ¶3. The USDA's instructions about obtaining information states its policy is "not to comment on open investigations." T27:428; T40:1270, ¶3. IES enforcement documents in AWA and HPA cases, once processed, can be obtained by a request. An AWA Form 7060 can only be obtained by a FOIA request, but the policy is silent as to whether an HPA Form 7060 can be obtained by a FOIA request. T24:428-29; T40:1270, ¶3; T42:1324-25, ¶87.

120.    Privacy Act §552a(b) and the USDA's regulation 7 C.F.R. §1.119, provide that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be" to officers and employees of that agency, required under §552 when responding to a FOIA request, or for a routine use. T42:1325, ¶88.

121.    USDA/APHIS–1 describes the USDA's System of Records identified above as including the documents and information the USDA has published and about which the McGartlands

complain. T25:415-17; T40:1270, ¶3. The publication of these lists and records is not authorized

by the Routine Uses of records maintained in the system, and is not among the listed purposes of

such uses. Indeed, this information about the McGartlands is exempt from disclosure under a FOIA

request made by anyone but them. T42:1325, ¶89.

122.    The Privacy Act, 5 U.S.C. §552a(e)(1), requires that the agency "maintain in its records

only such information about an individual as is relevant and necessary to accomplish a purpose of

the agency required to be accomplished by statute or by executive order of the President."  There

is no authorized purpose under the HPA justifying the issuance of warning letters and publishing

them under false headings as public notice of an administrative determination that an individual

has violated the HPA. Maintaining these records about the McGartlands is prohibited under this

Privacy Act provision. T42:1325, ¶90.

123.    Contrary to 5 U.S.C. §552a(e)(5), the Agency has used  records about the McGartlands

without "making any determination about [them] with such accuracy, relevance, timeliness, and

completeness as is necessary to assure fairness to the individual…."   Nor did the Agency, as

required by 5 U.S.C. §552a(e)(6), prior to dissemination of records about the McGartlands, "make

reasonable efforts to assure that such records are accurate, complete, timely, and relevant for

agency purposes."  T42:1326, ¶91.

124.    Under 5 U.S.C. §552a(g)(1)(C), when an Agency fails to maintain any  records so as to

"assure fairness in any determination relating to the qualifications, character, right or opportunities

of, or benefits to the individual that may be made on the basis of such record, and consequently a

determination is made which is adverse to the individual," then   "the individual may bring a civil

action against the agency, and the district courts of the United States shall have  jurisdiction in the

matters under the provisions of this subsection" including ordering the agency to amend the records as the court may direct.

125.    APA §702 provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review" and may seek "relief other than money damages" including "actions for declaratory judgments or … mandatory injunction."  Section 706(2) authorizes the court to "hold unlawful and set aside agency action, findings and conclusions found (A) arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." The court has authority to grant injunctive relief for the USDA's violation of the Privacy Act.

126.    Under the APA, HPA and Privacy Act, the McGartlands request this court to declare that the Agency has and is violating the Privacy Act and the McGartlands' privacy rights,  that the court enjoin such violations from occurring in the future, order that the website lists  identifying people who have been penalized with a public reprimand and Form 7060 be removed from the USDA's website, order the Agency to purge from its system all records and information about the McGartlands and Contender Farms and require that the court's order be published in their place. T42:1326, ¶92.

**E.      SHOW is Unlawfully Listed as a "Violator" of the Act.**

127.    The USDA adopted regulations, to be effective July 9, 2012, requiring that all HIOs incorporate into their programs the requirement that their DQP inspectors issue tickets to those people whose horses failed an inspection and that the HIO enforce the ticket by assessing USDA

mandated minimum suspension penalties against those persons the HIO determined  violated the Act. 9 C.F.R.  §11.25. T41:1287, ¶40; T42:1326, ¶¶93 and 94.

128.    SHOW declined to comply with these regulations, and on June 26, 2012, filed a suit against the USDA seeking to invalidate the regulations on the grounds that the Agency could not make private HIOs enforce the Act, that HIOs had no authority to enforce the Act, and that any penalty for violating the Act could only be assessed by the Secretary as provided by HPA §1825(b) and (c).

129.    The district court declined to enjoin APHIS's enforcement of the regulations while the lawsuit was pending. As a result, in July and August 2012, APHIS gave SHOW notice that it would be decertified as an HIO. After the adverse decision in the district court in July 2013, SHOW informed the USDA that it would comply, which it did. Nonetheless, on January 9, 2014, the USDA filed formal decertification proceedings against SHOW in Docket No. 14-0056. T28:432-35; T40:1270, ¶3.  SHOW answered, but the administrative action was inactive while the federal suit proceeded through the Fifth Circuit Court of Appeals. T41:1287, ¶42.

130.    On the USDA APHIS | Enforcement Actions website, the Agency publicized the filing of the administrative complaint, identified as an "enforcement action." T28:431. SHOW is identified under the heading "Violator Name," and the dates of violations are identified as 7/14/12 and 9/21/13. T28:436.  The violation is described as "HIO DQP Certification."  Opening the icon under column "View" produces a copy of the January 2014 administrative complaint. T28:437-40; T41:1287-88, ¶43.

131.    On February 19, 2015, in *Contender Farms  v. USDA,* the court struck down the new regulations because they exceeded the USDA's authority under the Act and were unlawful in contravention of §1825(b). On April 22, 2015, in *SHOW, Inc. et al. v. U.S. Department of*

*Agriculture,* Action No. 4:12-cv-429-Y, the district court entered a Final Judgement "[i]n accordance with the opinion, judgment, and mandate recently issued by the Fifth Circuit Court of Appeals for the Fifth Circuit." T28:441; T41:1288, ¶44.

132.   SHOW has not violated the Act or the Agency's lawful regulations. The USDA acknowledged this by filing a Motion to Dismiss Complaint with prejudice in Docket No. 14-0056, and the ALJ "dismissed with prejudice" on that basis on April 11, 2015. T28:442. The dismissal order was signed April 14, 2015. T28:443; T41:1288, ¶45.

