UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CONTENDER FARMS,   L.L.P., | § | |
| LEE MCGARTLAND,  MIKE | § | |
| MCGARTLAND and SHOW, INC. | § | |
| | § | |
| Plaintiffs | § | Case No. 4:16-cv-0163-Y |
| vs. | § | |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF AGRICULTURE | § | |
| | § | |
| Defendant | § | |

# Amended Complaint for Declaratory and Injunctive Relief

## I.  THE PARTIES

1.      Plaintiffs Mike and Lee McGartland (McGartlands) are partners in Plaintiff Contender Farms L.L.P. (Contender), a Mississippi limited partnership with its principle place of business in Fort Worth, Texas, that owns Tennessee walking horses that the McGartlands enter into competitive events. The McGartlands reside in Fort Worth, Texas.

2.      Plaintiff SHOW, Inc. is an IRC §501(c)(3) not-for-profit corporation that is a Horse Industry Organization (HIO) certified by the USDA  to  train and license Designated Qualified Persons (DQPs) as private inspectors, pursuant to 9 C.F.R. §11.7.  Its principle place of business is in Shelbyville, Tennessee.

3.      Defendant United States Department of Agriculture (USDA, Agency or Department), administers and enforces the Horse Protection Act, 15 U.S.C.§ 1821 *et seq.*, (HPA or Act) through its Animal and Plant Health Inspection Service (APHIS).

## II.  JURISDICTION AND VENUE

4.      Plaintiffs complain that USDA supplements its enforcement of the HPA employing policies and practices that are not a credible extension and interpretation of the law. Plaintiffs seek a declaration that these alternative enforcement activities are unauthorized and unlawful and request an injunction against their use in the future.

5.      HPA §1825(d)(6) vests this court "with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter." The Privacy Act, 5 U.S. C. §552a(g)(d)(1)(D) grants this court jurisdiction over the McGartlands' Privacy Act complaints. The Administrative Procedures Act (APA), 5 U.S.C. §702 and §703, grant Plaintiffs the right of judicial review seeking declaratory and injunctive relief in a district court when the Plaintiffs have suffered a legal wrong because of the agency's actions or have been adversely affected or aggrieved by the agency's action within the meaning of the relevant statute.

6.      Under 28 U.S.C. §1331, this court has federal question jurisdiction because the Plaintiffs' claims arise under federal statutes and the Constitution. Venue is proper in this court under 28 U.S.C. §1391 and 5 U.S.C. §552a(g)(5) because the McGartland plaintiffs are United States citizens residing in Fort Worth, Texas.

## III.  HPA ENFORCEMENT STATUTES, REGULATIONS AND ADMINISTRATIVE PROGRAMS.

**A.      Enforcement Proceedings Authorized by Statutes and USDA Regulations.**

**1.      15 U.S.C. §1825 authorizes civil penalties and prescribes due process procedures.**

7.      Congress prohibited entering sored horses into Tennessee walking horse events in the 1970 HPA.  The Act, 15 U.S.C. § 1821, *et seq.*, was amended in 1976, with several amendments related specifically to civil enforcement. HPA §1824 prohibits participants from entering sore horses into

events. Any person believed to have engaged in conduct prohibited by §1824 can be criminally

prosecuted under §1825(a), or sanctioned by civil penalties under §1825(b) and (c).  It was

Congress' judgment that these sanctions were sufficient to both punish offenders and deter others

from committing offenses.

8.      HPA §1825, titled "Violations and penalties," authorizes civil penalties for violations of

§1824.  The relevant subsections in §1825(b) declare that

> (1) **Any person who violates section 1824 of this title shall be liable to the
> United States for a civil penalty of not more than $2,000 for each violation. No
> penalty shall be assessed unless such person is given notice and an opportunity
> for a hearing before the Secretary with respect to such violation.** The amount
> of such penalty shall be assessed by the Secretary by written order. In determining
> the amount of such penalty, the Secretary shall take into account all factors relevant
> to such determination, including the nature, circumstances, extent, and gravity of
> the prohibited conduct, and with respect to the person found to have engaged in
> such conduct, the degree of culpability, any history of prior offenses, ability to pay,
> effect on ability to continue to do business, and such other matters as justice may
> require. (Emphasis added)
> 
> ***
> 
> (4) The Secretary may, in his discretion, compromise, modify, or remit, with   or
> without conditions, any civil penalty assessed under this subsection.

9.      Section 1825(c) authorizes the Secretary to disqualify people from entering events for a

period of time if they have been found in violation of §1825(b). The procedural requirements of

subsection (b) apply to disqualification proceedings.

10.     Section 1825(d) provides due process safeguards for the administrative proceedings, like

subpoenas for attendance of witnesses and production of documents, and empowers district courts

to aid in implementing the procedures. Section 1825(b)(2) guarantees any person determined liable

for a civil penalty the right to appeal to a United States Court of Appeals.

### 2. The Administrative Procedures Act mandates formal enforcement procedures.

11.     The APA applies to an agency's assessment of a sanction, which includes the "imposition

of penalty or fine." 5 U.S.C. §551(10)(c). An "agency action" includes a "sanction." 5 U.S.C.

§551(13). When an agency seeks to assess a civil penalty, the proceedings must be held in the agency's administrative court, where an Administrative Law Judge (ALJ) shall "preside at the taking of evidence." 5 U.S.C. §556(b).  Any proceeding that could result in a sanction must be on the record; the accused must receive adequate notice and be afforded the opportunity to present evidence and arguments. 5 U.S.C. §554.  Detailed procedural requirements that afford the accused due process are required. 5 U.S.C. §556. "A sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b).

