UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CONTENDER FARMS, LLP, | § | |
| LEE MCGARTLAND, MIKE | § | |
| MCGARTLAND and SHOW, INC., | § | |
| | § | |
| Plaintiffs | § | Case No. 4:16-cv-163-Y |
| vs. | § | |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF AGRICULTURE | § | |
| | § | |
| Defendant | § | |

# SECOND AMENDED COMPLAINT

1.      Plaintiffs complain that the United States Department of Agriculture ("USDA," "Agency" or "Department") supplements enforcement of the Horse Protection Act ("HPA" or "Act"), 15 U.S.C. §1821 *et seq.*, by employing policies and taking actions that are not credible extensions or interpretations of the HPA. Plaintiffs seek declaratory and injunctive relief holding these alternative enforcement actions unauthorized and unlawful under the HPA, arbitrary and capricious under the Administrative Procedures Act ("APA") and in violation of the McGartlands' rights under Privacy Act §552a(b).

## I. THE PARTIES

2.      Mike and Lee McGartland reside in Fort Worth, Texas, and are partners in Contender Farms LLP ("Contender"), whose horses the McGartlands enter in shows. It is a Mississippi limited partnership with its principle place of business in Fort Worth, Texas. SHOW Inc. is an IRS §501(c) not-for-profit Tennessee corporation located in Shelbyville, Tennessee.

3.     Defendant USDA, administers and enforces the HPA through its Animal and Plant Health Inspection Service ("APHIS").

## II. JURISDICTION, VENUE AND REVIEW

### A. Jurisdiction and Venue.

4.     HPA §1825(d)(6) vests this court "with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter."  Under 28 U.S.C. §1331, this court has federal question jurisdiction because the Plaintiffs' claims arise under federal statutes. District courts have jurisdiction over any proceeding based on an Act of Congress regulating commerce. 28 U.S.C. §1337. Venue is proper under 28 U.S.C. §1391 since the McGartlands are United States citizens residing in Fort Worth, Texas and SHOW is properly joined under 28 U.S.C. §1391(e).

### B. Scope of Review.

5.      APA §701 *et seq.* waives government immunity from judicial review of agency actions where declaratory or injunctive relief is sought. Plaintiffs allege they have suffered and are suffering from a legal wrong because of USDA actions, or have been adversely affected or aggrieved by USDA actions within the meaning of the HPA. 5 U.S.C. §702 and §704.

6.     The legal wrong about which the McGartlands and Contender Farms complain results from USDA employees unlawfully deciding the McGartlands violated the HPA and imposing sanctions on them by assessing penalties that are then published on USDA databases. 5 U.S.C. §551(10)(C) and (13).  SHOW complains that the USDA has wrongfully publicized on these same databases that SHOW has violated the HPA.

7.     SHOW also complains of the USDA's action in publishing database lists which are derived from SHOW's records that falsely and misleadingly characterize SHOW as assessing penalties against people for violations of the HPA. SHOW and the McGartlands complain that they are

adversely affected by the USDA publishing database lists that misleadingly characterize those listed or who may be listed as violating the HPA based on HIO penalties. These agency actions are reviewable under 5 U.S.C. §702 and §704.

8.      The McGartlands also complain that the USDA has violated their privacy rights by disclosing and publishing false and misleading personal information about them on USDA databases in violation of the Privacy Act, 5 U.S.C. §552a(b). The publication of false and misleading information about the McGartlands is the result of final Agency actions marking the consummation of the Agency's decision-making process. These decisions determine the rights or obligations of the Agency or the McGartlands or are decisions from which legal consequences will flow. 5 U.S.C. §702 and §704.

9.       APA §706(2) authorizes this Court to review the evidence and law, and to "hold unlawful and set aside agency actions" that are "arbitrary, capricious, an abuse of discretions or not in accordance with law," are "contrary to constitutional right," are "in excess of statutory jurisdiction, authority, or limitations" or are the result of decisions made "without observance of procedure required by law." 5 U.S.C. §706(A), (B), (C) and (D).

### III. THE USDA'S FOUR HPA ENFORCEMENT PROGRAMS.

#### A. The HPA's Congressionally Authorized and Mandated Enforcement Scheme.

#### 1.   15 U.S.C. §1825(b) authorizes civil penalties and prescribes due process procedures.

10.     The HPA authorizes only one civil enforcement scheme by which a person can be determined to have violated the Act for which he or she can be assessed a penalty. HPA §1825(b) requires that decisions about whether a person violated the HPA and about what civil penalty should be imposed must be determined on the record. It provides:

> (1) Any person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation. **No penalty**

**shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation.** The amount of such penalty shall be assessed by the Secretary by written order. In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent, and gravity of the prohibited conduct, and with respect to the person found to have engaged in such conduct, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require. (Emphasis added).

11.    In addition to requiring notice and a hearing, §1825(d) authorizes subpoenas for attendance of witnesses and production of documents, and it empowers district courts to aid in implementing the procedures. Section 1825(b)(2) guarantees a person determined liable for a civil penalty the right to appeal to a United States Court of Appeals.

**2.  The Administrative Procedures Act mandates Formal Enforcement Proceedings.**

12.    "A sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b). The APA governs an agency's assessment of a sanction, which includes the "imposition of penalty or fine." 5 U.S.C. §551(10)(B). APA §554(a) applies in every case of agency adjudication required by statute to be determined on the record. ("Formal Enforcement Proceeding"). Proceedings must be held in the agency's administrative court, where an Administrative Law Judge ("ALJ") shall "preside at the taking of evidence." 5 U.S.C. §556(b). The accused must receive adequate notice and be afforded the opportunity to present evidence and arguments. 5 U.S.C. §554.  Detailed due process protections are required. 5 U.S.C. §556.

**3. USDA Regulations govern all USDA enforcement proceedings.**

13.    The USDA's "Rules of Practice Governing Formal Adjudicatory Administrative Proceedings Initiated by the Secretary" ("Enforcement Rules") govern Formal Enforcement Proceedings. 7 C.F.R. §1.130 *et seq.*  Under §1.133(a)(1), when information about a possible

violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder." The HPA provides one statutorily authorized proceeding, under §1825(b), and the USDA has promulgated no regulations authorizing alternative enforcement proceedings.

14.     When the Agency receives information of an "alleged violation," the "Administrator shall cause such investigation to be made as, in the opinion of the Administrator, is justified by the facts. If such investigation discloses that no violation of the Act or of the Regulations has occurred, no further action shall be taken…." 9 C.F.R. §1.133(a)(3).

15.     "If there is reason to believe that a person has violated or is violating any provision of a statute…or of any regulation … issued pursuant thereto…a Complaint may be filed with the Hearing Clerk pursuant to these rules." 9 C.F.R. §1.133(b). The Complaint shall include "allegations of fact and provisions of law which constitute a basis for the proceeding and the nature of the relief sought." 9 C.F.R. §1.135(a).  USDA regulations authorize only Formal Enforcement Proceedings to determine liability and assess penalties.