133.   Nonetheless, the USDA continues to publish on the sites touting its enforcement actions against SHOW for violating the Act, and continues to make the administrative complaint available to the public.  No information on these websites or the lists indicates that SHOW prevailed against the USDA, or that it was the USDA that acted unlawfully, not SHOW. T41:1288,¶46.

134.   SHOW seeks an order from this court declaring that, under APA §706(2), the Agency's listing of SHOW as a violator of the Act or its regulations is unlawful, beyond the Agency's authority and arbitrary and capricious. SHOW seeks an order compelling the USDA to remove the false information about SHOW from its websites, and requiring the Agency to make a retraction by publishing the court's order and the Fifth Circuit's decision on its website. T41:1288, ¶47.

## VI.   THE USDA'S UNLAWFUL PRIVATE PARTY ENFORCEMENT SCHEME

135.   Another HPA 1976 amended related to enforcement was §1823, which authorized the USDA to promulgate regulations to qualify private persons who could be appointed by management to inspect horses entered into walking horse events. 15 U.S.C. §1823(c).  If the private inspector was of the opinion a horse was sore or did not comply with the Department's regulations, management would be informed and the managers were obligated to disqualify the horse. 15 U.S.C. §1823(a). Those managers who appointed DQP inspectors and disqualified the horses

identified as sore would not be liable for a violation of the Act even if a sore horse was entered and shown. T41:1288-89, ¶48.

A.    **Operating Plans Required HIOs to Penalize Entrants.**

136.    After the 1976 amendment, in implementing §1823(c), the USDA decided it would not train or license private inspectors. Instead, the USDA adopted regulations in 9 C.F.R. §11.7, under which it certified horse industry organizations (HIOs) to train and license DQPs to inspect horses. The management of an event could contract with a certified HIO to provide licensed DQP inspectors. Training and licensing the private inspectors would cost the government nothing. T41:1289, ¶49.

137.    The HPA does not require that event managers appoint DQPs. Participants who do not want their horses inspected by DQPs or who do not agree with the HIO's rulebook can enter events where management does not contract for HIO/DQP inspections.  There are hundreds of such events each year. Those who enter horses in competitions have the choice to forego DQP inspections by entering these events. However, entering DQP inspected events provides the prospect of fairer competitions. T41:1289, ¶50.

138.    Beginning in 1999, through a series of agreements between the certified HIOs and the USDA, Operating Plans were developed establishing a working relationship affecting enforcement of the Act. HIOs agreed to include in their rulebooks a matrix of penalties they would assess against entrants when the DQP was of the opinion that a horse was sore.  T29:446-47; T40:1270, ¶3; T41:1289, ¶51.

139.    Under the Operating Plans, if the HIOs enforced their rulebook penalties against entrants whose horses failed inspection, the USDA generally did not determine civil liability or assess civil penalties under §1825(b). The USDA inspected few horses compared to the number inspected by

DQPs, and assessed few penalties under §1825, compared to those assessed by HIOs for rulebook violations. T41:1290, ¶52.

140.    The HIO could impose penalties on entrants because the entrants signed entry forms in which they agreed to accept the imposition of the penalties in the HIO's rulebook. These penalties could range from a fine to a suspension of the person from entry in future events in which that HIO contracted to inspect horses.  The penalties were generally less severe than those provided under §1825, but the due process procedures the HIOs adopted for contesting penalty assessments also fell below those §1825 prescribed. T41:1290, ¶53.

141.    When the DQP was of the opinion a horse was sore, not only would management be informed and the horse disqualified, but the DQP would issue a "ticket" to those persons allegedly responsible for entering the horse. The ticket specified the DQP's opinion of the condition of the horse. Within a few days, the HIO would notify the entrant, owner or trainer of the penalty it was assessing for the rulebook violation.  If a person wanted to contest the ticket or penalty, the HIO provided an informal procedure to appeal. T41:1290, ¶54.

142.    Under the Operating Plans with the HIOs, the USDA enforced the Act in a less time consuming and less expensive way than under the procedures of §1825(b). Indeed, delegating enforcement to private HIOs cost the government nothing, since the administrative costs of DQP inspections, ticketing, and HIO penalty enforcement were all borne by the HIOs, who covered some of these expenses by charging participants an entry fee. T41:1290, ¶55.

143.    In 2009, the USDA audited several HIO-inspected events and concluded the DQP inspection practices were uneven and that HIO ticket enforcement was not uniform. The Agency concluded that DQPs issued fewer tickets when not monitored on site by the Department, possibly as a result of some DQPs' conflicts of interest in being hired by event management and because

DQPs were also participants in events, and may have favored those who might later be in a position to inspect their horses. T41:1291, ¶56.

144. Aware of these concerns, SHOW was activated as a certified HIO in 2009 by the Tennessee Walking Horse National Celebration. SHOW's goal was to diminish conflicts of interest and provide more objective inspections. The McGartlands actively participated in SHOW, and Mike McGartland served as SHOW's prosecutor when entrants who received tickets contested them. By 2010, SHOW inspected more horses at more events than any other HIO in the industry. T41:1291, ¶57.

145. In 2009, the USDA also decided to address their perceived problems with the HIO/DQP system by exerting more control over the HIOs. It proposed a new working agreement it thought would enhance enforcement by requiring HIOs to adopt uniform suspension penalties. Several HIOs, including SHOW, rejected this proposed Operating Plan, and, as a result, operating agreements between HIOs and the USDA terminated at the end of 2009. T41:1291, ¶58.

146. As a result of the failure to agree on an Operating Plan for 2010, the USDA embarked on an effort to compel HIOs to incorporate into their rulebooks uniform mandatory minimum suspension penalties. It promulgated the "2010 Points of Emphasis" protocol, requiring HIOs to enforce uniform mandatory suspension penalties. T41:1291, ¶59.

147. On August 10, 2010, the USDA demanded that all certified HIOs include the uniform suspension penalty protocol in their rulebooks, and followed that up with a written directive on August 12, 2010. On November 30, 2010, SHOW informed the USDA that it would not adopt the protocol. On January 18, 2011, the USDA gave notice to SHOW that it had 30 days to adopt and enforce the protocol or be decertified. SHOW refused. T41:1291-92, ¶60.