**3.     USDA Regulations require USDA enforcement actions be by formal proceedings.**

12.     On January 4, 1977, the USDA implemented due process enforcement procedures under the authority of 5 U.S.C. §301, by adopting "Rules of Practice Governing Formal Adjudicatory Administrative Proceedings Initiated by the Secretary" ( Enforcement Regulations) at 7 C.F.R. §1.130 *et seq.* Section §1.133(a)(1) provides that where information about a possible violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder."

13.     When the Agency receives information of an "alleged violation," the "Administrator shall cause such investigation to be made as, in the opinion of the Administrator, is justified by the facts. If such investigation discloses that no violation of the Act or of the Regulations has occurred, no further action shall be taken…." 9 C.F.R. §1.133(a)(3). Investigations are made by the USDA's Investigative and Enforcement Service (IES) pursuant to 7 C.F.R. 371.5(b)((7), which authorizes it to "[d]irect and coordinat[e] investigations related to APHIS program laws and regulations and coordinating enforcement of program laws and regulations with the Office of General Counsel."

4

14.     "If there is reason to believe that a person has violated or is violating any provision of a statute...or of any regulation … issued pursuant thereto...a Complaint may be filed with the Hearing Clerk pursuant to these rules." 9 C.F.R. §1.133(b). The Complaint shall include "allegations of fact and provisions of law which constitute a basis for the proceeding and the nature of the relief sought." 9 C.F.R. §1.135(a).

15.     The USDA's Enforcement Rules provide that administrative hearings to determine liability and assess civil penalties shall be conducted by an ALJ under the authority of 5 U.S.C. §3105 and 7 C.F.R. §1.144. The ALJ's decision is reviewable by the Department's Judicial Officer (JO), who is delegated the Secretary's authority under §1825(b) and (c) pursuant to 7 U.S.C. §450(e) and (g) and 7 C.F.R. §1.145. The JO's decision can be appealed to a United States Court of Appeals. 15 U.S.C. §1825(b)(2).

16.     The only scheme lawfully authorized to enforce penalties against those allegedly violating the HPA requires that when information comes to the attention of the Agency, it may open an investigation. If the investigation discloses that a violation may have occurred, the USDA may file a Complaint with the Clerk of the administrative court against an alleged violator identifying an alleged violation. The proceedings in the administrative court will be conducted under the Enforcement Regulations, which implement the HPA and APA due process requirements, including giving notice and providing a hearing before the Secretary, who can penalize the violator only by a written order. That order can be appealed to a United States Court of Appeals.

**B.      The  USDA's Alternative Enforcement Programs**

17.     In 2010, the USDA's Office of Inspector General reported that since its passage, APHIS's budget for enforcing the HPA has been about $500,000 a year. The USDA has found that formal

5

enforcement "proceedings may be time-consuming and expensive, and our resources for prosecuting such cases are limited." 76 Fed. Reg. 30865 (May 27, 2011).

18.    As a result, the USDA employs alternative enforcement procedures by implementing three less time-consuming and less expensive programs. It established two internal administrative enforcement schemes separate from the statutory Formal Enforcement Proceedings: the "Protocol for Foreign Substance Penalty" and the "IES Investigative and Enforcement Process." It also adopted Regulations requiring private entities to enforce the Act by assessing penalties for violations..

## IV.    THE USDA'S ALTERNATIVE ADMINISTRATIVE ENFORCEMENT PROGRAMS

19.    Since filing suit against the USDA in June 2012, USDA Veterinarian Medical Officers (VMOs) disqualified the McGartland's horses from events five times, and the McGartlands have been penalized under the alternative enforcement programs and are subject to further alternative enforcement.

**A.    The Foreign Substance Penalty Program.**

**1.    How the Protocol for Foreign Substance Penalty program works.**

20.    The USDA established a "Protocol for Foreign Substance Penalty" (the "Protocol") program under which penalties are assessed "for a foreign substance violation detected by a USDA inspector through the use of the Gas Chromatography/Mass Spectrometry (GC/MS) Test."  For the first and second offenses, the penalty is the issuance of a Form 7060 Warning Letter.  For the third offense, the offender is  issued a stipulation, which, if not accepted, would lead to a complaint for civil penalties under HPA §1825(b). For a fourth offense, "the USDA will initiate an administrative enforcement action (commonly known as a 'Federal Case')."

21.    The GC/MS test is administered to horses selected by USDA officials. The horse's forelimbs are swabbed and the sample sent to Ames, Iowa for analysis. It takes time to receive the results, so the USDA would "notify the alleged violator of the specific foreign substance or substances detected concurrently with the notification of the penalty."

22.    Under the Protocol, penalties for foreign substance violations are automatically assessed based solely on a qualitative, not quantitative, basis of whether the GC/MS test results are positive. There is no notice to an alleged offender of an alleged violation, no opportunity to examine any USDA evidence and no opportunity for a hearing before an impartial decision maker.

23.    When the penalty is assessed by issuing a Form 7060 Warning Letter, the USDA publishes on its website the name of the violator, the name of the horse, the date of the violation and that the violation is of the HPA's prohibition against the use of foreign substances. The effect of this publication is to sanction violators and deter others from committing such violations.

    **2.**       **The McGartlands have been penalized under the foreign substance enforcement program.**

24.    On August 23, 2012, Mike and Lee McGartland entered the Contender Farms' horse "Low on Gin" in a class at the Celebration. After passing the DQP inspection, a VMO inspected the horse and decided it was sore. The horse was disqualified. The horse was also subjected to the GC/MS foreign substance swab test. On October 18, 2013, the USDA sent Mike and Lee McGartland each a copy of an Official Warning on Form 7060, issued in Case No. TN130373-AC, informing the McGartlands that when entering "Low on Gin," they had violated 15 U.S.C. §1824(7) and 9 C.F.R. §11.2(c), because the horse tested positive for a substance.