16.     The USDA's Enforcement Rules require that Formal Enforcement Proceedings be conducted by an ALJ whose decision is reviewable by the Department's Judicial Officer ("JO"), who has been delegated the Secretary's authority.  7 U.S.C. §450(e) and (g) and 7 C.F.R. §1.145. A Formal Enforcement Proceeding under the Department's Enforcement Rules is the only authorized and lawful enforcement scheme by which a person's liability for a violation can be determined and a penalty assessed.

**B. The USDA's Three Alternative Enhanced Enforcement Schemes.**

17.    In 2010, the USDA's Office of Inspector General reported that since its passage, APHIS's budgets for enforcing the HPA had been about $500,000 a year and that the USDA found that formal enforcement "proceedings may be time-consuming and expensive, and our resources for prosecuting such cases are limited." 76 Fed. Reg. 30,865 (May 27, 2011).  Fewer than a dozen Formal Enforcement Proceedings are filed each year.

18.    To increase enforcement, the USDA decided to employ three less time-consuming and less expensive enforcement schemes as alternatives to Formal Enforcement Proceedings.  The Department utilizes two internal administrative enforcement schemes: the "Protocol for Foreign Substance Penalty" and the "IES Investigative and Enforcement Process." A third alternative enforcement scheme requires private entities to enforce the Act by assessing penalties for violations.

19.    Penalties imposed under these three alternative enforcement programs are published on the USDA's public website, identifying violators, their violations and the date of the violations. Using these three alternative enforcement schemes, the USDA claims that more than 2,000 enforcement actions are completed each year.

**IV. THE PROTOCOL FOR FOREIGN SUBSTANCE PENALTY AND IES INVESTIGATIVE AND ENFORCEMENT PROCESS ARE ALTERNATIVE ENFORCEMENT SCHEMES.**

**A. The Foreign Substance Penalty Program. [1]**

20.    The USDA's Protocol for Foreign Substance Penalty enforcement program assesses penalties "for a foreign substance violation detected by a USDA inspector through the use of the

---

[1]  The Protocol on Foreign Substance Penalty is a published internal enforcement procedure, not a regulation adopted under the APA.

Gas Chromatography/Mass Spectrometry ("GC/MS") Test."  The GC/MS test samples are taken by USDA employees from horses selected by USDA officials. The horse's forelimbs are swabbed and the sample sent to a non-governmental laboratory for analysis.

21.     It takes time to receive the results, so the USDA will "notify the alleged violator of the specific foreign substance or substances detected concurrently with the notification of the penalty." The notification of the person's violation of the Act and the assessed penalty are final Agency actions determining legal rights or obligations or from which legal consequences flow.

22.     Those consequences include assessing one of three types of penalties. For the "**1st offense**: Issue official USDA warning (Form 7060) for violation of Federal Regulations to all parties involved." For a "**2nd offense**: Issue official warning (Form 7060) for violation of Federal Regulations to all parties involved." For the "**3rd offense:**" offer of a stipulated penalty, which, if not accepted, will result in a §1825 proceeding being filed. For a "**4th offense:** a 'Federal case' will be filed."

23.     The penalty assessed by issuing a Form 7060 "OFFICIAL WARNING OF VIOLATION OF FEDERAL REGULATIONS" is published on the USDA's databases, disclosing the name of the violator, the horse's name, the date of the violation and specifying the offense as one for a foreign substance in violation of the HPA. The purpose and effect of the publication is to penalize the violator and thereby deter others from committing violations. The USDA justifies the publications because "APHIS is highlighting enforcement actions taken in response to violations of the Animal Welfare Act (AWA) and Horse Protection Act (HPA)."

24.     On August 23, 2012, Mike and Lee McGartland entered the Contender Farms' horse "Low on Gin" in a class at the Celebration.[2] The horse was swabbed for the GC/MS foreign substance test. On October 18, 2013, the USDA sent Mike and Lee McGartland each an Official Warning on Form 7060, issued in Case No. TN130373-AC, informing them that the USDA's evidence showed that they had violated 15 U.S.C. §1824(7) and 9 C.F.R. §11.2(c), because the horse tested positive for Sulphur. They were identified as the "Violator" who had "committed the following violation(s) of federal law" with the "Unlawful Acts" identified and told they were being "warned of this violation" because their conduct could have "serious and costly impact detrimental to the public interest." The Official Warnings were published on two USDA databases, which identified the McGartlands as having violated the HPA.

25.     On August 30, 2012, the McGartlands entered Contender Farms' horse "He's Shady in Black" in a Celebration class. On one database, the USDA identified "He's Shady in Black" as having been in violation of the foreign substance prohibition and identified Mike McGartland as the violator.

**B. The USDA's Alternative Investigative and Enforcement Services ("IES") Scheme.**

26.     To address a backlog of investigations and bolster its numbers of enforcement actions, in 2010, the USDA created the IES Investigative and Enforcement Process.[3] HPA §1823(e) authorizes the Secretary's duly appointed representatives to attend events to inspect for possible HPA violations. These Veterinarian Medical Officers ("VMOs") inspect horses and inform

---

[2]  The Tennessee Walking Horse National Celebration ("Celebration") is the World Series of walking horse events and the largest show for this breed.

[3]  The IES Investigative and Enforcement Process in a published internal enforcement procedure, not a regulation adopted under the APA.

management if a horse is sore. If management receives such a report, the horse must be disqualified from participating in the event under HPA §1823(a).

27.     VMOs report the results of their inspections to IES Field Investigators in Regional Offices, who open investigations into possible violations. According to written procedures, in conducting an investigation, the IES Investigator may interview witnesses, collect evidence and "[a]s part of its investigative process, IES provides alleged violators with the opportunity to submit any evidence that they did not violate an APHIS-administered law"; further, "[o]nce the investigation is complete, the investigator prepares a report of investigation (ROI), which summarizes the investigative findings." The report and any evidence are then sent "to IES' enforcement staff for review."

28.     Enforcement decisions are made at IES Headquarters, where "a specialist reviews and analyzes this information to determine if the violation is substantiated by the evidence provided." The enforcement specialist "determines whether an enforcement action is appropriate….[w]hen preparing penalty recommendations, [the enforcement specialist] … relies on the penalty provisions contained in the relevant APHIS-administered law … and applies penalty adjustments for aggravating and mitigating factors."

29.     If the enforcement specialist decides an alleged non-compliance does not warrant an enforcement action, "letters of information" can be sent, with the aim of educating an individual to correct a noncompliance in non-egregious cases. These letters of information are not considered an "official enforcement action," in contrast to the issuance of a Warning Letter.

30.     If the IES enforcement specialist concludes there has been a substantiated violation that warrants an enforcement action, the possible "[e]nforcement actions may include an official

warning, a voluntary settlement agreement, [or] a referral to the USDA's Office of General Counsel (OGC) to institute an administrative proceeding."