148.    Thus, beginning in 2010, the USDA confronted two enforcement problems. First, as set

out above, APHIS' Investigative and Enforcement Service was bogged down. This it addressed by

its Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process.

Second, since the USDA had relied almost exclusively on HIOs to punish those who entered sore

horses, and that system had ended with the failure to agree on a new Operating Plan, the USDA

decided to resolve this impasse by adopting a new regulation compelling HIOs to assess minimum

suspension penalties.

### B.    New Enforcement Regulations Imposed on HIOs.

#### 1.    Adopting new regulations compelling HIOs to enforce the Act.

149.    On May 27, 2011, the USDA published in the Federal Register its "Proposed Rules,"

with a call for comments, stating that the purpose of the proposed regulations was to require

HIOs and DQPs "to assess and enforce minimum penalties for violations of the Horse Protection

Act (the Act) and the regulations." 76 Fed. Reg. 30864; T41:1292, ¶61.

150.    On June 7, 2012, the USDA adopted the new regulations by amending 9 C.F.R. §11.7(g)

and §11.21(d) and adding §11.25.  77 Fed. Reg. 33607.  The USDA's position was that it had

authority to "impose whatever requirements on the HIOs that [it] determines to be necessary to

enforce the Act and the regulations."  *Id.* at 33609.  As the USDA saw it, "DQPs find violations

of the Act by inspecting horses, and thus penalties will be assessed and enforced on the basis of

the inspections."  *Id*. at 33610; T41:1292, ¶62.

151.    The new regulations were necessary, the USDA explained, because even though the Act

provided it "with authority to pursue civil and criminal penalties against persons who violate the

Act...such procedures may be time-consuming and expensive, and our resources for proceedings

are limited." 76 Fed. Reg. 30865; T41:1292, ¶63.

152.    The key provision of the new regulations, in 9 C.F.R. §11.25, was the requirement that HIOs assess mandatory minimum suspension penalties for violations of the Act.  Penalties were to be enhanced based on prior violations of the Act. For example, the minimum suspension penalty for a horse determined to be bilaterally sore would be one year for the first offense, two years for a second offense, while for a third or subsequent offenses the suspension would be four years. *Id*. at 30868; T41:1292, ¶64.

153.    9 C.F.R. §11.25(b)(3) also provided that "[a] person who is suspended must not be permitted to show or exhibit any horse or judge or manage any horse show or exhibition, sale or auction for the duration of the suspension."  77  Fed. Reg. 33618. This is identical language to HPA §1825(c), authorizing the Secretary to disqualify a person "from showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale or auction for a period" of time. APHIS acknowledged that "the language in proposed paragraph (b)(3) is taken from the Act (specifically, paragraph (c) of section  [§1825])." *Id*.; T41:1293, ¶65.

### 2.    Providing lists to HIOs in order to prohibit entry and to assess enhanced penalties.

154.    In order for HIOs to know when a person was under suspension so he or she would be denied entry into the event, or to know when an enhanced suspension penalty should be assessed because of prior offenses, the USDA would have to publish lists identifying those people who were currently suspended or had prior violations.  To do this, the USDA would have to accumulate enforcement records from about a dozen different HIOs. T41:1293, ¶66.

155.    The USDA promised to provide HIOs  this information, because "[w]e make lists of people who have been disqualified through USDA action and people who have been suspended through HIO action available on the Horse Protection Web site, at http://www.aphis.usda.gov/animal

welfare/hpa info.shtml. We will continue to do so after this final rule becomes effective." 77 Fed. Reg. 33614; T41:1293, ¶67.

156.     On the USDA web site there is a page titled "Horse Protection Act." T6:59x; T40:1270, ¶3. Under "Related Links," there are three links that are relevant here. The link "Horse Protection Act and its Administration" provides a summary of the Agency's administration of the Act. T29:446-47; T40:1270, ¶3. It states that the "DQP program provides one of the primary mechanisms for detecting sore horses" and that APHIS' "practice has been and continues to be one of delegating initial enforcement responsibility to HIOs and DQPs." T29:446; T41:1293, ¶68.

157.     On the page "Horse Protection Act Inspection and Enforcement," under the heading "Enforcement," there are three links. T6:62x-64x. The report at the link "Searchable HPA Suspensions" is not presently available.  However, the first page of the report, printed June 12, 2015, indicates that that version of the report contained about 2,400 names of "Responsible Parties for the Horses Found in Violation." T30:448; T40:1270, ¶3.  The violations are called "HPA Suspensions," and the described violations purport to be of the HPA, not of an HIO's rulebook. The information in the report is taken from HIO records of tickets issued and suspension meted out by a private entity. T41:1293-94, ¶69.

158.     Also on the USDA/APHIS website, there is a link titled "Horse Industry Organizations and Designated Qualified Persons." T6:59x. That link can be accessed presently by clicking "Designated Qualified Person (DQP) Program." That link makes available five lists: (1) "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," and (2) "Suspensions: Currently Active: | 2014 | | 2013 | | 2012 | | 2011 | | 2010" and (3) "Fines: | 2014 | | 2013 | | 2012 | | 2011 | | 2010."  These lists identify people as having violated the HPA, as determined by HIOs. T6:67x; T41:1294, ¶70.

159.     Opening the link titled "Fines: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," produces lists titled "USDA Horse Protection Program Fine Report," that include the name of the "Fined Person," the fine amount, the HIO ticket date and number, the fined horse's name and the HIO's name.  Copies of these lists were printed June 21, 2015. T31:450-59.  Of the 115 people listed, 99 were fined by SHOW.  T40:1271-72, ¶14; T41:1294, ¶71.

160.     The link "Suspensions: Currently Active | 2014 | | 2013 | | 2012 | | 2011 | | 2010," produces the "USDA Horse Protection Program Active Suspension Report."  T32:461-64; T40:1272, ¶15. On a copy printed June 21, 2015, the list identifies 90 individuals under the heading "Suspended Person."  SHOW is the identified HIO assessing 70 of those suspensions. The suspension dates, ticket date and number, suspended horse's name and HIO are identified.   T40:1272, ¶15; T41:1294, ¶72.