25.    On August 30, 2012, the McGartlands entered Contender Farms' horse "He's Shady in Black" in a Celebration class. After the horse passed the DQP inspection, a VMO inspected the horse and deemed it in violation of the scar rule. The horse was disqualified from the event. The

horse was also subjected to a foreign substance swab test.  On its website, the USDA identified "He's Shady in Black" as violating the foreign substance prohibition on August 30, 2012, and identifies Mike McGartland as the violator.

**B.     The USDA's "IES Investigative and Enforcement Process" Enforcement Program.**

**1.     How the "IES Investigative and Enforcement Process" program works.**

26.     In 2010, to address a backlog of investigations and bolster enforcement, the USDA established another Department administered enforcement program, the IES Investigative and Enforcement Process. Under this program, the USDA investigates possible violations of the HPA through its Investigative and Enforcement Services offices.

27.     HPA §1823(e) authorizes the Secretary's duly appointed representatives to attend events to inspect for and report possible violations of the Act. These Veterinarian Medical Officers (VMOs) are authorized to inspect horses and to inform management if a horse is sore. If management receives such a report, the horse must be disqualified from the class under HPA §1825(a). No statutory or regulatory provisions authorize VMOs to punish a person the VMO believes entered a sore horse.

28.     The VMOs report the results of their inspections to the IES Field Investigators in the Regional Offices, who open investigations into possible violations of the Act. In conducting an investigation, the IES Investigator may interview witnesses, collect evidence and "[a]s part of its investigative process, IES provides alleged violators with the opportunity to submit any evidence that they did not violate an APHIS-administered law." "Once the investigation is complete, the investigator prepares a report of investigation (ROI), which summarizes the investigative findings." The report and any evidence are then sent "to IES' enforcement staff for review."

29.     The "Enforcement Process" is carried out by Headquarters Enforcement staff members upon receipt of the report and evidence, when "a specialist reviews and analyzes this information to determine if the violation is substantiated by the evidence provided." The enforcement specialist "determines whether an enforcement action is appropriate." The specialist, "[w]hen preparing penalty recommendations … relies on the penalty provisions contained in the relevant APHIS-administered law … and applies penalty adjustments for aggravating and mitigating factors."

30.     If the IES Investigator decides an alleged non-compliance does not warrant an enforcement action, "letters of information" are issued with the aim of educating an individual to correct a noncompliance in non-egregious cases. These letters of information are not considered an "official enforcement action," in contrast to the issuance of a Warning Letter.

31.     If the IES Investigator concludes there have been substantiated violations, the possible "[e]nforcement actions may include an official warning, a voluntary settlement agreement, [or] a referral to the USDA's Office of General Counsel (OGC) to institute an administrative proceeding" under Formal Enforcement Proceedings.

32.      If the IES Investigator decides a violation has occurred, but that it does not warrant a Formal Enforcement Proceeding, a Form 7060 Warning Letter can be issued to the alleged violator, identifying the violator, the horse, the violation and the date of the violation. That information and the Form 7060 will then be published on the USDA's website as a sanction against the alleged violator and to deter others from such conduct.

###     2.     The McGartlands have been penalized under the IES administrative enforcement program.

33.     On August 30, 2012, the McGartlands entered Contender Farms' horse "He's Shady in Black" in a Celebration class. After the horse passed the DQP inspection, a VMO inspected the horse and deemed it in violation of the scar rule. The horse was disqualified from the event. On

July 7, 2014, the USDA sent both McGartlands a Form 7060, Case No. TN130155-AC, informing them that they violated 24 U.S.C. §1824(2) and 9 C.F.R. §11.3, the Scar Rule, when entering "He's Shady in Black" at the Celebration.

34.     On August 24, 2014, the McGartlands entered Contender Farms' horses "She's A Shady Sister" at the Celebration. After the horse passed DQP inspection, it was selected for VMO inspection. The VMO said the horse was sore.  On February 22, 2016, both Lee and Mike McGartland received an Official Warning Letter dated February 17, 2016, with a Form 7060 for Lee McGartland in case number TN150128-AC, and for Mike McGartland in cases nos. TN150127-AC and TN150128-AC, informing them they violated HPA §1824(2)(A), the scar rule, when entering "She's A Shady Lady."

**C.      Under Both Administrative Enforcement Programs the USDA Publishes the Names of People Found in Violation, their Alleged Violations and the Form 7060 Warning Letters.**

**1.      Official Warning Letters on Form 7060 are enforcement actions and penalties.**

35.     Official Warning Letters on Form 7060 are issued for violations the USDA decides have occurred under either the "Protocol for Foreign Substance Penalty" or under the "IES Investigative and Enforcement Process."  The "legal effect of a Form 7060" is that it "is an administrative action…routinely used for minor infractions instead of other forms of legal enforcement such as civil penalties, sanctions or criminal prosecutions." This "administrative action" is one "used when APHIS determines that it would not be an effective use of its limited resources to pursue other forms of legal enforcement."  "Although official warning letters do not include a monetary penalty, they are official enforcement actions and will be considered as part of a person's enforcement history if additional action is deemed necessary in the future."

### 2. The USDA Publishes Lists Identifying People It Has Determined Violated the Act.

36.     The USDA's website provides a "Searchable HPA Federal Enforcement Actions" report. On June 21, 2015, this 79 page report titled "USDA/APHIS-Animal Care Horse Protection Violations 2009-2013," listed the "Violator" by name, the horse's name, the "Violation date," and identified the "Violation." Opening the icon in the column under "View" usually produced a copy of Form 7060. This form was headed "Official Warning Violation of Federal Regulations," and states that "[t]he U.S. Department of Agriculture has evidence that … you… committed the following violation(s) of Federal law." The Form 7060 identifies the violation by referring to a subsection of HPA §1824 and sometimes a regulation.