31.     If the IES enforcement specialist decides a violation has been substantiated, but that it does not warrant enforcement by a Formal Enforcement Proceeding, a Form 7060 Official Warning can be issued to the violator, identifying the violator, the horse, the violation and the date of the violation. That information and the Form 7060 will then be published on the USDA's public database as a sanction against the alleged violator and to deter others from such conduct. "When IES issues an official warning, it closes the investigative file involving the alleged violation." The IES' decisions, that a person has violated the HPA, the assessment of the Form 7060 penalty and the database publication are final Agency actions that determine rights or from which legal consequences flow.

32.     Under the IES Investigative and Enforcement Process, APHIS has found the that decisions it makes about who violated the HPA and the assessment of the Form 7060 penalty, coupled with publication on the public databases, have effectively allowed APHIS to "take swift action." In 2014, APHIS's Administrator said: "I believe that enforcement delayed is enforcement denied" and that "[t]aking action more quickly against violators serves as a better deterrent to not only the specific violator, but other violators as well."

33.     On August 30, 2012, the McGartlands entered Contender Farms' horse "He's Shady in Black" in a Celebration class. After the horse passed the Designated Qualified Person ("DQP") inspection, a VMO inspected the horse and said it violated the scar rule. The horse was disqualified from the event. On July 7, 2014, the USDA sent both McGartlands a Form 7060, in Case No. TN130155-AC, informing them that they had violated 24 U.S.C. §1824(2) and 9 C.F.R. §11.3, the

Scar Rule. The USDA identified both Mike and Lee McGartland as violators of the scar rule on two public databases and published each Form 7060.

34.     On July 26, 2014, the McGartlands entered Contender Farms' horse "The Royal Dollar" in a class at the 74th Annual Red Carpet Show of the South. After passing pre-event inspection, the horse placed third in the class. It was selected by a VMO for post-event inspection, and he said it was sore. On March 8, 2016, in Case No. TN150187-AC, the USDA issued a Form 7060 to Lee McGartland identifying her as a "violator" of "Federal law" and stating that USDA evidence showed a scar rule violation of 15 U.S.C. §1824(2)(A). On April 18, 2016, a USDA News Release announced that the HPA March enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." On April 19, 2016, the March enforcement actions were posted on the Enforcement Action List, and Lee McGartland was listed in case number TN150187-AC as a "violator" of HPA §1824(2)(A) and the Form 7060 was published.

35.     On August 26, 2014, the McGartlands entered Contender Farms' horse "She's a Shady Sister" at the Celebration. After passing DQP inspection, a VMO inspected the horse and said the horse violated the scar rule. On February 17, 2016, in case no. TN 150128-AC, the USDA issued two Form 7060 to Lee and Mike McGartland for a scar rule violation. On March 18, 2016, a USDA News Release announced that the HPA February enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." The McGartlands were listed as "violators" in two cases and their Forms 7060 were published.

36.     On August 27, 2014, the McGartlands entered Contender Farms' horse "Blue's Master" in a class at the Celebration. After passing the DQP inspection a VMO inspected the horse and said

it violated the scar rule. On February 17, 2016, the USDA sent Mike McGartland a Form 7060, in Case No. TN150128-AC, stating that he violated the scar rule by allowing the horse to be shown in violation of 15 U.S.C. §1824(2)(D), which decision along with the Form 7060 the USDA published on its database. On March 18, 2016, a USDA News Release announced that the HPA February enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." The McGartlands were listed in two cases as "violators" and their Forms 7060 were published.

### C. The USDA Unlawfully Publishes the Names of HPA Violators, their Violations and Form 7060 Warning Letter Penalties

**1. Official Warnings on Form 7060 are USDA final enforcement actions assessing penalties.**

37    According to the USDA, "enforcement actions…in ascending order of severity, are: the Official Warning Letter (7060); the Stipulation; the OGC Complaint; the Consent Decision; and the Decision and Order."   The "legal effect of a Form 7060" is that it "is an administrative action…routinely used for minor infractions instead of other forms of legal enforcement such as civil penalties, sanctions or criminal prosecutions." The decision that a person has violated the HPA, even if only a "minor" infraction, is a final Agency decision.

38.    The Form 7060 "administrative action…. used when APHIS determines that it would not be an effective use of its limited resources to pursue other forms of legal enforcement." "Although official warning letters do not include a monetary penalty, they are official enforcement actions and will be considered as part of a person's enforcement history if additional action is deemed necessary in the future."   The penalty assessed for minor infractions of the HPA is a Form 7060 that identifies the "Violator" and "Violation," but it does not state the infraction is "minor."

**2.   The USDA publishes lists identifying people it has determined violated the Act.**

39.     According to the USDA, a Form 7060 Official Warning serves as a "deterrent not only to the specific violator, but other potential violators as well." This deterrent effect results from APHIS publishing copies of the Official Warning on its public databases. One database, an archived listing, is titled "USDA/APHIS-Animal Care Horse Protection Violations 2009-2013" ("Searchable Violations List").[4] This archived list has identified the "Violator" by name, the horse's name, the "Violation date," and the "Violation." Opening the icon in the column under "View" beside the violators' name usually produces a copy of a Form 7060.

40.     APHIS also publicizes "enforcement actions taken in response to violations of the Horse Protection Act" using a database titled "USDA APHIS | Enforcement Actions," covering 2010 into 2016. ("Enforcement Actions List").[5]  Opening a specific year produces AWA and HPA enforcement actions by month, with access to 7060s, Stipulations, Complaints and Decisions and Orders. This database reflects that from 2010 through 2015, the USDA completed about 2,279 HPA enforcement actions resulting in a Form 7060, representing 95% of APHIS's total HPA enforcement actions for that period.

41.     Under the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process, the USDA made final decisions that the McGartlands violated the HPA. Based on those decisions, the Agency penalized the McGartlands by issuing each a Form 7060 Official Warning. Upon closing the investigations, the USDA published the McGartlands' names as people subject to enforcement actions, identifying them as violators, identifying the APHIS case

---

[4]https://acissearch.aphis.usda.gov/acis_request/faces/DataRequest.jspx?output_type=1&request_type=801&sd=01-01-2014&ed=12-31-2014&request_id=ALL
[5] https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions

numbers and disclosing the Form 7060s to the public in order to punish not only the McGartlands, but to deter others from violating the HPA.

42.     These Agency actions have adversely affected the McGartlands. As a result of these USDA's enforcement actions, and given that in the future they may have a Form 7060 penalty assessed against them or have a "Federal case" filed against them because of "past offenses" described above, the McGartlands have temporarily stopped entering horses in events, while awaiting the outcome of this lawsuit.