161.     The link titled "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010|," contains a massive amount of information on lists for each of the years under the heading "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation." Each report lists the person's name under "Responsible Party." The "Violation" is usually an HPA §1824 prohibited act. The horse is identified, along with the date of the show and the HIO that assessed the penalty.  T40:1272-73, ¶¶16-20; T41:1294-95, ¶73.

162.     A copy of the 2010 "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" report, printed June 21, 2015, is 235 pages long, listing 3,281 entries naming the "Responsible Party," and identifying a "violation" and a horse. T33:465-694; T40:1272, ¶16; T41:1295, ¶74.

163.     A copy of the 2011 "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" report, printed June 21, 2015, is 245 pages long, listing 3,426 entries

naming the "Responsible Party," and identifying a "violation" and a horse. T34:695-869; T40:1272, ¶17; T41:1295, ¶75.

164.     A copy of the 2012 "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" report, printed June 12, 2015, is 188 pages long, listing 2,621 entries naming the "Responsible Party," and identifying a "violation" and a horse. T35:870-1055; T40:1272, ¶18; T41:1295, ¶76.

165.     A copy of the 2013 "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" report, printed June 21, 2015, is 122 pages long, listing 1,709 entries naming the "Responsible Party," and identifying a "violation" and a horse. T36:1056-1181; T40:1272, ¶19; T41:1295, ¶77.

166.     A copy of the 2014 "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" report, printed June 21, 2015, is 79 pages long, listing 1,102 entries naming the "Responsible Party," and identifying a "violation" and a horse. T37:1182-1260; T40:1273, ¶20; T41:1295-96, ¶78.

167.     When the USDA made HIOs responsible for enforcing the Act, and began publishing the annual reports of HPA violations as determined by HIOs, the Agency benefitted from the appearance that the Act was being vigorously enforced. The "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation" reports for 2010 through 2014 contain 12,139 entries identifying "responsible parties found in violation."  T33-37; T40:1274; T41:1296, ¶79.

168.     When those enforcement actions are added to the list of 2,279 IES Investigative and Enforcement Process and Protocol for Foreign Substance Penalty enforcement actions resulting in the issuance of Form 7060, the USDA makes it appear there were 14,418 determinations of

violations of the Act over a four and a half to five year period, or about 3,200 unlawfully determined enforcement actions per year.  T40:1273, ¶21; T41:1296, ¶79.

169.    More than 99% of these alleged enforcement actions resulting in determinations of violations of the Act were made under procedures Congress did not establish, in contravention of HPA §1825(b), and in disregard of the alleged violators' statutory and constitutional due process rights. T40:1273, ¶21; T41:1296, ¶81.

### C.    HPA §1825(b) Precludes Private Party Enforcement Schemes.

170.    On February 19, 2015, the Fifth Circuit Court of Appeals sided with the plaintiffs in *Contender Farms, L.L.P. v. U.S. Dept. of Agriculture*, 779 F. 3d 258 (5th Cir. 2015).  The Fifth Circuit described the challenged regulation as one "requiring that private entities impose mandatory suspensions on those participants found to engage in a practice known as soring."  *Id.* at 262.

171.    The court held that the HPA "plainly prohibit[ed]" the Regulation and its approach to HPA enforcement, observing that "by looking to the plain language of §1823(c)," it is clear that "nothing in § 1823(c) contemplates USDA involvement in the *enforcement* procedures of HIOs."  *Id.*  The court held that, contrary to the statute, "the Regulation establishes a parallel enforcement scheme" to §1825, unsupported by the "plain language" of the statutory text.  *See id* at 271-75.

172.    The Fifth Circuit rejected the Government's position that the regulations were authorized by the general rulemaking provision in HPA § 1828, concluding that the "USDA's reading of its rulemaking authority under §1828 of the HPA stretches beyond the statute's plain language" because the "Regulation addresses an area that is plainly outside the USDA's statutory authority." *Id.* at 274.

173.    The HPA authorizes only one civil enforcement scheme – the one Congress prescribed in

HPA §1825(b) and (c).

> Indeed, Congress expressly conferred civil and criminal enforcement to the
> USDA elsewhere in the HPA.  Such violators of the HPA could be disqualified
> from participating in horse shows "by order of the Secretary, after notice and an
> opportunity for a hearing before the Secretary."  15 U.S.C. §1825(c).  By its
> plain language, the HPA confers upon the USDA the ability to disqualify
> competitors from participating in the Tennessee walking horse industry
> following notice and a hearing *before the USDA*.  This provision addresses the
> issue of enforcement, and it provides that only the USDA has enforcement
> power, not HIOs.  In light of §1825, the USDA possesses only the authority: (1)
> to provide qualifications for inspectors; and (2) to, itself, assess penalties for
> HPA violations.

*Id*. at 273, n.6 (emphasis in original). Civil penalties can only be assessed by the Secretary after

notice and hearing, and only in compliance with the due process provisions in HPA §1825, APA

§551 *et seq.* and 7 C.F.R. §1.130 *et seq.;* T42:1304, ¶4.

### D.    Penalties by Public Reprimand Continue to be Assessed
###       Based on HIO Records.

174.    In *Contender Farms v. USDA,* the Fifth Circuit Court of Appeals decided that the USDA's

effort to compel the HIOs to enforce the Act was unauthorized and unlawful. The only statutorily

authorized procedure for determining if the Act had been violated is the one Congress prescribed

in HPA §1825(b). HIOs, as private entities, could not determine if a person violated the Act, nor

could they assess penalties for violations of the Act. If an HIO included a penalty provision in its

rulebook, its authority to assess the penalty rested on its agreement with the entrant. Only the

Secretary could determine if someone violated the Act, and then only after notice and an

opportunity to be heard. T41:1296-97, ¶82.

175.    The invalidation in *Contender Farms* of the new regulations solved only part of the

problems created during their short- lived implementation. The numerous lists created by the

Agency to implement the invalid rules are still published, and continue to be updated.  Since the

USDA's lists of "violators," "violations" and "suspensions" are no longer used by HIOs to exclude people from entering a show, if they are under an HIO suspension, or to enhance penalties based on prior offenses, their only present purpose is to enhance the USDA's numbers of successful enforcement actions that result in a determination that a person has violated the Act and to serve as a public reprimand of people inaccurately identified by the USDA as having violated the Act. T41:1297, ¶83.