37.     Additionally, the USDA's website provides "USDA APHIS | Enforcement Actions" for each year 2010 through the beginning of 2016. Opening a specific year makes available HPA enforcement actions by month, with access to Official Warnings, Stipulations, Complaints and Decisions and Orders.

38.     According to its "USDA|APHIS Enforcement Actions" report printed October 5-6, 2015, and January 30, 2016,  from 2010 through 2015, the USDA initiated or completed about 2,279 enforcement actions resulting in Form 7060, representing 95% of APHIS' total enforcement actions.  The published lists, together with the attached Form 7060, are USDA  enforcement actions, and constitute a sanction imposed against those people it has determined to have violated the Act. Together with the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process, the lists create the appearance that, under authorized and lawful proceedings, the government found the listed person to have violated HPA §1824.

**3.   The USDA published its enforcement actions taken against the McGartlands.**

39.     The USDA's administrative enforcement actions against the McGartlands were published on the USDA's website. The "USDA-APHIS-Animal Care Horse Protection Enforcement Actions 2009-2013" searchable list on June 21, 2015, listed the McGartlands under the column "Violator Name." Their horses "Low on Gin" and "He's Shady in Black" were named. The website listed the "Violation Date." Under "Violation" it listed "Foreign Substance"  as the violations. Clicking the icon in the "View" column beside their names opened the four Forms 7060.

40.     The June 21, 2015, "HPA Enforcement Actions" report listed the McGartlands as having been subject to enforcement actions issued in October 2013 and July 2014.  The Official Warning Letters on Form 7060 could be opened, viewed and printed.  The violation for "Low on Gin" was foreign substance while the violation on "He' Shady in Black" was scar rule.

41.     The USDA's actions in publishing lists on its website that identified the McGartlands as having violated federal law was a penalty by public reprimand. The effect of the publication was to punish the McGartlands for the alleged violations and to deter others from violating the Act.

42.     On June 8, 2015, the McGartlands saw on the USDA's website that they were listed as having violated the Act on August 23 and 30, 2012.  The USDA was immediately contacted and informed of the McGartlands' concern that they were listed as having violated the Act. The McGartlands requested that the USDA remove the website and inform the world that it was a mistake to have said they had violated the Act.

43.     On June 12, 2015, the McGartlands wrote the USDA complaining of the lists the Agency was publishing identifying them as having violated the Act, pointing out that the USDA was violating HPA §1825(b) and the Privacy Act.  The McGartlands requested the Agency cease any publication about them.

44.     On August 26, 2015, the Director of IES wrote the McGartlands acknowledging their letter and saying that IES "will take further action, as appropriate and necessary, based upon the result of [its] review." Though IES did not notify the McGartlands of any action taken, an October 2015 review of the enforcement reports indicated that some action has been taken.  On one list their names were deleted, and their Form 7060s are no longer available.

45.     On February 29, 2016, the McGartlands filed their complaint in this lawsuit, which they emailed to a USDA attorney. On March 2, 2016, the USDA altered the searchable list to change "Violator" and "Violation" to "Alleged Violator" and "Alleged Violation."  The USDA has continued to alter its website limiting information about its enforcement actions against Plaintiffs.

46.     The USDA's deletion of the Searchable List, fails to address the adverse consequences to the McGartlands resulting from the Agency's actions. The USDA continues to publically report on its website that the McGartlands entered horses in violation of the foreign substance rule and the Act.

47.     A second adverse consequence arises if in the future the McGartlands have a civil enforcement action filed against them under §1825. Based on the IES Investigative and Enforcement Process program, the Form 7060 enforcement actions will be considered in determining their punishment if they are found liable by the Secretary, even though the McGartlands had no opportunity to contest those actions.

48.     A third adverse effect is that the Department has made available electronic copies of these lists to private horse industry organizations. For example, Friends of Sound Horses (FOSH), maintains "a public database of violators, www.hpaadata.us," containing the names of violators taken from the USDA's official enforcement published lists. FOSH's database permits searches

by name; and searching "McGartland" brings up the purported IES violations of August 23 and 30, 2012, for the scar rule and for foreign substance.

49.     Finally, the USDA's recent action in altering its website to preface "Violator" and "Violation" with "Alleged" solves no problems.  The USDA is not "alleging" any violations against the McGartlands, and there are no Formal Enforcement Proceeding complaints pending against them that impose on the USDA the burden to prove the "alleged" violation.  The USDA's post-filing deletion of enforcement information about the McGartlands, but not others, indicates the Agency will continue the use of its alternative enforcement programs unless the court declares them invalid and enjoins the USDA from these alternative enforcement programs.

### 4.     SHOW is listed as violating the Act.

50.     When the USDA adopted regulations, to be effective July 9, 2012, requiring that all HIOs enforce mandated minimum suspension penalties, SHOW declined to comply, and on June 26, 2012, filed a suit against the USDA challenging the regulations.  The district court did not enjoin enforcement of the regulations while the lawsuit was pending. As a result, in July and August 2012, APHIS gave SHOW notice that it would be decertified. After the adverse decision in the district court in July 2013, SHOW informed the USDA that it would comply. Nonetheless, on January 9, 2014, the USDA filed formal decertification proceedings against SHOW.

51.     On both the USDA APHIS | Enforcement Actions website and the 2009-2013 searchable site the Agency publicized the filing of the administrative Complaint, and identified it as an "enforcement action." A copy of the administrative Complaint could be viewed.  SHOW was identified under "Violator Name,"  the dates of violations are identified as 7/14/12 and 9/21/13 and the violation is described as "HIO DQP Certification."

52.     On February 19, 2015, in *Contender Farms  v. USDA,* 779 F. 3d 258, 262 (5th Cir. 2015), the Fifth Circuit Court of Appeals  struck down the new regulations.  The USDA responded by filin a Motion to Dismiss Complaint with prejudice in the administrative proceeding, and the ALJ "dismissed with prejudice" on April 14, 2015.