43.     The McGartlands are practicing attorneys, who abhor the possibility of being publically reprimanded based on an APHIS employee's decision made in cases held without notice or hearing in violation of §1825(b). There can be little question that the disclosures identifying the McGartlands as targets of USDA law-enforcement investigations can, and have, subjected them to embarrassment and potentially more serious reputational harm.

## V.  THE PROTOCOL FOR FOREIGN SUBSTANCE PENALTY AND IES INVESTIGATIVE AND ENFORCEMENT PROCESS ARE UNAUTHORIZED AND UNLAWFUL ENFORCEMENT SCHEMES.

### A. The Two Alternative Enforcement Schemes and the Published Lists are Not Authorized by the HPA and are Unlawful.

44.     The USDA administered Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process alternative enforcement programs under which it decides whether a person violated the HPA and whether a penalty should be assessed contravene the plain language of §1823(b): "**No penalty shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation.**"  (Emphasis added).

45.     USDA employees working as enforcement specialists are not authorized to decide whether a person has violated the HPA or to assess any penalty for a violation.  There is no authority under the HPA to publish the Searchable Violations List or Enforcement Actions List, both of which

14

falsely identify people as violators of the Act, or to publish the Form 7060, which is materially inaccurate and misleading.

46.     The two alternative enforcement schemes exemplify the type of scheme invalidated in *National Pork Producers Council v. EPA*, 635 F. 3d 738, 749 (5th Cir. 2011), which held that where Congress creates a comprehensive liability enforcement scheme, an agency's "attempt to supplement th[e] scheme is in excess of its statutory authority." The USDA cannot "create from whole cloth new liability provisions." *Id*. at 753.

> **B. The Agency's Actions Under the Two Alternative Enforcement Schemes are Arbitrary, Capricious, Not in Accordance With Law, Contrary to Constitutional Rights, in Excess of Statutory Jurisdiction and Authority and Without Observance of Procedures Required by Law.**

47.     "A sanction may not be imposed…except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b). The USDA's final decisions that the McGartlands violated the HPA, for which it assessed penalties,  adversely affected the McGartlands. These enforcement actions should be declared "unlawful and set aside"; they are "not in accordance with law," are in "excess of statutory jurisdiction, authority, or limitation" and do not follow "procedures required by law." 5 U.S.C. §706(2)(A), (C) and (D).

48.     The USDA acknowledges that issuing a Form 7060 is a penalty for a violation of the HPA. Adverse legal consequences flow from these Agency actions. The final decisions are a part of the McGartlands' record as "prior offenses" that will be taken into account by the USDA in assessing a penalty in a future proceeding.  5 U.S.C. §551(13).

> **1. The Protocol for Foreign Substance Penalty is an unauthorized and unlawful enforcement scheme that denies constitutionally and statutorily protected due process rights, and the decisions and penalties made under it are arbitrary and capricious.**

50.     From its adoption, the Protocol for Foreign Substance Penalty has been a subject of controversy because under the Protocol, if any substance the Agency tests for can be identified,

the USDA considers that all the people associated with the horse –- the owner, trainer, transporter, rider and entrant -- violated the Act. Because the decision that a violation occurred rests solely on the test results, it is not surprising that the single largest category of HPA violations in the Searchable Violations List for 2009-2013 is for "Foreign Substance." There are almost 1,000 entries for foreign substance violations. Yet the USDA has never instituted a Formal Enforcement Proceeding based solely on the GC/MS test results.

51.     When the USDA announced the Protocol for Foreign Substance Penalty, SHOW questioned whether the protocol was reasonable or fair.  The USDA issues Form 7060 penalties based solely on a "positive" test result, meaning any detectable amount, however slight. The test results alone do not provide evidence from which one can determine if the substance was foreign or natural, or decide whether a person might have applied the substance and, if so, who that person might have been. Nor can one determine from the test alone whether the substance could cause soreness or was present in sufficient quantity to sore the horse. Using the test results alone to decide whether an HPA foreign substance violation has occurred is arbitrary and capricious

52.     Publically identifying people as having violated the Act based on the GC/MS test results disseminates false and misleading information. The USDA's determination that a person has violated the foreign substance prohibition of the Act by using the protocol has a continuing adverse effect on the McGartlands and SHOW. For example, at the 2012 Celebration, at which two McGartland horses allegedly tested positive for foreign substances, the USDA reported that of the 190 horses tested, 145 horses tested positive.

53.     Based on this USDA report, in May 2013, a national animal advocacy organization issued a press release titled the "USDA Indicates 76 Percent of the Horses Tested at 2012 Walking Horse Celebration Found Positive For Foreign Substances." The group requested that the Tennessee

Attorney General initiate an investigation of the Celebration to determine if a fraud had been committed on the public and if the Celebration had conspired to violate the HPA.  Plaintiff SHOW was the horse industry organization (" HIO") for this event.

54.     Under the Protocol for Foreign Substance Penalty, the USDA's enforcement decisions that sanction people are made without notice and hearing. Constitutional and statutory due process requires notice and a hearing before an agency determines that a person has violated the law and impose a penalty. There was no notice or hearing where the USDA had the burden to prove that "Low on Gin" had Sulphur on its legs, that the Sulphur was a foreign substance, that the McGartlands applied it, that the Sulphur was an irritant, which it is not, that it was present in sufficient quantity to affect the horse's gait, and, that an appropriate penalty was issuance of a Form 7060 or that these Agency enforcement action should be published.

55.     The penalties assessed against the McGartlands under the protocol violate the APA requirement that a proceeding for "imposition of penalty or fine" be on the record, where the accused may present evidence and arguments. 5 U.S.C. §551(10)(A),(C) and (G). The actions taken against the McGartlands under the Protocol for Foreign Substance Penalty are invalid under APA §706(2)(A), (B), (C) and (D).

**2. The IES Investigative and Enforcement Process is an unauthorized and unlawful enforcement scheme that denies constitutionally and statutorily protected due process rights and the decisions and penalties made under it are arbitrary and capricious.**

56.     Since 2012, under the IES Investigative and Enforcement Process the McGartlands have received seven Form 7060s for allegedly soring their horses and have been identified as violators on the two USDA databases on which the 7060s were published. The McGartlands' responsibility for violating the Act was decided by IES employees who were supposed to make their decisions after the McGartlands were afforded an opportunity to present evidence. There were no hearings.

The IES investigators' decisions that the McGartlands violated the Act rested solely on the VMO's reports, which are the result of subjective inspection and digital palpation of the horse's forelegs. If a VMO decides a horse is sore, the VMO completes a form report, and later makes an affidavit that is submitted to IES for enforcement determination. *See Young v. United States Dept. of Agriculture*, 53 F.3d 728, 729-30 (5th Cir. 1995) and *Bradshaw v. U.S. Dept. of Agriculture*, 254 F.3d 1081 (5th Cir. 2001).