176.    Of consequence to this dispute, under the HPA and the Fifth Circuit decision in *Contender Farms*, the USDA's practice of publishing reports identifying people as having violated the Act, based on HIO records of tickets issued and HIO penalties assessed, is unlawful. HIOs do not enforce the Act, and those receiving an HIO "ticket" or penalty for violating the rulebook have not been lawfully adjudged to have violated the HPA.  T41:1297, ¶84; T42:1326-27, ¶95.

177.    By disregarding the language in the Act and the holdings in *Contender Farms,* the USDA continues to publish lists based on information it receives from HIOs that it uses to produce lists that identify people and horses as having been found in violation of the Act. The USDA continues this activity knowing that HIOs do not and cannot determine whether a person has violated the Act. That can only be done by the Secretary, and then only under §1825. T41:1297, ¶85; T42:1327, ¶96.

178.    There is no legal or legitimate purpose for the USDA continuing to accumulate HIOs' information about people who are ticketed by a DQP or who are assessed an HIO penalty. Nor is there any legitimate legal basis for the USDA making this information public. The USDA information accumulation policies and practices with regard to HIO records, and the practices and policies for publically disseminating this information, are unauthorized and unlawful under the HPA and the Department's own regulations. T41:1297-98, ¶86; T42:1327, ¶97.

### E.     The McGartlands' Object to APHIS' Publication of the HIO Penalty Lists.

179.     The McGartlands and Contender Farms object to the USDA's practice of publishing lists that identify people as HPA "violators" along with their alleged "violation" based on the activities of HIOs in ticketing and penalizing entrants.  The McGartlands and Contender Farms enter horses only in HIO inspected events, and face the real possibility that they will be mistakenly accused of soring a horse, will have an HIO mistakenly penalize them without due process of law, will have the HIO provide this information to the USDA and will have the USDA publish a public reprimand falsely identifying them and their horses as having violated the Act. T42:1327, ¶98.

180.     This happened in 2008, when Mike McGartland was ticketed by a DQP, working for the HIO NHSC, who was of the opinion that McGartland's horse was sore on one foot.  The horse was disqualified and a ticket was issued. But McGartland successfully appealed the ticket by proving that the DQP was mistaken. Nonetheless, McGartland's name has been published as having received a one month suspension. This incident is still published in FOSH's data link. T15:287-92; T42:1327-28, ¶99. FOSH is an HIO that maintains a website that combines information it receives about alleged HPA violations. FOSH and the USDA cooperate in this effort, with the USDA providing information on alleged violations and coordinating with FOSH's work. T15:287-292; T40:1270, ¶7.

181.     Any HIO inspected event the McGartlands enter could result in a DQP ticket, and an HIO penalty, which the USDA would include in a list it publishes as "proof" that the McGartlands violated the Act.  Such a false publication presents an actual or imminent injury that is concrete and particularized, that is directly traceable to the conduct of the USDA, and that is redressable by a judgment in their favor. T42:1328, ¶100.

182.     The USDA's policy and practice of publishing the lists of participants who have received HIO rulebook penalties specifically targets participants in Tennessee walking horse events like the McGartlands and Contender Farms. They are the objects of the lists, the sole purpose of which is to issue a public reprimand as a penalty against the accused and as a deterrent to others. T42:1328, ¶101.

183.     The publication of the lists targets even those horse owners who do not sore their horses, because all entrants in HIO inspected events agree to the penalties and appeal procedures in the HIO's rulebook. The DQP and VMO palpation inspection procedures to determine soreness are far more art than science, and inspectors often disagree about whether the horse is sore. *Contender Farms v. USDA*, 779 F. 3d 258 (5th Cir. 2015) and *Young v. USDA*, 53 F. 3d 728 (5th Cir. 1995). T42:1328, ¶102.

184.     The McGartlands and Contender Farms raise a purely legal challenge to the USDA's policy of publishing the names of those penalized under an HIO's rulebook, representing that such persons have violated the Act. Their challenge is ripe, and the McGartlands do not have to wait for the policy to be further applied against them in order to determine its legality.

### F.     The USDA's Demands for and Publication of SHOW's Records Are Unlawful.

185.      SHOW objects to the USDA's continuing demands that it turn over to IES its private records identifying people who receive DQP tickets and who have penalties assessed against them. The USDA has no legal authority to demand these records, and the procedures it follows in obtaining these records are contrary to the Agency's regulations, the APA and HPA provisions for obtaining records and the Fourth Amendment of the Constitution. T41:1298, ¶87.

1.       **No lawful regulation requires HIOs to produce its penalty records.**

186.    The USDA cannot claim that it has the authority to require HIOs to maintain and provide

ticketing and penalty information based on 9 C.F.R. §11.21(d), which provides that "[t]he certified

DQP organization shall assess appropriate penalties for violations, as set forth in the rule book of

the certified program under which the DQP is licensed or as set forth by the Department, and shall

report all violations, in accordance with §11.20(b)(3) of this part."  9 C.F.R. §11.20(b)(3), requires

only that after inspecting a horse, "[t]he DQP shall immediately report to the management of any

horse show…any horse which, in his opinion, is sore or otherwise in violation of the Act or

regulations." The regulation does not require that the DQP provide management with information

about tickets issued or HIO assessed penalties.  T41:1298, ¶88.

187.    More importantly, there is no authority under the Act for the USDA to require HIOs to

"assess appropriate penalties for violations, as set forth in their rulebook," and report such

violations to anyone. It is settled law, under the Fifth Circuit's decision in *Contender Farms,* that

the HPA does not authorize the USDA to require that the "certified DQP organization shall assess

appropriate penalties for violations, as set forth in their rule book."  SHOW will not include a

penalty matrix in its 2016 rulebook. T41:1298, ¶90.  Another HIO, the International Walking

Horse Association, in March 2015, (see T41:1298-99, ¶89) announced it was deleting its penalty

scheme from its rulebook:

> In a recent decision (Contender Farms/Mike McGartland vs United States
> Department of Agriculture), the Fifth Circuit Court of Appeals negated USDA's
> authority to require USDA-certified horse industry groups, which inspect horses
> for signs of soring, to issue mandatory minimum penalties. As a result of this
> decision, the International Walking Horse Association has decided to no longer
> issue fines and/or suspensions for Horse Protection Act (HPA) violations. All
> violations of the HPA will be reported to show management. The HPA requires
> show management to disqualify horses from showing when they are found to be
> sore.