53.     SHOW is not capable of violating the HPA, so it is not subject to Formal Enforcement Proceedings in an administrative court.   The USDA's administrative complaint filed as a Formal Enforcement Proceeding was filed in a court without jurisdiction.  HPA §1825(d) vests exclusive jurisdiction to enforce the Act in the United States district courts, except enforcement actions under §1825(b). The Complaint against SHOW was not a proceeding under HPA §1825(b). Even after the dismissal, the USDA continues to publish on its two sites its enforcement actions stating that SHOW violated the Act. Listing SHOW as having violated the Act is unauthorized and unlawful.

## V. THE USDA ADMINISTRATIVE ENFORCEMENT PROGRAMS ARE UNLAWFUL

### A.         The Protocol for Foreign Substance Penalty Is Unauthorized and Unlawful.

54.     The Protocol for Foreign Substance Penalty is not authorized by the HPA and contravenes the exclusive enforcement provisions in HPA §1825(b). From its adoption, the Protocol for Foreign Substance Penalty has been a subject of controversy because under the Protocol, the USDA performs a chemical analysis on a swab taken from the horse's limb, and if any substance that the Agency tests for can be identified, the USDA considers the entrant in violation of the Act. The Agency has no published criteria by which it seeks to determine whether the alleged substance was or was not applied by a person or whether the substance could reasonably be expected to cause inflammation that would affect the horse's gait.

55.     When the USDA announced the Protocol for Foreign Substance Penalty, SHOW questioned whether the protocol for penalizing people was reasonable or fair. The USDA

responded, that "[w]e believe that the protocol, with its two-warning (with specificity about the detected foreign substance) provision, provides fair notice and specificity for owners and trainers to adjust their practices before they face significant penalties."

56.    The USDA issues Form 7060 Warning Letters based solely on a "positive" test result and then publishes lists with the names of those it represents violated the Act. The single largest category of HPA violations found in the searchable "USDA-APHIS Animal Care Horse Protection Enforcement Actions 2009-2013" is "Foreign Substance." There are almost 1,000 entries for foreign substance violations. The USDA has never instituted a Formal Enforcement Proceeding based solely on the test results.

57.    The USDA's determination that a person has violated the foreign substance prohibition of the Act has a continuing adverse effect on the Plaintiffs. For example, at the 2012 Celebration, at which two McGartland horses allegedly tested positive for foreign substances, the USDA reported that of the 190 horses tested, 145 horses tested positive.  In May 2013, a national animal advocacy organization issued a press release titled the "USDA Indicates 76 Percent of the Horses Tested at 2012 Walking Horse Celebration Found Positive For Foreign Substances." The group requested that the Tennessee Attorney General initiate an investigation of the Celebration, which used SHOW as the inspecting HIO, to determine if a fraud had been committed on the public and if the Celebration had conspired to violate the HPA. The alleged fraud was the assurance by SHOW that based on its HIO's inspections the entrants complied with the Act.

58.    The Foreign Substance Penalty Protocol violates HPA §1825(b) because it enforces the Act by publically sanctioning people it alleges have sored their horses, but without notice and hearing required before the Secretary in Formal Enforcement Proceedings under 9 C.F.R. §1.131 *et seq.* The penalty assessed under the Protocol violates the APA requirement that a proceeding

for "imposition of penalty or fine" be on the record, where the accused may present evidence and arguments. 5 U.S.C. §551(10)(A),(C) and (G). The penalty Protocol violates the statutory requirement that "[a] sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b).

**B.   The USDA's IES Investigation and Enforcement Process is Unauthorized and Unlawful.**

59.    On August 30, 2012, the McGartlands' horse "He's Shady in Black" was disqualified by a VMO for an alleged violation of the Scar Rule.  On August 26, 2014, the McGartlands' horse "She's A Shady Lady" was disqualified by a VMO for an alleged scar rule violation. Both disqualifications resulted in IES determinations that the violation warranted Form 7060 enforcement letters.

60.    The McGartlands' responsibility for violating the Act was decided by IES enforcement employees, who are supposed to make their decisions after the alleged violator is afforded an opportunity to present evidence. Apparently the IES investigators' decisions that the McGartlands violated the HPA scar rule rested solely on the VMOs' reports, which are based on the subjective inspection and digital palpation of the horse's forelegs.  If a VMO decides a horse is in violation, the VMO completes a form report, and later on makes an affidavit to be submitted to IES for enforcement determination.  *See Young v. USDA*, 53 F. 3d 728, 729-30 (5th Cir. 1995).

61.    These reports and affidavits 1) "are created with a bias towards the Government's position; and 2) the conclusions reached in them are based on an unreliable method of determining whether a horse has been sored." *Id*.at 730.  A decision by the USDA that a person has sored a horse based solely on the VMO's hearsay report does not constitute substantial evidence that will sustain a penalty under HPA §1825. Standing alone, the VMO's report is "lacking in probative value and reliability." *Id*.

17

62.     Enforcement actions against the McGartlands under the IES Investigative and Enforcement Process contravene the USDA Regulation at 7 C.F.R. §1.133(a), which provides that where information about a possible violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder." The USDA's actions against the McGartlands have not resulted from proceedings filed under 7 C.F.R. §1.131 *et seq*. or any regulation or provision authorized by the Act.

63.     IES Investigators have no authority to decide a violation has occurred, or to issue and publish Warning Letters to enforce the Act. IES Investigators are authorized to direct and coordinate investigations of possible violations and coordinate enforcement with the Office of General Counsel. 7 C.F.R. §371.5(7).  If the investigation provides reason to believe a person has committed a violation, then the Office of General Counsel may civilly enforce the Act only by filing a complaint with the Hearing Clerk of the USDA. 7 C.F.R. §1.133(4)(b).