57.     These reports and affidavits 1) "are created with a bias towards the Government's position; and 2) the conclusions reached in them are based on an unreliable method of determining whether a horse has been sored." *Young,* 53 F. 3d at 730.  A decision by the USDA, that a person has sored a horse based solely on the VMO's hearsay report, is not based on evidence substantial enough to sustain a penalty issued under HPA §1825. Standing alone, the VMO's report is "lacking in probative value and reliability." *Id*.

58.     Enforcement actions against the McGartlands under the IES Investigative and Enforcement Process contravene the USDA Regulation at 7 C.F.R. §1.133(a), which provides that where information about a possible violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder." The USDA's actions against the McGartlands have not resulted from proceedings filed under 7 C.F.R. §1.131 *et seq*. or under any regulation or provision authorized by the Act.

59.      The Agency's decisions that the McGartlands violated the scar rule when entering or showing their horses were arbitrary, capricious and not made in accord with the law. Constitutional and statutory due process requires notice and a hearing before an agency can determine that a person has violated the law much less impose a penalty. There was no notice or hearing where the

USDA had the burden to prove that "He's Shady in Black," "The Royal Dollar,"  "She's A Shady Sister," or "Blue's Master" were sored or that an appropriate penalty would be the issuance of a Form 7060 to be published on  the USDA's website..

**C. The Agency's Actions in Issuing and Publishing Form 7060s for HPA Violations are Arbitrary and Capricious, Not in Accordance With Law, Contrary to Constitutional Rights, in Excess of Statutory Jurisdiction and Authority and Without Observance of Procedures Required by Law.**

60.     APHIS administers the Animal Welfare Act ("AWA") and the HPA. The AWA and HPA differ substantially with regard to the role of Form 7060 warnings in enforcement proceedings. The AWA regulates the activities of those who deal commercially in animals, exhibit animals or operate research facilities. The AWA requires dealers, exhibitors and research facilities to be licensed. 7 U.S.C. §2133-§2139. Under AWA §2149(a), a license issued by the USDA may be suspended or revoked by the Secretary only "after notice and opportunity for a hearing."

61.     In a proceeding to revoke or terminate an AWA license, the USDA must comply with 5 U.S.C. §558(c), which provides that "the withdrawal, suspension, revocation, or annulment of a license is lawful only if before the institution of agency proceedings therefore, the licensee has been given -- (1) notice by the agency in writing of the facts or conduct which may warrant the action, and (2) opportunity to demonstrate or achieve compliance with all lawful requirements."

62.     The USDA's Enforcement Rule 7 C.F.R. §1.133(3) requires that "[a]s provided in 5 U.S.C. §558," prior to instituting a proceeding to terminate or suspend a license, "the Administrator, in an effort to effect an amicable or informal settlement of the matter, shall give written notice to the person involved of the facts and conduct concerned and shall afford such person an opportunity … to demonstrate or achieve compliance…."  Form 7060 Warnings, under the AWA, are issued to allow alleged violators an opportunity to make corrections or demonstrate compliance.

63.     The USDA enforces the AWA "primarily through inspections of regulated facilities." In implementing 7 C.F.R. §1.133(3), the Agency "understands that there may be concerns about what its inspectors cite on inspection reports," so it provides an Appeal Process "to resolve concerns over inspection findings quickly and cooperatively." Appeals of inspectors' findings can be filed within 21 days, and an "appeals team will review each appeal." "[D]ecisions made by the appeals team are final and represent USDA's final determination of compliance." Only then will the compliance decision be published as a Form 7060.

64.     Form 7060 Official Warnings are not authorized under the HPA, since proceedings under §1825 do not seek revocation of a license. Before issuing a Form 7060 based solely on a test result or an inspector's report for an HPA violation, the USDA provides no appeal process for challenging the inspector's report before the compliance determination is published.

65.     The Form 7060 sent by the USDA for an HPA violation does not invite the recipient to respond to the USDA in order to amicably comply with, achieve, or demonstrate compliance. Before a Form 7060 is issued for a foreign substance violation, the recipient does not have the ability to file an affidavit or submit evidence to the Agency to avoid its issuance, since the first time he or she knows of an alleged violation is after the Form 7060 is issued. Under the HPA, the USDA uses the Form 7060 as a penalty.

66.     The HPA Form 7060 is "an Official Warning for the violation(s) [and] any further violation of these federal regulations may result in the assessment of a civil penalty, criminal prosecution, or other sanction." The Form 7060 states the USDA's unequivocal final position that its evidence indicates a violation of the HPA. It is not possible for the alleged violator to take corrective action or demonstrate compliance before the Agency issues its determination of an enforcement action.

67.     The Form 7060 and its publication on lists describing the USDA's enforcement actions is a penalty by publication. Issuing the Form 7060 and publishing it, as Defendant acknowledges, is "part of its effort to make its actions transparent and accessible to the public, by highlighting enforcement actions taken in response to violations of the … Horse Protection Act" because taking action "quickly against violators serves as a better deterrent to not only a specific violator, but other potential violators as well." Enforcement by "naming and shaming" is the antithesis of law.

68.     The USDA's use of the Form 7060 as a penalty is the "imposition of penalty or fine" that should be determined on the record. 5 U.S.C. §551(10)(A),(C) and (G). The actions taken by the USDA in issuing and publishing the Form 7060 about the McGartlands are invalid under APA §706(2) (A), (B), (C) and (D).

### D. The USDA Unlawfully Disclosed the McGartlands' Personal Information Without Their Consent in Violation of Privacy Act §552a(b).

69.     On June 8, 2015, the McGartlands saw on the USDA's website that they were identified as having violated the HPA on August 23 and 30, 2012.  The USDA was immediately contacted and informed of the McGartlands' concern that it had been publically disclosed that they had violated the Act, pointing out that the HPA does not authorize the Agency to release allegations about those it investigated or believed had violated the Act. The USDA was requested to remove the website and inform the world that it was a mistake to have said the McGartlands violated the Act.

70.     On June 12, 2015, the McGartlands wrote the USDA complaining of the lists the Agency was publishing that identified them as having violated the Act, pointing out that the USDA was violating HPA §1825(b) and the Privacy Act.  The McGartlands requested the Agency stop making disclosures about them.  The disclosures about the McGartlands on the Searchable Violations List and Enforcement Actions List were materially false and misleading.

71.     On August 26, 2015, the Director of IES acknowledged the McGartlands' letter, saying that IES "will take further action, as appropriate and necessary, based upon the result of [its] review." The McGartlands heard nothing further. Subsequent reviews of the Searchable Violations List and Enforcement Actions List indicate that some action was taken.  Yet the changes fail to eliminate the adverse consequences to the McGartlands, and the Agency continues to disclose personal records about the McGartlands without their consent.

72.      There are no USDA regulations requiring an exhaustion of administrative remedies for parties complaining of unauthorized disclosure under §552a(b). There are no administrative requirements as a condition of bringing a lawsuit seeking relief from unauthorized disclosures in violation of §552a(b). The McGartlands have exhausted any administrative avenue for relief and further effort would be futile, as evidenced by the USDA continuing to disclose materially inaccurate information about the McGartlands.