188.    USDA regulation 9 C.F.R. §11.7(d)(1) requires all licensed DQPs to maintain records "concerning any horse which said DQP recommends be disqualified or excused for any reason," including information identifying show management, horse ownership, the trainer, and a "detailed description of all of the DQP's findings and the nature of the alleged violation…." These records must identify the horse and those persons who entered, trained or owned the horse. The DQP must maintain a "detailed description of all the DQPs' findings and the nature of the alleged violation, or other reason for disqualifying or excusing the horse, including said DQP's statement regarding the evidence or facts upon which the decision to disqualify or excuse said horse was based." Copies of these records "shall be submitted by the involved DQP to the horse industry organization or association that has licensed the DQP within 72 hours after the horse show…." There is no regulatory requirement that the DQP or HIO submit this information to APHIS, and no requirement that ticketing or penalty records be maintained or provided to the USDA. T41:1299, ¶91.

189.    USDA regulation 9 C.F.R. §11.7(d)(3) requires that each HIO, within 30 days, "shall submit a report to the Department containing the…information in paragraph (d)(1) of this section," which includes information identifying any disqualified horse and those that might be responsible for a violation. SHOW keeps such records, and recognizes that making them available to the USDA provides the Agency information it might need to monitor the work of a DQP or for its own enforcement purposes. But the regulation does not require SHOW to maintain or provide to the USDA any information about the tickets DQPs issue, any penalties people accept under the HIO penalty matrix or any penalties that are assessed by SHOW after an appeal. T41:1300, ¶92.

190.    USDA regulation 9 C.F.R. §11.23(b) provides: "Horse industry organizations who train, maintain, and license DQPs under a certified DQP program shall permit any APHIS representative, upon request, to examine and copy any and all records relating to the DQP program which are

62

required by any part of the regulations."  The regulation does not require an HIO to administer a ticketing and penalty program, and, if one is maintained, the regulation does not require any records be maintained or produced about tickets and penalties. Such records do not relate to the training, licensing and qualification of DQPs to inspect horses. T41:1300, ¶93.

191.    Based on the HPA and the holdings in *Contender Farms*, no valid regulation can require an HIO to have a ticketing and rulebook penalty system. The USDA is limited to regulating the HIOs' training programs and licensing requirements for inspectors. Likewise, no regulation can lawfully require HIOs to maintain and produce an HIO's ticketing and penalty records. T41:1301, ¶95.

### 2.    HPA §1825(d) provides the exclusive means to obtain SHOW's private records.

192.    Congress included in the HPA a provision granting the USDA authority to obtain private records. HPA §1825(d) provides that "[t]he Secretary may require by subpoena the … production of books, papers, and documents relating to any matter under investigation or the subject of any proceeding."

193.    District courts can enforce the administrative subpoenas, or, where a proper objection is made, quash or modify the requested production. This statutory provision provides the Agency the authority to obtain records it legitimately requires, while protecting those, like SHOW, from having to produce records that may be improperly disseminated.

194.    APA §555(c) provides that any agency's "requirement of a report, inspection, or other investigative act or demand may not be issued, made or enforced except as authorized by law" and that enforcement of a subpoena shall be before a neutral decision maker, affording the person upon whom the request or demand is made a fair opportunity to be heard.

195.    Under the HPA and APA, the USDA is not legally entitled to demand from SHOW, under the threat of decertification if it refuses to comply, production of its private records or information about individuals who have been ticketed or penalized under HIO procedures. The Agency must follow the procedures in §1825(d).

### 3.    IES' demands for SHOW's records violate the Constitution's Fourth Amendment.

196.    Though SHOW has in the past provided the USDA with copies of records relating to its rulebook ticketing and penalty activities, the Agency has recently made unreasonable demands on SHOW for such records, alleging the records were relevant to a purported IES investigations of SHOW and the Celebration. T41:1301, ¶96.

197.    On June 9, 2015, Paul Warren, a representative of the USDA, appeared at SHOW's office in Shelbyville, Tennessee, and demanded that SHOW's Operations Manager turn over all the tickets that SHOW had issued for April and May, 2015.  Mr. Warren said he needed the copies immediately, because the USDA was investigating a complaint alleging that SHOW was destroying some tickets rather than enforcing them. Given that SHOW has been under the threat of decertification or in formal decertification proceedings since 2010, Mr. Warren was provided copies of the tickets. T41:1301, ¶97.

198.    On August 24, 2015, an IES employee, Mr. Harris, delivered an unsigned memo to SHOW's office in Shelbyville, Tennessee, requiring that SHOW turn over all documents identified on a list concerning its activities as the HIO under contract with management of the Celebration, which was scheduled for August 25 through September 5, 2015. T38:1261; T40:1270, ¶6; T41:1301, ¶96.

199.    On August 26, 2015, SHOW wrote IES complaining of the demands made on it, but apparently not on any other HIO, and requested the Agency identify any legal authority for its

conduct and demands. T39:1262-66; T40:1270, ¶6. Because no responsive explanation was received from IES, SHOW did not comply with the document request..

200.    The USDA's actions in requiring that SHOW turn over its records on demand is "facially unconstitutional because it fails to provide [SHOW] with an opportunity for precompliance review" by a "neutral decisionmaker." *City of Los Angeles, California v. Patel*, 135 S. Ct. 2443 (2015). If the USDA wants SHOW's ticketing and penalty records and it does not provide a reason that convinces SHOW to voluntarily provide the information, then it can obtain the records only by issuing an administrative subpoena, thereby providing SHOW with the opportunity to challenge production before a neutral decisionmaker before production takes place. T41:1301-02, ¶100.