**C.     Alternative Enforcement Programs are Unauthorized and Unlawful.**

64.      There is no statutory authority for the Agency to employ either the IES Investigative and Enforcement Process or the Protocol for Foreign Substance Penalty, or to otherwise administratively determine liability for a violation and assess a penalty. The Act, specifically §1825(b), establishes that the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process contravene the HPA. The only civil penalties that can be assessed for an HPA violation must be assessed by an order of the Secretary.  The Act does not authorize the USDA to declare that every horse that tests positive for a substance is sore, or to publicize that the owner, trainer and entrant have violated or are alleged by the Department to have violated, HPA §1824. Nor does the Act authorize an IES "enforcement specialist" to determine whether a person

18

has violated §1824, or to impose a "penalty" on any person by issuing a warning letter that is published on the USDA's website.

65.     The USDA's alternative administrative enforcement schemes exemplify the type of scheme the Fifth Circuit invalidated in *National Pork Producers Council v. EPA*, 635 F. 3d 738 (5th Cir. 2011). There the EPA tried to impose a duty on producers to apply for a permit and imposed administrative penalties for failure to apply. The court ruled that where Congress created a comprehensive liability enforcement scheme, an agency's "attempt to supplement th[e] scheme is in excess of its statutory authority." *Id*. at 749.

**D.      The USDA's Publications Violate the McGartlands' Privacy Rights.**

66.     The USDA's published lists of its enforcement actions are compiled from information accumulated in its "Investigative and Enforcement Records Regarding Regulatory Activities, USDA/APHIS" system of records. ("System of Records"). Accumulation and dissemination of information in this system of records is governed by the Privacy Act, 5 U.S.C. §552a. The USDA has adopted regulations covering the accumulation and dissemination of information in this system.  See 7 U.S.C. §1.110 *et seq.*

67.     Privacy Act §552a(b) and the USDA's regulation 7 C.F.R. §1.119, provide that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be" to officers and employees of that agency, required under §552 when responding to a FOIA request, or for a routine use.

68.     USDA/APHIS–1 describes the USDA's System of Records identified above as including the documents and information the USDA has published and about which the McGartlands

complain. The publication of these lists and records is not authorized by the Routine Uses of records maintained in the system, and is not among the listed purposes of such uses. Indeed, this information about the McGartlands is exempt from disclosure under a FOIA request made by anyone but them.

69.     Under 5 U.S.C. §552a(e)(1), the agency is required to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."  There is no authorized purpose under the HPA justifying the issuance of warning letters and publishing them under false headings as public notice of an administrative determination that an individual has violated the HPA. Maintaining these records about the McGartlands is prohibited under this Privacy Act provision.

70.     Contrary to 5 U.S.C. §552a(e)(5), the Agency has used  records about the McGartlands without "making any determination about [them] with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness to the individual…."   Nor did the Agency, as required by 5 U.S.C. §552a(e)(6), prior to dissemination of records about the McGartlands, "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes."

71.     Under 5 U.S.C. §552a(g)(1)(C), when an Agency fails to maintain any  records so as to "assure fairness in any determination relating to the qualifications, character, right or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual," then   "the individual may bring a civil action against the agency, and the district courts of the United States shall have  jurisdiction in the matters under the provisions of this subsection" including ordering the agency to amend the

records as the court may direct. The McGartlands have suffered a legal wrong because of the USDA's publication of their names and information about them which is protected from disclosure by the Privacy Act.

## VI. THE USDA ENFORCEMENT PROGRAM BASED ON HIO PENALTIES IS UNAUTHORIZED AND UNLAWFUL

**A.     Alternative Enforcement of the Act Using Private Entities to Assess Sanctions**

72.   HPA §1823 was a 1976 amendment relating to enforcement, which authorized the USDA to promulgate regulations to qualify private persons who could be appointed by management to inspect horses entered into walking horse events. 15 U.S.C. §1823(c).  If the private inspector was of the opinion a horse was sore or did not comply with the Department's regulations, managers were informed and they were obligated to disqualify the horse. 15 U.S.C. §1823(a).

### 1.     HIOs penalized entrants for rulebook violations.

73.     The USDA decided it would not train or license private inspectors. Instead, it adopted Regulations under which it certified horse industry organizations (HIOs) to train and license DQPs to inspect horses. 9 C.F.R. §11.7.  From 1999 through 2009, the USDA and HIOs agreed to Operating Plans under which HIOs included in their rulebooks penalties they would assess against entrants when the DQP was of the opinion that a horse was sore.

74.     After an inspection, the DQP would issue a "ticket" to the person allegedly responsible for entering a sore horse.  Within days, the HIO notified the entrant of the penalty it was assessing.  If a person wanted to contest the penalty, the HIO provided an informal procedure to appeal.

75.     In 2009, the USDA proposed a new working agreement to enhance enforcement by requiring HIOs to adopt uniform suspension penalties. Several HIOs, including SHOW, rejected this proposed Operating Plan, and operating agreements terminated at the end of 2009.

      **2.**     **The USDA adopted new Regulations compelling HIOs to enforce the Act.**

76.    As a result of the failure to agree on an Operating Plan for 2010, on May 27, 2011, the USDA published in the Federal Register "Proposed Rules," which would require HIOs and DQPs "to assess and enforce minimum penalties for violations of the Horse Protection Act (the Act) and the regulations." 76 Fed. Reg. 30864.

77.    On June 7, 2012, the USDA adopted the new Regulations.  77 Fed. Reg. 33607.  The USDA's position was that it had authority to "impose whatever requirements on the HIOs that [it] determines to be necessary to enforce the Act and the regulations."  *Id.* at 33609.  The USDA claimed that "DQPs find violations of the Act by inspecting horses, and thus penalties will be assessed and enforced on the basis of the inspections."  *Id.* at 33610.