**1. The disclosed personal information about the McGartlands is in a retrievable database.**

73.     The USDA's databases publicizing its enforcement actions are compiled from information accumulated in its "Investigative and Enforcement Records Regarding Regulatory Activities, USDA/APHIS" system of records. ("System of Records" or "USDA/APHIS-1"). Accumulation and dissemination of information in this system of records is governed by the Privacy Act, 5 U.S.C. §552a. The USDA has adopted regulations covering the accumulation and dissemination of information in this system.  See 7 C.F.R. §1.110 *et seq.*

74.     Privacy Act §552a(b) and the USDA's regulation 7 C.F.R. §1.119, provide that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of

the record would be" to officers and employees of that agency, required under §552 when responding to a Freedom of Information Act ("FOIA") request, or for a routine use.

75.    USDA/APHIS–1 describes the System of Records that includes the documents and information the USDA has published about the McGartlands. The publication of the lists and the disclosures about the McGartlands are not authorized by the Routine Uses of records. Indeed, this information about the McGartlands is exempt from disclosure in response to a FOIA request under §552, or even a request made by the McGartlands under §552a.  5 U.S.C.§552a(k)(2), 7 C.F.R. §1.123 and USDA/APHIS – 1 (records authorized by 15 U.S.C. §1821 *et seq*.)

76.    The Privacy Act and FOIA Exemption 7(C) protect from disclosure information compiled for law enforcement purposes where release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(7)(C). There can be little question that Agency disclosures, that the McGartlands have been targets of USDA law-enforcement investigations and enforcement actions, can, and have subjected them to embarrassment and potentially more serious reputational harm.

77.    Under 5 U.S.C. §552a(e)(1), the agency is required to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."  There is no authorized purpose in the HPA justifying the issuance of warning letters or maintaining or disclosing them on lists using false and misleading headings as public notice of an administrative determination that an individual has violated the HPA.

**2. Declaratory and injunctive relief are appropriate to protect the McGartlands' privacy rights and to enforce Privacy Act §552a(b).**

78.    The McGartlands seek a declaration that the disclosures and publications about them are unauthorized, unlawful, arbitrary and capricious. They request an injunction ordering the USDA

to remove any data from its website that discloses that the McGartlands have been the subjects of law enforcement investigations or disclosing the results of those investigations. The disclosures made on the USDA's Searchable Violations List and the Enforcement Actions List are final agency actions by which rights or obligations have been determined or from which legal consequences flow.

79.     The USDA's actions in assessing sanctions and publicizing them are reviewable under APA §702. It is the Agency's intent to penalize the McGartlands through adverse publicity, by making materially false and misleading disclosures. In imposing penalties and publishing them, the USDA has violated the clear and mandatory statutory prohibition and specific statutory command in HPA §1825(b) that no penalty shall be assessed except after notice and hearing and by order of the Secretary.

80.     The USDA's actions are also reviewable under APA §704, because they are final agency actions that mark the consummation of the agency's decision making process. The decisions that the McGartlands violated the HPA under the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process are final decisions on the basis of which penalties have been assessed. Because the penalties were the issuance and publication of a Form 7060, the investigations were closed, and the McGartlands were told that for any offense in the future that result in Formal Enforcement Proceedings these prior offenses may be taken into account.

81.     The USDA's actions in disclosing materially false information about the McGartlands determines rights or obligations from which legal consequences flow. The USDA has determined, over the McGartlands' protest, that it has a right to publish the Searchable Violations List and the Enforcement Actions List; and, after this lawsuit was filed, the Agency continues to falsely publicly identify the McGartlands as having USDA enforcement actions taken against them that

culminated in decisions that they violated the HPA and that the USDA has disclosed the Forms 7060 penalties assessed against the McGartlands.

82.     The USDA has determined its has a right to disclose personal information about the McGartlands from its system of records, even though the records disclosed are the product of the Agency's unauthorized and unlawful enforcement schemes.  The USDA has also determined that the McGartlands do not have a right to keep materially inaccurate disclosures regarding them from being published on the database. The disclosures about the McGartlands indict them by innuendo and are individualized and accusatory. The disclosures about them have the consequence of denying the McGartlands the protections against having penalties assessed other than after notice, a hearing and by an order of the Secretary.

83.     This Court should hold unlawful and set aside the USDA's actions in disclosing personal information about the McGartlands without their consent because these actions are arbitrary and capricious, not in accordance with law, in excess of the USDA's statutory jurisdiction, authority and limitations and carried out without observing procedures required by law. 5 U.S.C. §706(2)(A),(B),(C) and (D).

## VI. THE USDA PUBLISHES FALSE AND MISLEADING DATABASE LISTS BASED ON RECORDS OBTAINED IN THE HIO PENALTY PROGRAM THAT ADVERSELY AFFECT PLAINTIFFS.

### A. Background of Private HIO Penalty Programs.

84.     The USDA is authorized to promulgate regulations that provide for the licensing of DQPs who event management can appoint to inspect horses. 15 U.S.C. §1823(c). To accomplish this, it adopted regulations to certify HIOs to train and license DQPs. 9 C.F.R. §11.7.  From 1999 through 2009, the USDA and HIOs agreed to Operating Plans under which each HIO included in its

rulebook a matrix of penalties it would assess against entrants when the DQP was of the opinion that a horse was sore ("HIO Penalty Program"). *See* 62 Fed. Reg. 63,510 (December 1, 1997).

85.     The USDA's position has been that DQPs "inspect horses for purposes of enforcing the Act." 77 Fed. Reg. 33,608 (June 6, 2012). If a horse failed inspection, the DQP would issue a "ticket" to the person entering the horse.  Within days, the HIO notified the entrant of the penalty it was assessing. If that person wanted to contest the penalty, the HIO provided an informal appeal procedure.  As the USDA viewed it, "[o]ver the years, the role of HIOs has expanded to include assessing and enforcing penalties for violations of the Act." *Id.* at 33,609.

86.      SHOW began operation as a certified HIO in 2009, and included in its rulebook a ticketing, penalty and appeal procedure. Entrants agreed to the provisions in the rulebook. That same year the USDA proposed a new working agreement to enhance enforcement by requiring HIOs to adopt uniform suspension penalties. Several HIOs, including SHOW, rejected the proposal and the operating agreements terminated at the end of 2009. As a result, in 2010, the USDA decided to compel HIOs to enforce the Act by requiring them to assess uniform mandatory minimum suspension penalties.

87.     During 2010, several HIOs refused to incorporate the USDA protocol for assessing uniform penalties. In response, on May 27, 2011, the USDA published "Proposed Rules," which would require HIOs "to assess and enforce minimum penalties for violations of the Horse Protection Act (the Act) and the regulations." 76  Fed. Reg. 30,864 (May 27, 2011).