201.    SHOW objects to the USDA's requirements and demands that it turn over its ticketing and penalty records on request, because the Agency uses SHOW's records for "illicit purposes," including misrepresenting the information when it publishes lists that inaccurately identify people a SHOW DQP has ticketed as  having been determined to have violated the Act. The USDA's policy and actions in demanding SHOW's records about its internal ticketing and penalty activities, on their face, and, as applied, violate the Fourth Amendment.   T41:1302, ¶101.

202.  SHOW seeks a declaration that it is under no duty to maintain a ticket and penalty system, but that if it chooses to, then the USDA has no legal authority to require SHOW to provide its records, other than voluntarily or in response to a lawful subpoena. SHOW requests an appropriate injunction restraining and enjoining Defendant from continuing to engage in the policies and practices described above. SHOW requests the court order Defendant to remove the offending lists from its website, and order the Defendant to publish the court's order in their place. T41:1302, ¶102.

## VII.    APPLICATION FOR A PRELIMINARY INJUNCTION

203.    Pursuant to Fed. R. Civ. P. 65, Plaintiffs move the court to issue a preliminary injunction during the pendency of the district court lawsuit. Plaintiffs support this request based on the facts and legal authorities set out above and those cited below. Plaintiffs also submit the exhibits and supporting declarations in the Appendix filed with this lawsuit verifying the request for injunctive relief. Notice of this application for a preliminary injunction will be served on the Defendant as part of the complaint, as provided by Federal Rule of Civil Procedure 4, providing the Defendant ample time to respond prior to a hearing. Plaintiffs anticipate that the material facts supporting an injunction will not be in dispute, and that the application for a preliminary injunction can be decided on the exhibits and declarations submitted by the parties. *See PCI Transp. V. Fort Worth & W.R.R.*, 418 F.3d 535, 546 (5th Cir. 2005). Should the material facts be in dispute, Plaintiffs request a hearing on this application and that it be consolidated with the trial on the merits. Fed. R. Civ. P. 65(a)(2).

### A.    There is Substantial Likelihood Plaintiffs Will Prevail on the Merits.

204. There is a substantial likelihood Plaintiffs will prevail on the merits as set out above in the factual statements, their supporting exhibits and legal citations, thus satisfying the first element for the issuance of a preliminary injunction.  See *Spiegel v. City of Houston, 6*36 F. 2d 997, 1001 (5th Cir. 1981). Congress has prescribed that a "sanction may not be imposed … except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(c).  HPA §1825 provides the exclusive authority for the USDA's imposition of a sanction for an HPA violation. No penalty shall be imposed except on order of the Secretary after notice and hearing.

205.    The USDA has adopted policies and procedures by which it decides there has been a violation of the Act, without notice or an opportunity for a hearing before the Secretary. Based on

decisions by HIOs and IES, people are sanctioned by public reprimands published on numerous lists on both the USDA's and private websites. No statutory provision or USDA regulation authorizes these activities. The Agency actions challenged here are not only unauthorized, they are unlawful. *See Contender Farms, supra.*

**B.    There Exists a Substantial Threat that Plaintiffs Will Suffer an Irreparable Injury if an Injunction is Not Issued.**

206.    The Plaintiffs' supporting evidence proves they will be irreparably harmed if a preliminary injunction is not issued. Each day during the pendency of this lawsuit the USDA will display to the world on its website statements that the Plaintiffs have violated the HPA. The published information is false, the Plaintiffs have not violated the Act, their horses have not been proven to be sore, and their reputations will suffer. No remedy exists at law that can redress this injury, so the only recourse is injunctive relief. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F. 2d 328, 338 ( 5th Cir. 1981).

207.    Injunctive relief is expressly authorized by HPA §1825(d) to prevent violations of the HPA. APA §701-702 expressly authorizes injunctive relief when the Agency acts beyond the scope of its authority. Plaintiffs' evidence establishes that the USDA is violating §1825 (b) of the HPA and is acting outside its authority. Under these circumstances, no specific proof of irreparable injury need be shown as it is presumed. *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F. 2d 1085, 1090 (5th Cir. 1987).

**C.    The Injury to the Plaintiffs Outweighs Any Harm the Injunction Will Cause the USDA.**

208.    The USDA's continued publication of lists and reports falsely identifying the Plaintiffs as violators of the HPA, and the continued use of SHOW's ticketing and penalty records to identify thousands of people as violators of the Act, injures the Plaintiffs and the walking horse industry.

The USDA's unauthorized and unlawful demands that SHOW provide it with SHOW's private records, which the Agency then misuses, publishing the names of people SHOW has penalized as violators of the Act, harms SHOW and the walking horse industry it serves and supports.

209.    No harm will be suffered by the USDA if it is enjoined from publishing the reports that falsely characterize people as violators of the Act. The USDA will continue to have IES investigate reports from DQPs and VMOs that suggest a violation may have occurred. The Agency can continue to send Warning Letters to those it suspects of having violated the Act.  And foreign substance tests can continue as they currently do. If an injunction is issued, the only thing the USDA will have to cease is misrepresenting to the public (1) that where a DQP or VMO decided a horse non-compliant these opinions establish that a person has violated the Act; and (2) that a so-called positive test for a substance proves the entrant sored the horse.  The USDA can continue to examine and receive copies of SHOW's records either by obtaining SHOW's consent, or by subpoena as provided by HPA §1825(d).  The Agency will not, however, simply be able to demand instant production or the production of records it is not lawfully authorized to receive.

**D.    Granting the Injunction Will Not Disserve the Public.**

210.    The public is not well served when the government publishes misleading information that accuses people of having violated the law. Indeed, such publications disserve the public's interest, by causing citizens to petition for changes in laws that do more harm than good. False government publications can serve as the basis of misinformed and defamatory articles and press releases by advocacy groups, like HSUS's press releases characterizing SHOW, the Celebration and entrants as organized criminals in a conspiracy to defraud the public.

211.    The public will be best served by the USDA filing complaints against those it contends violated the HPA, giving them notice, providing a hearing, and if fault is found, publishing that

information. The public is not served when an administrative agency enforces an act of Congress in ways Congress did not authorize, and in contravention of the procedures Congress did authorize.