78.    A key provision of the new Regulations was the requirement that HIOs assess mandatory minimum suspension penalties for violations of the Act.  Penalties were to be enhanced based on prior violations of the Act. For example, the minimum suspension penalty for a horse determined to be bilaterally sore would be one year for the first offense, two years for a second offense, while for a third or subsequent offenses the suspension would be four years. *Id.* at 30868.

      **3.**     **Providing lists in order to prohibit entry and to assess alternative penalties.**

79.    In order for HIOs to know when a person was under suspension such that he or she would be denied entry into events, or to know when an enhanced suspension penalty should be assessed because of prior offenses, the USDA would have to identify those people who were currently suspended or had prior violations. The USDA gathered and provided the HIOs this information.

80.    On its website, the USDA provided these lists: (1) "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," (2) "Suspensions: Currently Active: | 2014 | | 2013 | | 2012 | | 2011 | | 2010" and (3) "Fines: | 2014 | | 2013 | | 2012 | | 2011 | | 2010."

81.     The "USDA Horse Protection Program Fine Report" for 2010-2014 included the name of the "Fined Person," the fine amount, the HIO "ticket" date and number, the fined horse's name and the HIO's name.  On the June 21, 2015, report, of the 115 people,  99 were fined by SHOW.

82.     The USDA publishes the "USDA Horse Protection Program Active Suspension Report." A June 21, 2015, copy identifies 90 individuals under the heading "Suspended Person."  SHOW assessed 70 of those suspensions.

83.     The USDA's lists of "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010|," contains a massive amount of information under the heading "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation." Each report lists the person's name under "Responsible Party." The "Violation" is specified. The horse is identified, along with the date of the show and the HIO that assessed the penalty. The June 21, 2015, reports total about 869 pages, with about 12,139 entries naming a "Responsible Party," identifying a "violation" and naming a horse.

**B.      HPA §1825(b) Precludes Private Party Enforcement of the HPA.**

84.     In *Contender Farms, L.L.P. v. U.S. Dept. of Agriculture*, 779 F. 3d 258, 262 (5th Cir. 2015), the Court described the new Regulation as one "requiring that private entities impose mandatory suspensions on those participants found to engage in a practice known as soring."  The Court held that the HPA "plainly prohibit[ed]" the Regulation and its approach to HPA enforcement, observing that "by looking to the plain language of §1823(c)," it is clear that "nothing in § 1823(c) contemplates USDA involvement in the *enforcement* procedures of HIOs." *Id.*  The Court reasoned that contrary to the statute, "the Regulation establishes a parallel enforcement scheme" to §1825, unsupported by the "plain language" of the statutory text.  *See id* at 271-75.  The Regulation

contravened the statute's plain language" because the "Regulation addresses an area that is plainly outside the USDA's statutory authority." *Id.* at 274.

85.     The HPA authorizes only one civil enforcement scheme – the one Congress prescribed in HPA §1825(b) and (c).

> Indeed, Congress expressly conferred civil and criminal enforcement to the USDA elsewhere in the HPA. Such violators of the HPA could be disqualified from participating in horse shows "by order of the Secretary, after notice and an opportunity for a hearing before the Secretary." 15 U.S.C. §1825(c). By its plain language, the HPA confers upon the USDA the ability to disqualify competitors from participating in the Tennessee walking horse industry following notice and a hearing *before the USDA*. This provision addresses the issue of enforcement, and it provides that only the USDA has enforcement power, not HIOs. In light of §1825, the USDA possesses only the authority: (1) to provide qualifications for inspectors; and (2) to, itself, assess penalties for HPA violations.

*Id.* at 273, n.6 (emphasis in original).

86.     The invalidation of the new regulations solved only part of the problems created during their short-lived implementation. The USDA's website lists implementing the rules are still published, and continue to be updated. Since the USDA's lists of violators, violations and suspensions are no longer used by HIOs to exclude people from entering a show, or to enhance penalties based on prior offenses, their only present purpose is to serve as an alternative enforcement program imposing sanctions by public reprimand on people identified as having violated the Act.

87.     By disregarding the language in the Act and the holdings in *Contender Farms,* the USDA continues to publish lists based on information it receives from HIOs that identify people as having violated the Act. There is no legal basis for the USDA continuing to accumulate and publish HIO information about people who are ticketed or assessed an HIO penalty.

**C.      The McGartlands' Object to APHIS' Publication of the HIO Penalty Lists.**

88.      The McGartlands and Contender Farms contend the USDA's practice of publishing lists that identify people as responsible for horses found in violation, based on the activities of DQPs and HIOs in ticketing and penalizing entrants, is unauthorized and unlawful.  The McGartlands and Contender Farms enter horses in HIO inspected events. They face the real possibility that they will be ticketed for soring a horse, will have an HIO penalize them without due process of law, will have the HIO provide this information to the USDA and will have the USDA publish a public reprimand identifying them as responsible for violating the Act.

89.      This happened in 2008, when Mike McGartland was ticketed by a DQP, working for the HIO NHSC. The horse was disqualified and a ticket was issued. But McGartland appealed the finding, won and was not suspended.  Nonetheless, McGartland's name has been published as having received a one month suspension.  This incident is still published in FOSH's data link. FOSH is an HIO that maintains a website that combines information it receives about alleged HPA violations. FOSH and the USDA cooperate in this effort, with the USDA providing information on alleged violations and coordinating with FOSH's work. Such a false publication presents an actual or imminent injury that is concrete and particularized, that is directly traceable to the conduct of the USDA, and that is redressable by a judgment in Plaintiffs' favor.

90.      The USDA's policy and practice of publishing the lists of participants who have received HIO rulebook penalties, which are characterized as violations of the Act, specifically targets participants in Tennessee walking horse events like the McGartlands and Contender Farms. They are the objects of the lists, the sole purpose of which is to issue a public reprimand as a penalty against the accused and as a deterrent to others.