88.     On June 7, 2012, the USDA adopted the new regulations.  77  Fed. Reg. 33,607-33,619. The USDA's position was that it had authority to "impose whatever requirements on the HIOs that [it] determines to be necessary to enforce the Act and the regulations." *Id.* at 33,609.  The USDA claimed that "DQPs find violations of the Act by inspecting horses, and thus penalties will be

assessed and enforced on the basis of the inspections." *Id*. at 33,610. The new rule would "strengthen our enforcement of the Act by ensuring that minimum penalties are assessed and enforced consistently" by all HIOs. *Id*. at 33,607.

### B. The USDA Falsely and Misleadingly Identifies SHOW as Violating the HPA on the Searchable Violations List and Enforcement Actions List.

89.     When the USDA adopted the new regulations that compelled SHOW to enforce the HPA and assess mandated minimum penalties, SHOW refused to adopt the regulations by incorporating them into its rulebook. On June 26, 2012, SHOW filed a lawsuit against the USDA challenging the validity of the new rules. While the lawsuit was pending the USDA gave SHOW notice it would be decertified for not amending its rulebook and enforcing the mandated penalties.

90.     On Januarys 9, 2014, the USDA filed an administrative Complaint against SHOW to decertify it. Formal Enforcement Proceeding are authorized only for violations of the HPA under §1825. SHOW did not, and could not, violate §1824. When the USDA filed the Complaint, it falsely and misleadingly published on the Searchable Violations List and Enforcement Actions List, complained of above, that SHOW had violated the HPA, and made a copy of the Complaint available.

91.     SHOW prevailed in the lawsuit, when, on April 22, 2015, this Court entered Final Judgement enjoining the USDA from enforcing the rule. The USDA's administrative complaint was dismissed with prejudice on April 14, 2015. The USDA continues to falsely and misleadingly identify SHOW on the Searchable Violations List and Enforcement Actions List as an alleged HPA violator against whom the Agency has taken an enforcement action.  These publications adversely affect SHOW by stating SHOW violates the HPA, a statute SHOW enforces under the provisions in HPA §1823(c) by training and providing DQPs who inspect horses.

**C. The USDA's Enhanced Enforcement of the HPA Under the "HIO Penalty Program."**

92.      The new Regulations required that HIO penalties be enhanced based on prior offenses. For example, the minimum suspension penalty for a horse determined to be bilaterally sore would be one year for the first offense, two years for a second offense, while for a third or subsequent offense the suspension would be four years. *Id*. at 30,618.

93.      In order for HIOs to know when a person was under suspension so that he or she would be denied entry by the HIO into its events, and so the HIO could know when an enhanced suspension penalty should be assessed because of prior HIO offenses, the USDA would have to identify those people who were currently suspended or had prior HIO violations. The USDA gathered penalty records from the HIOs and used them to publish several database lists. ("HIO Penalty Lists").  The USDA promised it would "make lists of people who have been disqualified through USDA action and people who have been suspended through HIO action available on the Horse Protection Web site, at http://www.aphis.usda.gov/animal welfare/hpa info.shtml." *Id.* at  33,614.

94.      The USDA initially provided a link to a Searchable HPA Suspensions list, which on June 12, 2015, contained 2,421 entries of "Responsible Persons Found in Violation." While the link is still on the USDA website, opening it no longer produces the list.

95.      The USDA continues to provide three database lists about HIO enforcement: (1) "Fines: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," (2) "Suspensions: Currently Active: | 2014 | | 2013 | | 2012 | | 2011 | | 2010" and (3) "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," [6]

---

[6] https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/sa_hpa/ct_hpa_hio_and_dqps  These databases have been updated regularly into 2016.

96.     The "USDA Horse Protection Program Fine Report" for 2010-2014 includes the name of the "Fined Person," the fine amount, the HIO ticket date and number, the horse's name and the HIO's name.  On the June 21, 2015, report, of the 115 people listed, 99 were fined by SHOW.

97.     The "USDA Horse Protection Program Active Suspension Report" identifies people currently under an HIO suspension. A June 21, 2015, copy identifies 90 individuals under the heading "Suspended Person."  SHOW assessed 70 of those suspensions.

98.     The USDA's lists of "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010|" contains a massive amount of information under the heading "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation." Each yearly report lists the person's name under "Responsible Party." The "Violation" is specified. The horse is identified, along with the date of the show, as is the HIO that assessed the penalty. On June 21, 2015, the yearly reports totaled about 869 pages, with about 12,139 entries naming the "Responsible Party," identifying a "violation" and naming a horse.

   **D. The USDA Unlawfully and Without Authority Penalizes People by Using HIO Records to Publish the HIO Penalty Lists that Misleadingly Identify People as Having Violated the HPA.**

99.     In *Contender Farms, L.L.P. v. U.S. Dept. of Agriculture*, 779 F. 3d 258, 262 (5th Cir. 2015), the Court held that the HPA "plainly prohibit[ed]" the USDA's approach to HPA enforcement, observing that "by looking to the plain language of §1823(c)," it is clear that "nothing in § 1823(c) contemplates USDA involvement in the *enforcement* procedures of HIOs." The Court held that "the Regulation establishes a parallel enforcement scheme" to §1825, unsupported by the "plain language" of the statutory text.  *Id.* at 271-75.  The USDA's effort to make HIOs assess penalties for violations of the HPA "contravened the statute's plain language" because the "Regulation addresses an area that is plainly outside the USDA's statutory authority."  *Id.* at 274.

100.    The invalidation of the HIO enforcement scheme solved only part of the problems created during its short-lived implementation. The HIO Penalty Lists implementing the Regulations are still published by the Agency. Since the USDA's HIO Penalty Lists identifying violators, violations and suspensions are no longer used by HIOs to exclude people from entering a show, or to enhance penalties based on prior offenses, their only present purpose is to serve as an alternative enforcement program imposing sanctions by public reprimand on people misleadingly identified as having been determined to have violated the Act.

101.    There is no legal basis authorizing the USDA to collect HIO penalty records other than to enhance its own enforcement activities by misleadingly publishing that people who have been assessed an HIO penalty are responsible for violating the HPA.

### 1. The McGartlands are adversely affected by the HIO Penalty Lists.

102.     The USDA's actions in publishing the HIO Penalty Lists that identify people as responsible for horses found in violation, where that misleading characterization is based on HIO records penalties, is unauthorized and unlawful.  The McGartlands and Contender Farms are adversely affected by these publications because they intend to enter horses only in HIO inspected events.

103.    When the McGartlands enter an HIO inspected event, they agree to the penalty assessment provisions in the HIO's rulebook. In doing so, the McGartlands face the real possibility that, if they are ticketed, they will have an HIO mistakenly decide they violated its rules, penalize them without due process of law and have the HIO provide this information to the USDA. The USDA will then publish the McGartlands' names on a website databases, misleadingly identifying them as persons responsible for violating the Act and Contender Farm's horse as being found in violation, thereby sanctioning them with a public reprimand.