## X.    CONCLUSION

212.    The HPA is short and uncomplicated. Cheating by cruelly soring horses that are entered into competitive events is prohibited. The Secretary's inspectors are authorized to inspect horses at all events, and, if a horse appears to be sore, then managers are under a duty to disqualify the horse from the event.

213.    HPA §1823(c) authorizes the Agency to adopt regulations to qualify private inspectors to inspect and diagnose the condition of horses. Managers can appoint these inspectors to inspect all entered horses. If an inspector finds a sore horse, then Management is informed, and it has the right and duty to disqualify the horse.

214.    If the USDA believes that the people entering the sore horse should be punished, or that management permitted a horse identified as sore by an inspector to participate, then, under §1825(b), the Agency can file a civil proceeding, provide notice and a hearing, and assess civil penalties if warranted.

215.    All this is clear from the statute and simple to administer. Congress passed a law to reduce cruelty to animals. No sane elected representative could be expected to vote against such a universally popular goal. Unfortunately, voting to appropriate money for governmental enforcement of Congress' laws is not universally popular, and, as a result, appropriations to administer the HPA have usually been about $500,000 per year.

216.    If, in an agency's opinion, Congress does not appropriate sufficient funds to enforce an act under lawful procedures, bureaucrats sometimes find another way.  That has happened with the HPA.  First, the USDA decided it would not spend its funds to train and license private horse

inspectors. Instead, by regulatory fiat, it created certified Horse Industry Organizations, delegating to these private entities the authority to train and license the inspectors. Then, because the Agency found enforcing the Act under §1825(b) too time-consuming and expensive, it entered into agreements with the certified HIOs, delegating to them the power to enforce rulebook penalties against people whose horses were disqualified.

217.    When these agreements fell apart, the Agency, using the threat to decertify any HIO that did not acquiesce, adopted regulations that compelled the HIOs to create Department approved adjudication procedures and assess government mandated penalties against those violating the Act. Again, at no cost to the USDA. When this scheme was declared unlawful, the USDA continued to collect the HIOs' ticketing and penalty records, and still uses them to publish lists of people it misleadingly represents to have violated the Act.

218.    Additionally, and again because it considered enforcement under §1825(b) too time-consuming and expensive, the USDA developed  the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process, establishing internal administrative procedures separate from §1825(b), that allow its employees to decide if someone violated the Act.  Under the Protocol for Foreign Substance Penalty, the Agency penalizes people for violating the Act solely because a GC/MS test is allegedly positive for a substance, whether the horse is sore or not.  Under the IES Investigative and Enforcement Process, if a VMO identifies a horse as sore, then an IES investigator will open a case, investigate, decide if there was a violation, and determine the penalty. The USDA created a new category of administrative penalties, official Warning Letters on Form 7060, and publishes lists of those it decides have violated the Act.

219.    By employing these enforcement schemes that are different from the one Congress prescribed, the Agency has amassed an astounding record of apparent success in enforcing the Act.

Based on its published lists of enforcement actions by HIOs and IES, the USDA claims it has enforced the Act by penalizing almost 15,000 violators over a five year period these penalty schemes have been in effect. But this illusory record of success has dearly costs those in the industry who have not violated the Act. Their reputations have been irreparably damaged, and it has been made to appear that the activity they enjoy is corrupt, and that those participating in events are cruel to the horses they love.

210. This court can alleviate this wrong. The relief requested by the Plaintiffs will undo this bureaucratic bramble, and leave standing the law Congress passed. If Congress does not want to appropriate millions of dollars for Agency proceedings under §1825(b), and even if the Agency decides it will seldom proceed under the allegedly costly and time-consuming requirements of §1825(b), the Act will still accomplish its purpose. VMOs and DQPs will continue to have the authority to inspect horses at events, and if they find horses they believe are sore, management will still be duty-bound to disqualify the horse.

211.    However, people will no longer be punished for allegedly violating the Act under non-existent, half-baked or ignored procedures that do not afford due process of law. No person will be punished for violating the HPA without being afforded the statutory and regulatory procedural safeguards in the HPA, APA and the Department's own regulations governing Formal Proceedings under §1825(b). Congress never intended otherwise.

**Certificate of Conference**

The undersigned attorney for the Plaintiffs certifies that counsel has attempted to confer with the Defendant to resolve the issues that are the subject of the Application for Preliminary Injunction. Plaintiffs' counsel, David Broiles, initially contacted an attorney representing the Defendant on June 8, 2015, complaining on behalf of the McGartlands that they were identified on lists published by the USDA as violators of the Horse Protection Act, requesting that their names be removed and that the lists be removed. Mike and Lee McGartland, both attorneys, wrote the USDA on June 12. 2015, complaining of the lists identifying them as violators of the Act, and requesting the lists be taken down. An attorney who was the head of the IES branch of the USDA responded by a letter of August 26, 2015, stating the McGartlands' requests were being considered, and any decision would be communicated to them. They received no further communication. Also in August 2015, Karin Cagle, an attorney for SHOW wrote the USDA complaining of the demands it made for documents and complaining of the misuse of such documents. No response to this letter was received.

s/ Karin Cagle
Karin Cagle

**Certificate of Service**

The undersigned certifies that the Plaintiffs' (1) Complaint for Declaratory and Injunctive Relief, (2) Application for a Preliminary Injunction, and (3) Brief in Support and the Appendix Supporting Plaintiffs' (1) Complaint for Declaratory and Injunctive Relief, (2) Application for a Preliminary Injunction and (3) Brief in Support will be served  (1) on the person designated to receive the document in the office of the United States Attorney for the Northern District of Texas by hand delivery at 801 Cherry St., Fort Worth, Texas, and (2) on  the United States Department of Agriculture, 1400 Independence Avenue, S.W., Washington, D.C. 20250 by certified mail and (3) on the Attorney General, United States Department of Justice, 950 Pennsylvania Ave., Washington, D.C. 20530-0001 by certified mail as provided in Federal Rule of Civil Procedure 4(i). Service will be made on the same day the document is filed with the Clerk of the United States District Court, Northern District of Texas, Fort Worth Division.

s/Karin Cagle
Karin Cagle