91.     The McGartlands and Contender Farms raise a purely legal challenge to the USDA's policy of publishing the names of those penalized under an HIO's rulebook, representing that such persons have violated the Act. Their challenge is ripe, and the McGartlands do not have to wait for the policy to be further applied against them in order to determine its legality.

 **D.     USDA Demands for and Use of SHOW's Records Is Unauthorized and Unlawful.**

92.      The USDA continues to demand that SHOW turn over its private records identifying people who have received DQP "tickets" and who have had penalties assessed against them. There is no authority under the Act for the USDA to require HIOs to assess appropriate penalties for violations.

93.     On June 9, 2015, Paul Warren, a USDA representative, appeared at SHOW's office in Shelbyville, Tennessee, and demanded that SHOW's Operations Manager turn over all the tickets SHOW had issued for April and May, 2015.  Mr. Warren said he needed the copies immediately, because the USDA was investigating a complaint alleging that SHOW was destroying some tickets rather than enforcing them.

94.     On August 24, 2015, Mr. Harris, an IES employee, delivered a memo to SHOW's office in Shelbyville, Tennessee, requiring that SHOW turn over all documents identified on the list concerning its activities as the HIO under contract with management of the Celebration, which was scheduled for August 25 through September 5, 2015.

95.     On August 26, 2015, SHOW wrote IES complaining of the demands made on it, but apparently not on any other HIO, and requested the Agency identify any legal authority for its conduct and demands.  No responsive explanation was received.

96.     The USDA's actions in requiring that SHOW turn over its records on demand is "facially unconstitutional because it fails to provide [SHOW] with an opportunity for precompliance

review" by a "neutral decisionmaker." *City of Los Angeles, California v. Patel*, 135 S. Ct. 2443 (2015).

97.     Congress included in the HPA a provision granting the USDA authority to obtain private records. HPA §1825(d) provides that "[t]he Secretary may require by subpoena the … production of books, papers, and documents relating to any matter under investigation or the subject of any proceeding."   District courts can enforce the administrative subpoenas, or, where a proper objection is made, quash or modify the requested production.

98.     APA §555(c) provides that any agency's "requirement of a report, inspection, or other investigative act or demand may not be issued, made or enforced except as authorized by law" and that enforcement of a subpoena shall be before a neutral decision maker, affording the person upon whom the request or demand is made a fair opportunity to be heard.

99.     SHOW challenges the USDA's demands that it turn over its ticketing and penalty records on request because the Agency uses SHOW's records for "illicit purposes," including misrepresenting the information when it publishes lists that inaccurately identify people SHOW has ticketed as  having been determined to have violated the Act.

## VII.   RELIEF REQUESTED

100.    Plaintiffs request a declaration that the USDA's alternative administrative enforcement programs, based on policies, processes or protocols that attempt to enforce the HPA other than as authorized by §1825, are not authorized and are unlawful. Plaintiffs request the Court enjoin the Agency from engaging such enforcement activities.

101.    Plaintiffs seek a declaration that the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process are not authorized by the Act as a means to sanction people for alleged violation or to deter others from committing violations and are unlawful under the Act.

102.    Plaintiffs seek injunctive relief prohibiting the Defendant from enforcing and administrating these alternative administrative procedures to enforce the Act against people, and enjoining it from publishing lists indicating that an identified person has violated the Act.

103.    The McGartlands request the Court declare the USDA's decisions that they violated the Act and its assessment of sanctions by publication, is void and of no effect. This Court should order the USDA to expunge the McGartlands' records, and order the USDA to publish on its website that its determination that  the McGartlands sored their horses was based on no evidence, afforded them no due process, and, under APA §706(2) was arbitrary and capricious.  The Court should enjoin future publications about the McGartlandds that are based on alterntive enforcement programs.

104.    Under the APA, HPA and Privacy Act, the McGartlands request this Court to declare that the Agency violated the Privacy Act and the McGartlands' privacy rights, that the Court enjoin such violations from occurring in the future, order that the website lists identifying the McGartlands and other people who have been penalized with a public reprimand and Form 7060 be removed from the USDA's website, order the Agency to purge from its system all records and information about the McGartlands and Contender Farms and require that the Court's order be published in their place.

105.    SHOW requests an order declaring that the Agency's listing of SHOW as a violator of the Act or its regulations was unlawful, beyond the Agency's authority and arbitrary and capricious. SHOW seeks an order compelling the USDA to remove the information about SHOW from its enforcement websites and an injunction prohibiting Defendant from representing that SHOW violated the HPA.

106.    The Plaintiffs request an order declaring that USDA information accumulation policies and practices with regard to HIO records, and the practices and policies for publically disseminating information through the USDA Horse Protection Program that identifies people as Responsible Parties for Horses Found in Violation, and its Fine Reports and Suspension List, are unauthorized and unlawful under the HPA and APA and request the Court enjoin the agency from publishing such information.

107.    Show requests the Court declare that the USDA is not legally entitled to demand from SHOW production of its private records or information about individuals who have been ticketed or penalized and that  the Agency follow the procedures in §1825(d).

108.    SHOW request a declaration that it is under no duty to maintain a ticket and penalty system, but that if it chooses to, then the USDA has no legal authority to require SHOW to provide its records, other than voluntarily or in response to a lawful subpoena.


Respectfully submitted by:

/s/Karin Cagle_____
Karin Cagle
Texas State Bar No. 24043588
1619 Pennsylvania Avenue
Fort Worth, Texas 76104
E-mail:  kcaglelaw@gmail.com
Tel.:  817.721.5127

David Broiles
Texas State Bar No. 03054500
2400 Indian Cove
Fort Worth, Texas 76108
Email: davidbroiles@gmail.com
Tel. 817.246.7801