104.    This happened in 2008, when Mike McGartland was ticketed by a DQP working for the HIO NHSC. The horse was disqualified and a "ticket" was issued. But McGartland successfully appealed. Nonetheless, McGartland's name has been published as having received a one month suspension. FOSH is an HIO that maintains a website that combines information it receives about alleged HPA violations. The 2008 incident is still published in FOSH's data link. FOSH and the USDA cooperate in this effort, with the USDA providing information on alleged violations and coordinating with FOSH's work. Such a false publication presents an actual or imminent injury that is concrete and particularized, that is directly traceable to the conduct of the USDA, and that is redressable by a judgment in their favor.

105.    The USDA's action in publishing the lists of participants who receive HIO rulebook penalties specifically targets participants in Tennessee Walking horse events like the McGartlands. They are the objects of the lists, the sole purpose for their publication being to issue a public reprimand as a penalty against them and as a deterrent to others.

106.    The McGartlands and Contender Farms raise a purely legal challenge to the USDA's policy of publishing the names of those penalized under an HIO's rulebook, which misrepresents that the person is responsible for violating the Act. Their challenge is ripe, and the McGartlands do not have to wait for a "ticket" and the USDA's publication of their names as persons responsible for violations in order to determine its legality.

### 2.  SHOW is adversely affected by the publication of the HIO Penalty Lists.

107.    The *Contender Farms'* decision recognized that "nothing in the HPA *prohibits* HIOs from adopting [penalty] procedures," even though the Act prohibits the USDA from regulating these penalty programs. 779 F.3d at 272.   After the decision, SHOW deleted the USDA mandated

penalties from its rulebook, substituted more appropriate penalties and continued its voluntary penalty program through 2015.

108.     On June 9, 2015, Paul Warren, a USDA representative, appeared at SHOW's office and demanded that SHOW turn over all the tickets it had issued for April and May, 2015.  Mr. Warren said IES needed the copies immediately, because the USDA was investigating a complaint alleging that SHOW was destroying some tickets rather than enforcing them.

109.     On August 24, 2015, W. Harris, an IES employee, delivered a memo to SHOW's office requiring SHOW to turn over all listed documents concerning its upcoming activities as the HIO under contract with the Celebration for its upcoming event scheduled for August 25 through September 5, 2015.

110.     On August 26, 2015, SHOW complained to IES about the demands made on it, but apparently not on any other HIO, and requested the Agency identify any legal authority for its demands.   No response was received. Nonetheless, the USDA continued to publish the HIO Penalty Lists, which misleadingly identify people as responsible for violating the Act based on SHOW's records about having penalized them under its private program.

111.     As a result of the USDA actions in investigating SHOW for allegedly improperly destroying tickets and because of the continued publication of the HIO Penalty Lists that misrepresent what SHOW has done in a private capacity, SHOW eliminated its private penalty program from its March 1, 2016, rulebook, adversely affecting SHOW's goal of improving walking horse events by penalizing those who may violate SHOW's rulebook.

112.     The USDA's publication of the HIO Penalty Lists exposes SHOW to potential liability from those who might claim to be damaged in their reputation or business because SHOW's ticket

and penalty records have been provided to the USDA, which uses them to mislead the public about violations of the HPA.

113.    SHOW is adversely affected by the publication of the HIO Penalty Lists. A large number of those identified on the lists were penalized by SHOW. From 2010 through 2014, SHOW was required by the USDA to include a penalty system in its rulebook and to provide the USDA with copies of records of penalties it assessed. However, the HPA does not authorize the USDA to publish databases based on SHOW's records that are misleading and that falsely characterize those penalized as responsible for soring their horses. Where an agency decides to disclose information gathered from a non-governmental source, the source may contest the misleading disclosure of that information as not in accordance with law and as arbitrary and capricious under APA §702 and seek relief under  §706(2).

114.    The USDA's actions in demanding SHOW's penalty records, which it uses to publish misleading enforcement lists, are final actions that adversely affect SHOW. The publications falsely identify people as having violated the HPA, and mischaracterize SHOW as having determined that the identified persons violated the Act.  The Agency has decided it has the right to publish the misleading HIO Penalty Lists. It has decided that those about whom it publishes this information, including SHOW, have no right to challenge the action.

**3. The publication of the HIO Penalty Lists is unauthorized, unlawful and arbitrary and capricious.**

115.    The USDA's publication of the HIO Penalty Lists contravenes the plain language of §1823(b): "**No penalty shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation.**"  (Emphasis added).  There is no authority under the HPA to publish the HIO Penalty Lists, which misleadingly identify people as responsible for violations of the Act.

33

116.    APA §558(b) and  HPA §1825(b) prohibit the imposition of a penalty except in accord with Formal Enforcement Proceedings, after notice and hearing before the Secretary and by order of the Secretary.  Plaintiffs are adversely affected by the USDA's publication of the HIO Penalty Lists and are entitled to judicial review of the Agency's actions. 5 U.S.C. §702. The complained of Agency actions are "made reviewable" by HPA §1825(d) and APA §702 and §704.

117.    This Court should "hold unlawful and set aside" Agency actions complained of by the Plaintiffs because they are arbitrary and capricious, not in accordance with law, exceed the Agency's statutory jurisdiction and authority and are carried out without following procedures required by law." 5 U.S.C. §706(2)(A), (C) and (D).

## VII. RELIEF REQUESTED

118.    Plaintiffs seek a declaration holding unlawful and setting aside Defendant's alternative enforcement programs to Formal Enforcement Proceedings, under which the USDA decides that people have violated the HPA, penalizes them for the violation and falsely and misleadingly publishes their names on database list as having been determined to have violated the Act.

119.    Plaintiffs seek an order enjoining the USDA from publishing the Searchable Violations List, Enforcement Actions List and HIO Penalty Lists, which falsely or misleadingly identify people as having been determined to have violated the HPA.

120.    Under the APA, HPA and Privacy Act, the McGartlands request this Court declare that the USDA has violated and is violating the Privacy Act by disclosing the McGartlands' personal information in violation of 5 U.S.C. §552a(b). The McGartlands request that the Court enjoin such violations from occurring in the future, and order that all USDA lists identifying the McGartlands as having been the subjects of investigations into HPA violations or identifying them as having been penalized with a public reprimand or Form 7060 be removed from the USDA's website.

Respectfully Submitted:

David Broiles                                    /s/Karin Cagle_____
2400 Indian Cove                                 1619 Pennsylvania Ave.
Fort Worth, Texas 76108                          Fort Worth, Texas 76104
Phone: 817-247801                                Phone: 817-721-5127
Email: davidbroiles@gmail.com                    Email: kcaglelawyer@gmail.com
Texas State Bar No. 03054500                     Texas State Bar No. 24043588