**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CONTENDER FARMS, L.L.P., <u>et al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Action No. 4:16-cv-0163-O |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

# THIRD AMENDED COMPLAINT

## I. THE PARTIES

1.      Mike and Lee McGartland reside in Fort Worth, Texas, and are partners in Contender

Farms LLP ("Contender Farms"), whose horses the McGartlands enter into Tennessee walking

horse competitions. Contender Farms is a Mississippi limited partnership with its principle place

of business in Fort Worth, Texas. SHOW Inc. is an IRS §501(c) not-for-profit Tennessee

corporation located in Shelbyville, Tennessee.

2.      Defendant USDA administers and enforces the Horse Protection Act ("HPA"), 15 U.S.C.

§1821 *et seq.*, through the offices of the Animal and Plant Health Inspection Service ("APHIS").

## II. JURISDICTION AND VENUE

3.      HPA §1825(d)(6) provides Plaintiffs the right to sue under the HPA because district courts

"are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of this

chapter and shall have jurisdiction in all other kinds of cases arising under this chapter, except as

1

provided in subsection (b) of this section." Under 28 U.S.C. §1331, this court has federal question jurisdiction because Plaintiffs' claims arise under federal statutes. District courts have jurisdiction over any proceeding based on an Act of Congress regulating commerce. 28 U.S.C. §1337. Venue is proper under 28 U.S.C. §1391 because the McGartlands are United States citizens residing in Fort Worth, Texas and SHOW is properly joined under 28 U.S.C. §1391(e).

4.      The USDA's actions complained of herein are reviewable under the Administrative Procedures Act ("APA"), 5 U.S.C. §701 *et seq.*, which waives governmental immunity from judicial review of agency actions when declaratory or injunctive relief is sought. APA §704 provides that"[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." In addition to being reviewable by statute under §1825(d)(6), the USDA's actions complained of are final and reviewable. As to Plaintiffs' claims, the Agency has no rules or regulations  requiring the exhaustion of any administrative remedies or appeal to a superior agency authority.

 5.      APA §706(2) authorizes this Court to review the evidence and law, and to "hold unlawful and set aside agency actions" that are "arbitrary, capricious, an abuse of discretions or not in accordance with law," are "contrary to constitutional right," are "in excess of statutory jurisdiction, authority, or limitations" or are the result of decisions made "without observance of procedure required by law." 5 U.S.C. §706(A), (B), (C) and (D).

### III. PROVISIONS AUTHORIZING USDA ENFORCMENT OF THE HPA.

6.      Tennessee walking horses are prized for their high kick gait. This gait is achieved by breeding, training and practice. It can also be caused by inhumanely soring the forelimbs of the horse, thus providing an unfair advantage in competitive events. In 1970, Congress passed the HPA to eliminate cheating in Tennessee walking horse competitions. The Act was amended in

1976, and now provides two provisions to catch and eliminate cheaters and punish those responsible for soring a horse.

**A.   15 U.S.C. §1823 Requires Event Managers to Disqualify Horses Identified as Sore.**

7.      Managers of horse shows are prohibited from permitting sore horses to enter events. 15 U.S.C. §1824. HPA §1823 provides management a safe harbor from strict liability. Under HPA §1823(e), the USDA is authorized to have its inspectors examine horses entered into events to diagnose whether they are sore. If a  Veterinary Medical Officer ("VMO") is of the opinion a horse is sore, this is reported to management, which must disqualify the horse from that event, as required by HPA §1823(a). VMOs are not authorized to issue citations to or penalize those who may be responsible for soring the horse.

8.      VMOs attend relatively few events and inspect few horses during a season. HPA §1823(c) authorizes the USDA to adopt regulations under which private inspectors are qualified to inspect horses to determine compliance with the Act and regulations. 9 C.F.R. §11.7. Current USDA regulations provide that the Agency will certify private Horse Industry Organizations ("HIOs") to train, license and supervise Designated Qualified Persons ("DQPs") to inspect horses entered into events. Management can contract with an HIO to provide DQP inspections. If a DQP is of the opinion a horse is sore, management is informed, and management can disqualify the horse from that event. 15 U.S.C. §1823(a). If management employs DQPs, then even if a sore horse is entered, management is not liable for a violation under HPA §1824. The HPA does not authorized management, HIOs or DQPs to enforce the HPA against those persons responsible for a violation other than by disqualification of the horse.

**B.   15 U.S.C. §1825 Authorizes Imposition of Criminal and Civil Penalties.**

9.        HPA §1824 enumerates the prohibited acts. Under HPA §1825(a), if a USDA investigation

indicates a knowing violation of HPA §1824, the Secretary may refer the case to the Attorney

General for criminal prosecution. Section 1825(b) authorizes the Secretary to assess a civil penalty

or fine against a person who violates §1824, while §1825(c) authorizes disqualification of a person

from future events for a period of time.

10.       HPA §1825(b) requires that any Agency decision, about whether a person violated the

HPA and what civil penalty should be imposed,  be determined on the record.

> (1) Any person who violates section 1824 of this title shall be liable to the United
> States for a civil penalty of not more than $2,000 for each violation. **No penalty
> shall be assessed unless such person is given notice and an opportunity for a
> hearing before the Secretary with respect to such violation.** The amount of such
> penalty shall be assessed by the Secretary by written order. In determining the
> amount of such penalty, the Secretary shall take into account all factors relevant to
> such determination, including the nature, circumstances, extent, and gravity of the
> prohibited conduct, and with respect to the person found to have engaged in such
> conduct, the degree of culpability, any history of prior offenses, ability to pay, effect
> on ability to continue to do business, and such other matters as justice may require.
> (Emphasis added).

11.       In addition to requiring notice and a hearing, §1825(d) authorizes issuance of subpoenas

for   attendance of witnesses and production of documents, and it empowers district courts to aid

in implementing the procedures. Section 1825(b)(2) guarantees a person adjudicated liable for a

civil penalty the right to appeal to a United States Court of Appeals.

**C.   The Administrative Procedures Act ("APA"), 5 U.S.C. §550 *et seq*., Mandates
       That Formal Enforcement Proceedings Provide The Accused Due Process of Law.**

12.       "A sanction may not be imposed…except within the jurisdiction delegated to the agency

and as authorized by law." 5 U.S.C. §558(b). The APA governs an agency's assessment of a

sanction, which includes the "imposition of penalty or fine." 5 U.S.C. §551(10)(B). Congress

requires, in APA §554(a)("Formal Enforcement Proceeding"), that every case of agency adjudication required by statute should be determined on the record. Proceedings must be held in the agency's administrative court, where an Administrative Law Judge ("ALJ") shall "preside at the taking of evidence." 5 U.S.C. §556(b). The accused must receive adequate notice and be afforded the opportunity to present evidence and arguments. 5 U.S.C. §554. Congress detailed the due process protections required in 5 U.S.C. §556.

**D.   USDA Regulations At 7 C.F.R. §1.130 *et seq.* Govern Civil Enforcement Proceedings.**

13.     The USDA's "Rules of Practice Governing Formal Adjudicatory Administrative Proceedings Initiated by the Secretary" govern the Agency's Formal Enforcement Proceedings. 7 C.F.R. §1.130 *et seq.*("Enforcement Rules").   Under §1.133(a)(1), when information about a possible violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder."  Section 15 U.S.C. §1825(b) contains the HPA's statutorily authorized civil enforcement proceedings.

14.     When the Agency receives information of an "alleged violation," the "Administrator shall cause such investigation to be made as, in the opinion of the Administrator, is justified by the facts.  If such investigation discloses that no violation of the Act or of the Regulations has occurred, no further action shall be taken…." 9 C.F.R. §1.133(a)(3).

15.     "If there is reason to believe that a person has violated or is violating any provision of a statute…or of any regulation … issued pursuant thereto…a Complaint may be filed with the Hearing Clerk pursuant to these rules." 9 C.F.R. §1.133(b). The Complaint shall include "allegations of fact and provisions of law which constitute a basis for the proceeding and the nature of the relief sought." 9 C.F.R. §1.135(a).

16.    The USDA's Enforcement Rules require that any Formal Enforcement Proceeding be conducted by an ALJ whose decision is reviewable by the Department's Judicial Officer ("JO"), who has been delegated the Secretary's authority under §1825(b).  *See* 7 U.S.C. §450(e) and (g) and 7 C.F.R. §1.145.   Only in a Formal Enforcement Proceeding under the Department's Enforcement Rules can a person's liability for a violation of the HPA be determined and a civil penalty or sanction assessed.

17.    As part of the authorized enforcement scheme, the USDA publishes final opinions and orders regarding the Secretary's determination that a person has violated the HPA on a list available on the USDA's FOIA Electronic Reading Room Enforcement Actions List.  5 U.S.C. §552(a)(2) ("Each agency, in accordance with published rules, shall make available for public inspection and copying – (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases.").

**E.   The USDA Enforces the HPA Using Four Alternative Enforcement Schemes That Are Not Authorized By The HPA And Are Unlawful.**

18.    In 2010, the USDA's Office of Inspector General reported that since its passage, APHIS's budgets for enforcing the HPA had been about $500,000 a year and that the USDA found that formal enforcement "proceedings may be time-consuming and expensive, and our resources for prosecuting such cases are limited." 76 Fed. Reg. 30,865 (May 27, 2011).   Fewer than a dozen HPA Formal Enforcement Proceedings were filed each year.

19.   To increase enforcement, the USDA adopted and employs four policies, which are less time-consuming and less expensive enforcement schemes, as alternatives to Formal Enforcement Proceedings. The Department utilizes two internal administrative enforcement schemes: the "Protocol for Foreign Substance Penalty" and the "IES Investigative and Enforcement Process." A third alternative enforcement scheme requires private entities, DQPs and HIOs, to enforce the

Act by assessing penalties against entrants for violations. The fourth USDA policy is to penalize those people it has unlawfully determined violated the Act under the three alternative schemes by publicizing their names, offenses, and penalties on its "FOIA Electric Reading Room Lists."

20.   Using these four alternative enforcement schemes, the USDA claims that more than 2,000 enforcement actions are completed each year.  None of these schemes is authorized by statute or regulation.  All four enforcement schemes are intended to punish not only those the USDA determines violated the Act, but to deter them and others who might violate the Act.  Deterrence is accomplished by publicly identifying the person accused, the horse, the event and the violation on multiple lists published on the FOIA Electronic Reading Room Enforcement Lists.  These publications penalize those named by public reprimand.

### IV. THE USDA'S "PROTOCOL FOR FOREIGN SUBSTANCE PENALTY."

**A.   The Foreign Substance Penalty Enforcement Scheme.**

21.     The USDA employs the Protocol for Foreign Substance Penalty enforcement scheme to determine participants' liability for violating the HPA and to assess penalties "for a foreign substance violation detected by a USDA inspector through the use of the Gas Chromatography/Mass Spectrometry ("GC/MS") Test."  The GC/MS test samples are taken by USDA employees from some horses entered into some events.  The horse's forelimbs are swabbed and the sample sent to a non-governmental laboratory for analysis.

22.     Because it takes time to receive the results, under the Protocol, the USDA will "notify the alleged violator of the specific foreign substance or substances detected concurrently with the notification of the penalty."   The consequences of the USDA's determination of a violation using the Protocol for Foreign Substance Penalty are: for the "**1st offense**: Issue official USDA warning (Form 7060) for violation of Federal Regulations to all parties involved," and for a "**2nd offense**:

Issue official warning (Form 7060) for violation of Federal Regulations to all parties involved."

For the "**3rd offense:**" the USDA will offer a stipulated penalty, which, if not accepted, will result

in a §1825(b) proceeding being filed. For a "**4th offense:** a 'Federal case' will be filed."

23.     A penalty is then assessed by issuing a Form 7060 "OFFICIAL WARNING OF

VIOLATION OF FEDERAL REGULATIONS," which is then published on an APHIS FOIA

Electronic Reading Room Enforcement List, disclosing the name of the "violator," the horse's

name, the "date of the violation" and specifying the offense as a violation of the HPA and

regulations. The purpose and effect of the publication is to penalize the violator and thereby deter

others from committing violations. The USDA justifies the publications by contending "APHIS is

highlighting enforcement actions taken in response to violations of the Animal Welfare Act

(AWA) and Horse Protection Act (HPA)."

**B.   Using The Protocol For Foreign Substance Penalty, The USDA Decided The
        McGartlands Violated The HPA Foreign Substance Prohibition And Penalized Them.**

24.     On August 23, 2012, Mike and Lee McGartland entered the Contender Farms' horse "Low

on Gin" in a class at the Celebration.[1] The horse was swabbed for the GC/MS foreign substance

test.[2] On October 18, 2013, the USDA sent Mike and Lee McGartland each an Official Warning

on Form 7060, issued in Case No. TN130373-AC, informing them that the USDA's evidence

showed that they had violated the HPA. On separate 7060 Forms, they were each identified as a

---

[1]  The Tennessee Walking Horse National Celebration ("Celebration") is the World Series of
walking horse events and the largest show for this breed.

[2]  The "inspection" occurred not two months after Mr. McGartland and Contender Farms filed
suit on July 25, 2012, in *SHOW Inc., Mike McGartland and Contender Farms v. United States
Department of Agriculture,* Civ. No. 4:12-cv-00429-Y, ECF No. 1. On July 29, 2013, the district
court denied Plaintiffs relief and granted the Defendant's motion for summary judgment. *See
SHOW, Inc. v. United States Department of Agriculture,* 2013 WL 11309349 (N.D. Tex.). The
Fifth Circuit reversed on February 19, 2015, in *Contender Farms, L.LP. v. U.S. Dept. of
Agriculture,* 779 F. 3d 258 (5th Cir. 2015). The district court entered a Final Judgment in
accordance with the Fifth Circuit decision on April 22, 2015. ECF No. 110. ("*Contender I*").

"Violator" who had "committed the following violation(s) of federal law," with the "Unlawful Acts" specified as violation of "15 U.S.C. §1824(7)" and the "9 C. F. R. § 11.2(c)" by entering "Low on Gin" in the Celebration "who tested positive for Sulfur." The McGartlands were told that "[a]ny further violations of the regulations may result in the assessment of a civil penalty or criminal prosecution." The McGartlands received no notice of this case prior to receiving the Form 7060 and were afforded no hearing. The 7060 Forms were published on two USDA databases, which identified them as "violators."

25.     On August 30, 2012, Mike and Lee McGartland entered Contender Farms' horse "He's Shady in Black" in a Celebration class.  The USDA did a swab test for foreign substances. The USDA did not send a Form 7060 to the McGartlands informing them a foreign substance had allegedly been found on "He's Shady in Black."  Nonetheless, the USDA published on its FOIA Electronic Reading Room Enforcement Lists that Mike McGartland violated the foreign substance prohibition of the HPA by entering "He's Shady in Black."

**C.  The Protocol For Foreign Substance Penalty Is Arbitrary And Capricious, Is Not Authorized And Is Unlawful Under HPA §1825(b).**

26.     From its adoption, the Protocol for Foreign Substance Penalty has been controversial, because, under the Protocol, if any amount of a substance the Agency tests for can be identified, the USDA considers that all people associated with the horse — the owner, trainer, rider and entrant — violated the Act. The USDA has deemed almost all substances to be "foreign" or "prohibited," including common substances found in human cosmetics, lotions and cleansers, under its regulations.  *See* 9 C.F.R. §11.2(c). Because the decision that a violation occurred rests solely on a positive test result, the single largest category of HPA violations on the FOIA Electronic Reading Room Enforcement List of Searchable Violations for 2009-2013, is for "Foreign Substance." There are almost 1,000 entries of "enforcement actions" for foreign

substance violations.  Yet, the USDA has never instituted a Formal Enforcement Proceeding based on GC/MS test results.

27.     When the USDA announced the Protocol for Foreign Substance Penalty, SHOW questioned whether the Protocol was reasonable or fair. The test results alone cannot provide evidence from which one can determine if the substance was foreign or natural; it cannot determine if a person applied the substance or if it was encountered in the environment; it cannot determine who applied the identified substance. Nor does a positive GC/MS test establish whether the substance was present in a sufficient quantity to actually "sore" the horse.

28.     Using the test results alone to decide whether an HPA foreign substance violation has occurred is arbitrary and capricious. The HPA does not authorize Agency enforcement action based solely on the results of a GC/MS test. Determining that a person violated the Act and penalizing them without notice and hearing is unlawful under HPA §1825(b).

29.     The use of the Protocol for Foreign Substance Penalty adversely affects the Plaintiffs. Based on this USDA report of the GC/MS test results at the Celebration for 2012, in May 2013, the Humane Society of the United States ("HSUS"), a national animal advocacy organization, issued a press release titled the "USDA Indicates 76 Percent of the Horses Tested at 2012 Walking Horse Celebration Found Positive For Foreign Substances." The group requested that the Tennessee Attorney General initiate an investigation of the Celebration to determine if a fraud had been committed on the public and if the Celebration had conspired to violate the HPA.  Plaintiff SHOW was the horse industry organization providing DQPs for this event. The McGartlands entered "Low on Gin" and "He's Shady in Black" in this event, both of which the USDA said tested positive for a foreign substance.

30.     After the USDA released its 2013 violations report based on the GC/MS tests results, in January 2014, HSUS issued another press release titled "Soring Violations Abound Among Walking Horse Industry Leaders, Competitors." HSUS's press release stated it was based on the 2013 USDA report on "testing of show horses' legs for illegal substances used to sore horses or hide the evidence of soring." HSUS, based on the USDA's report of its 2013 foreign substance GC/MS test results, stated that more than half the horses tested "were found in violation of the Horse Protection Act," but noted that while letters of warning had been issued to the violators, a "case has never been prosecuted by USDA." HSUS's use of the USDA's reports in its press releases falsely misleads the public into believing that the USDA lawfully determined that the majority of horses entered were sore in violation of the Act.

31.     In response to the USDA's misleading reports, SHOW includes on its website a January 2014 report of the Performance Show Horse Association ("PHSA") addressing "Foreign Substance Issues." As relevant to the McGartlands and the August 2012 entry of Contender Farms' "Low on Gin," the report notes that "sulfur is present in every cell and is structurally and functionally important in more than 150 compounds in the body including tissues, enzymes, hormones, antibodies and antioxidants."

32.     The PHSA report concludes that "it is impossible to say that each 'positive' swab result reported by the USDA was the result of the application of a substance to the horse's limb which was intended to alter the horse's gait or mask inspection." The PHSA report is credible, and had the USDA filed Formal Enforcement Proceedings against the McGartlands and afforded a hearing, they would have had the opportunity to submit evidence to support the PHSA report's conclusions.

33.     In response to the PSHA report, on February 10, 2014, Mr. Keith Dane, HSUS's Vice President for Horse Protection, emailed Rachel Cezar, APHIS's Horse Protection National

Coordinator, requesting that the USDA "come to its own defense in public and explain why foreign substance testing is well thought out, carefully administered, and scientifically viable…." HSUS continued: "The fact that the USDA has never chosen to prosecute a case when foreign substances are found certainly makes it more difficult to assert that this is a viable deterrent" and HSUS warns that "if this [PHSA report] is allowed to stand without reply, the public could begin to second guess the Department and question its ability to enforce the law using reliable scientific methods to find foreign substances" and "might even come to believe that the USDA is being unfair in citing horses on the basis of junk science…."

34.     The USDA did not issue a public response to HSUS's request. The PHSA report proves that the USDA penalized the McGartlands based on junk science and the USDA's actions taken under the Protocol are arbitrary and capricious. The HPA does not authorize the Agency to enforce the Act based on the Protocol for Foreign Substance Penalty, and the USDA's actions in doing so are unlawful under §1825(b).

**D.   The USDA's Action Taken Under the Protocol For Foreign Substance Penalty Are Final Agency Actions By Which Rights or Obligations Are Determined Or From Which Legal Consequences Flow.**

35.     The USDA has never filed a Formal Complaint under HPA §1825(b) seeking penalties for the illegal use of foreign substances based on the GC/MS test results. No person has been afforded the opportunity to challenge a USDA complaint claiming that a GC/MS detected foreign substance sored a horse. No ALJ, JO or United States Court of Appeals has had the opportunity to decide whether the GC/MS test results establish that a horse is sore as defined by the Act. The McGartlands have been denied the legal right to contest the USDA's determination that they violated the HPA foreign substance prohibition.

36.     The penalties assessed under the Protocol for Foreign Substance Penalty are self-executing, having the intended effect of deterring those penalized, like the McGartlands and others, from engaging in conduct prohibited by the HPA, and no further administrative or judicial action for enforcement is required. The determination of a violation and assessment of a penalty, both of which are published on FOIA Electric Reading Room Lists, are final agency actions. The USDA's determination to enforce the HPA by assessing a Form 7060 penalty is a final decision that the person has violated federal law.

37.     A legal consequence of the decision that the McGartlands violated the HPA using the Protocol for Foreign Substance Penalty is that a test result alone legally binds the Agency's investigators and enforcement employees to penalize them for violating the HPA based solely on GC/MS test results provided by an outside laboratory. For the first two positive results the mandated penalty is the issuance of a Form 7060 penalty and the publication of the enforcement decision and penalty on APHIS' website. Determination of liability and penalty assessment is automatic. Agency's employees have no discretion but to follow this protocol and impose these penalties. However, HPA §1825(b) (and the regulations for formal proceedings in 7 CFR §1.130 *et seq.*) require the decision maker to consider all evidence in deciding whether a person has violated the Act.

38.     A legal consequence of the Protocol on Foreign Substance Penalty is that no evidence, other than the lab test report, may be considered by the USDA's employees for the first and second violations. The USDA has committed its staff to applying the Protocol on Foreign Substance Penalty when conducting enforcement actions and referrals for formal enforcement proceedings.

39.     The Protocol on Foreign Substance Penalty commits the Agency to an interpretation of the HPA that a person violates the §1824 prohibition against foreign substances based on strict liability

13

arising from a positive result in a GC/MS test, without affording any opportunity to the accused to challenge the chain of custody, to determine if the swab the outside lab tested was one taken from her horse, to challenge the procedures, to disprove any evidence, to offer  contrary evidence, to challenge any claim that the accused  knew a substance was applied, to challenge that the test result was accurate, or to prove that the horse was not sore.

40.     The Protocol for Foreign Substance Penalty is an enforcement scheme under which the Agency penalizes people for conduct not prohibited by HPA §1824. It imposes a penalty against people outside of the statutory requirements of HPA §1825(b) by assessing the penalty without notice and an opportunity for a hearing before the Secretary that accords the due process protections of that provision. The Foreign Substance Penalty Protocol violates the APA requirement that a proceeding for "imposition of penalty or fine" be on the record, where the accused may present evidence and arguments. 5 USC §551(10)(A),(C) and (G). The penalty protocol violates the statutory requirement that "[a] sanction may not be imposed…except within the jurisdiction delegated to the agency and as authorized by law." 5 USC §558(b). Finally, the administrative penalty protocol ignores and contravenes the Agency's own duly adopted regulation and procedures in 9 CFR §1.130 *et seq*.

41.     Publically identifying people on the FOIA Electronic Reading Room Enforcement  Lists as having violated the Act based on the GC/MS test results disseminates false and misleading information.  The false publications impose a sanction by public reprimand – a penalty by publication.

 42.    The penalties assessed against the McGartlands under the Protocol violate the APA requirement that a proceeding for "imposition of penalty or fine" be on the record, where the accused may present evidence and arguments. 5 U.S.C. §551(10)(A),(C) and (G). The actions

14

taken against the McGartlands under the Protocol for Foreign Substance Penalty are invalid under APA §706(2)(A), (B), (C) and (D).

## V. HPA ENFORCEMENT ACTIONS USING THE USDA'S "IES INVESTIGATIVE AND ENFORCEMENT PROCESS."

### A.  The IES Investigative And Enforcement Process.

43.     To address a backlog of investigations and bolster its numbers of enforcement actions, in 2010, the USDA created the IES Investigative and Enforcement Process. HPA §1823(e) authorizes the Secretary's duly appointed representatives to attend events to inspect horses for possible non-compliance with the HPA or regulations. These Veterinary Medical Officers inspect horses and inform management if a horse is not compliant, which results in management disqualifying the horse from participating in the event under HPA §1823(a).

44.     VMOs report the results of their inspections to Investigative and Enforcement Service ("IES") Field Investigators in Regional Offices, who open investigations into potential violations. According to written procedures, in conducting an investigation, the IES Investigator may interview witnesses, collect evidence and "[a]s part of its investigative process, IES provides alleged violators with the opportunity to submit any evidence that they did not violate an APHIS-administered law." (Investigators, rarely, if ever, give the investigated this "opportunity.")  Once the investigation is complete, "the investigator prepares a report of investigation (ROI), which summarizes the investigative findings."  The report and any evidence are then sent "to IES' enforcement staff for review."

45.     Enforcement decisions are made at IES Headquarters, where "a specialist reviews and analyzes this information to determine if the violation is substantiated by the evidence provided." The enforcement specialist "determines whether an enforcement action is appropriate…." "When preparing penalty recommendations, [the enforcement specialist] … relies on the penalty

provisions contained in the relevant APHIS-administered law … and applies penalty adjustments for aggravating and mitigating factors."

46.     If the enforcement specialist decides an alleged non-compliance does not warrant an enforcement action, "letters of information" may be sent, with the aim of educating an individual to correct a noncompliance in non-egregious cases. These letters of information are not considered an "official enforcement action," in contrast to the issuance of a Warning Letter.

47.     If the IES enforcement specialist concludes there has been a substantiated violation that warrants an enforcement action, the possible "[e]nforcement actions may include an official warning, a voluntary settlement agreement, [or] a referral to the USDA's Office of General Counsel (OGC) to institute an administrative proceeding."

48.      If the IES enforcement specialist decides a violation has been substantiated, but that it does not warrant enforcement by a Formal Enforcement Proceeding, a Form 7060 Official Warning can be issued to the violator, identifying the violator, the horse, the specific statutory or regulation violation and the date of the violation. That information and the Form 7060 will then be published on FOIA Electric Reading Room Enforcement Lists as a sanction against the alleged violator and to deter others from such conduct.

49.     "When IES issues an official warning, it closes the investigative file involving the alleged violation." The IES' decision that a person has violated the HPA, the assessment of the Form 7060 penalty and the database publication, culminate the USDA's decision making process under the IES Investigative and Enforcement Process, and are final Agency actions that determine rights or obligations from which legal consequences flow.

50.     The Form 7060 warns that the Agency's decisions that the McGartlands violated the HPA may be used by the Agency in formal proceedings in the future should the USDA decide to file a

complaint against them based on future alleged violations.  The USDA's decisions in the cases initiated against the McGartlands bind the Agency in any future proceedings it might file against them under HPA §1825(a), which authorizes criminal penalties against "any person who knowingly violates section 1824."  The Form 7060s the McGartlands received not only identify them as violators of the HPA, specifying the section in HPA §1824 violated, but assert that further violations may result in criminal prosecution for a knowing violation of the HPA.   The determinations that they have violated the HPA have the legal consequence of proving that any subsequent alleged misconduct was committed "knowingly."

51.     Under the IES Investigative and Enforcement Process, APHIS has found that the decisions it makes about who violated the HPA and the assessment of the Form 7060 penalty, coupled with publication on its public databases, have effectively allowed APHIS to "take swift action." In 2014, APHIS's Administrator said that "enforcement delayed is enforcement denied" and that "[t]aking action more quickly against violators serves as a better deterrent to not only the specific violator, but other violators as well." Mike and Lee McGartland have had enforcement actions taken against them under the IES Investigative and Enforcement Process seven times in USDA enforcement cases about which they received no notice, were provided no hearing and from which they had no appeal.

**B.   The USDA Decided The McGartlands Violated The HPA And Penalized Them Using The IES Investigative And Enforcement Process.**

52.     On August 30, 2012, Mike and Lee McGartland entered Contender Farms' horse "He's Shady in Black" in a Celebration class. After the horse passed the DQP inspection, a VMO inspected the horse and said it violated the scar rule. The horse was disqualified from the event. On July 7, 2014, the USDA sent both McGartlands a Form 7060, in Case No. TN130155-AC, informing them that they had violated 24 U.S.C. §1824(2) and 9 C.F.R. §11.3, the Scar Rule. The

USDA separately identified Mike and Lee McGartland as violators of the scar rule on two public databases and published each Form 7060.

53.    On July 26, 2014, the McGartlands entered Contender Farms' horse "The Royal Dollar" in a class at the 74th Annual Red Carpet Show of the South. After passing pre-event inspection, the horse placed third in class. It was selected by a VMO for post-event inspection, and he said it was sore. On March 8, 2016, after this lawsuit was filed, in Case No. TN150187-AC, the USDA issued a Form 7060 to Lee McGartland identifying her as a "violator" of "Federal law" and stating that USDA evidence showed a scar rule violation of 15 U.S.C. §1824(2)(A). On April 18, 2016, a USDA News Release announced that the HPA March 2016, enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." On April 19, 2016, the March enforcement actions and penalties were posted on the USDA/APHIS Enforcement Action List, and Lee McGartland was listed in case number TN150187-AC as a "violator" of HPA §1824(2)(A) and the Form 7060 was published.

54.    On August 26, 2014, the McGartlands entered Contender Farms' horse "She's a Shady Sister" at the Celebration. After passing DQP inspection, a VMO inspected the horse and said the horse violated the scar rule. On February 17, 2016, in case no. TN 150128-AC, the USDA issued two Forms 7060 to Lee and Mike McGartland for a scar rule violation. On March 18, 2016, after this lawsuit was filed, a USDA News Release announced that the HPA February enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." Mike and Lee McGartland were separately listed as "violators" in two cases and their Forms 7060 penalties were published.

55.    On August 27, 2014, the McGartlands entered Contender Farms' horse "Blue's Master" in a class at the Celebration. After passing the DQP inspection, a VMO inspected the horse and said "Blue's Master" violated the scar rule. On February 17, 2016, the USDA sent Mike McGartland a Form 7060, in Case No. TN150128-AC, stating that McGartland violated the scar rule by allowing the horse to be shown in violation of 15 U.S.C. §1824(2)(D), which decision, along with the Form 7060, the USDA published on its database. On March 18, 2016, after this lawsuit was filed, a USDA News Release announced that the HPA February enforcement actions had been posted on the Enforcement Actions List, "highlighting enforcement actions taken in response to violations of the …Horse Protection Act (HPA)." Mike and Lee McGartland were separately listed in two cases as "violators" and their Forms 7060 penalties were published.

### VI. USDA ENFORCEMENT ACTIONS UNDER THE PROTOCOL FOR FOREIGN SUBSTANCE PENALTY AND IES INVESTIGATIVE AND ENFORCEMENT PROCESS ARE UNAUTHORIZED AND UNLAWFUL.

**A.   The Enforcement Actions Against the McGartlands Were Unauthorized and Unlawful.**

56.    The Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process enforcement programs, under which the USDA decides a person violated the HPA and assesses a penalty, contravene the plain language of §1823(b): "**No penalty shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation.**" (Emphasis added). USDA employees working as enforcement specialists are not authorized to decide whether a person has violated the HPA or to assess any penalty for a violation.

19

57.     The two enforcement schemes the USDA uses as alternatives to Formal Enforcement Proceedings exemplify the type of scheme invalidated in *National Pork Producers Council v. EPA*, 635 F. 3d 738, 749 (5th Cir. 2011) because; where Congress creates a comprehensive liability enforcement scheme, an agency's "attempt to supplement th[e] scheme is in excess of its statutory authority." The USDA cannot "create from whole cloth new liability provisions." *Id*. at 753.

58.     "A sanction may not be imposed…except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. §558(b). The USDA's final decisions that the McGartlands violated the HPA, for which it assessed penalties, adversely affect the McGartlands and Contender Farms. These enforcement actions should be declared "unlawful and set aside"; they are "not in accordance with law," are in "excess of statutory jurisdiction, authority, or limitation" and do not follow "procedures required by law." 5 U.S.C. §706(2)(A), (C) and (D).

59.     Since 2013, under the IES Investigative and Enforcement Process the McGartlands have received seven Form 7060s stating they sored their horses.[3] The IES investigators' decisions that the McGartlands violated the Act rested solely on the VMO's reports, which describe the results of subjective inspections and digital palpations of the horse's forelegs.  If a VMO decides a horse is sore, the VMO completes a form report, and later makes an affidavit that is submitted to IES for an enforcement determination.  *See Young v. United States Dept. of Agriculture*, 53 F.3d 728, 729-30 (5th Cir. 1995) and *Bradshaw v. U.S. Dept. of Agriculture*, 254 F.3d 1081 (5th Cir. 2001). These reports and affidavits 1) "are created with a bias towards the Government's position; and 2) the conclusions reached in them are based on an unreliable method of determining whether a horse has been sored." *Young,* 53 F. 3d at 730.  A decision by the USDA, that a person has sored a horse based solely on the VMO's hearsay report, is not based on evidence substantial enough to sustain

_____

[3] The "failed" inspections and the "enforcement actions" began  after  Mike McGartland and Contender Farms sued the USDA for  its unlawful HIO Penalty Program enforcement scheme in *Contender  I.*

a penalty issued under HPA §1825(b). Standing alone, the VMO's report is "lacking in probative value and reliability." *Id*.

60.     Enforcement actions against the McGartlands under the IES Investigative and Enforcement Process contravene the USDA Regulation at 7 C.F.R. §1.133(a), which provides that where information about a possible violation is provided to the Agency, "[s]uch information may be made the basis of any appropriate proceeding covered by the rules of this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder." The USDA's enforcement actions against the McGartlands have not resulted from proceedings filed under 7 C.F.R. §1.131 *et seq*., or any regulation or provision authorized by the HPA.

61.     The Agency's decisions that the McGartlands violated the scar rule when entering or showing their horses were arbitrary, capricious and not made in accord with the law. Constitutional and statutory due process requires notice and a hearing before an agency can determine that a person has violated the law much less impose a penalty. There was no notice or hearing where the USDA had the burden to prove that "He's Shady in Black," "The Royal Dollar," "She's A Shady Sister," or "Blue's Master" were sore or that an appropriate penalty would be the issuance of a Form 7060 to be published on the USDA's website.

**B.   The Enforcement Actions Against The McGartlands Are Final Agency Actions.**

62.     Paragraphs 34 through 42 are adopted by reference in this section pursuant to Fed. R. Civ. P. 10(c).

63.     The adoption and implementation of the enforcement schemes embodied in the Protocol on Foreign Substance Penalty and the IES Investigative and Enforcement Process are final agency actions representing the culmination of the Agency's deliberative process. The enforcement

decisions made using these enforcement schemes denied the McGartlands due process of law in violation of the Fifth Amendment of the Constitution, statutory due process as required by HPA §1825(b) and APA §551 *et seq.* and regulatory due process as provided by 7 C.F.R. §1.130. The McGartlands received no notice of the cases and were afforded no opportunity to defend.

64.     HPA §1825(d)(2) precludes this Court from deciding whether or not the McGartlands violated the HPA, that decision being vested in the Secretary and the United States Courts of Appeals under HPA §1825(b). The McGartlands do not seek to litigate that issue. Rather, they challenge the authority of the USDA to decide they violated the HPA under the Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process and challenge the Agency's authority to penalize them in any proceeding other than one filed pursuant to HPA §1825(b). The McGartlands' only recourse rests in this Court's determination that the two enforcement schemes were unauthorized and unlawful.

65.     The USDA's actions taken against Mike and Lee McGartland mark the culmination of the Agency's decision making process under the Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process. The decisions are not merely tentative or interlocutory. The USDA has ruled definitively in these cases that the McGartlands violated the HPA. The USDA describes the decisions as final and "[w]hen IES issues an official warning, it closes the investigation file involving the alleged violation."

66.     The Official Warnings on Form 7060 were not communications given to Mike and Lee McGartland as notice of facts or conduct about which the USDA was concerned. They did not afford the McGartlands an opportunity to demonstrate or achieve compliance with the applicable statute or regulations, and they did not warn that the McGartland's failure to do so might result in future enforcement proceedings. The USDA's decisions that the McGartlands violated the law and

the Official Warnings on Form 7060 are themselves an enforcement action and penalty, reflecting the USDA's final decisions that Mike and Lee McGartland violated the HPA.

67.     The findings and conclusions made by the USDA under the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process are not subject to further agency review.  While the Form 7060 invites the McGartlands to discuss any questions they might have with the Agency, that invitation confers no entitlement to further agency review, and there are no procedures for "appeal" included.

68.     HPA §1825(b) provides for judicial review of the USDA's lawfully assessed administrative civil penalties in the United States' Courts of Appeal. The penalties administratively assessed against Mike and Lee McGartland under the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process were not assessed under §1825(b). As a consequence,    the    McGartlands    have    been    denied    this    right    to    appeal.

69.     The USDA's enforcement actions against the McGartlands and Contender Farms, using the Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process, denied them the right to hearings before the ALJ and JO with the assistance of counsel. If the McGartlands prevailed in a Formal Enforcement Proceeding, they would have the right to seek attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. §2412, and 7 C.F.R. §1.190. The USDA's actions, taken under the Protocol for Foreign Substance Penalty and IES Investigative and Enforcement Process, allow the Agency to sanction people while avoiding the government's obligation to pay attorneys' fees in cases filed in Formal Enforcement Proceedings..

70.     The Form 7060 warns that the Agency's determinations that the McGartlands violated the HPA may be used by the Agency in future Formal Enforcement Proceedings.  The USDA's determinations in the cases initiated against Mike and Lee McGartland bind the Agency in any

future proceedings it might file against them under HPA §1825(a), which authorizes criminal penalties against "any person who knowingly violates section 1824." The Form 7060 asserts that further violations may result in criminal prosecution for a knowing violation of the HPA. The USDA's determination that the McGartlands violated the HPA, in the cases described above, has the legal consequence of proving that any subsequent alleged misconduct was committed "knowingly." The USDA's determinations that Mike and Lee McGartland violated the HPA may be taken into account by the Department of Justice and are capable of rendering a determination of a knowing violation as a stand-alone trigger for the imposition of criminal violations under HPA §1825(a).

71.     The USDA's decisions in the cases against Mike and Lee McGartland further bind the Agency in any future civil proceedings that it might file against them under §1825(b). The Form 7060 warns that further violations may result in the assessment of civil penalties. HPA §1825(b) provides that in assessing any civil penalty "the Secretary shall take into account all factors relevant to such determination, including …any history of prior offenses…." The Secretary must take into account prior offenses. The USDA has determined Mike and Lee McGartland have committed offenses. As consequence of these determinations, in a future proceeding for civil penalties under §1825(b), the Secretary must take the unlawful decisions in the cases described above into account in assessing penalties.

## VII. THE USDA'S "HIO PENALTY PROGRAM."

### A.   The Background And Structure Of  The HIO Penalty Program.

72.     The USDA is authorized to promulgate regulations that provide for the licensing of DQPs, who event management can appoint to inspect horses. 15 U.S.C. §1823(c). To accomplish this, the Agency adopted regulations under which it certifies HIOs to train and license DQPs. 9

C.F.R. §11.7.  From 1999 through 2009, the USDA and HIOs agreed to Operating Plans under which each HIO included in its rulebook a matrix of penalties it would assess against entrants when the DQP was of the opinion that a horse was sore ("HIO Penalty Program"). *See* 62 Fed. Reg. 63,510 (December 1, 1997).

73.     The USDA's position has been that DQPs "inspect horses for purposes of enforcing the Act." 77 Fed. Reg. 33,608 (June 6, 2012). The USDA's regulations require that by March 1 of each year, certified HIOs shall furnish the Department any rulebooks "and disciplinary procedures for the previous year pertaining to violations of the Horse Protection Act or regulations" and provide the Agency "a quarterly report of all disciplinary actions taken against … any exhibitor … for violation of the Horse Protection Act or regulations, and the results thereof."

74.     Pursuant to this regulation, HIOs included a penalty program in their rulebooks specifying penalties that would be assessed against those exhibitors who entered horses that failed DQP inspections. If a horse failed inspection, the DQP would issue a "ticket" to the person entering the horse.  Within days, the HIO notified the entrant of the penalty it was assessing. If that person wanted to contest the penalty, the HIO provided an informal appeal procedure.  As the USDA viewed it, "[o]ver the years, the role of HIOs has expanded to include assessing and enforcing penalties for violations of the Act." *Id.* at 33,609.

75. Beginning in 2001, the USDA and HIOs entered yearly agreements called Operating Plans, under which the HIOs would assess rulebook penalties, and the USDA would generally not bring civil enforcement proceedings against those who received HIO penalties. HIOs provided the primary enforcement program for the enforcement of the HPA against exhibitors.

76.     The McGartlands and Contender Farms are affected by the HIO Penalty Program because they enter horses only in HIO inspected events. When the McGartlands enter an HIO inspected

event, they agree to the penalty assessment provisions in the HIO's rulebook. In doing so, the McGartlands face the real possibility that, if they are ticketed, they will have an HIO mistakenly decide they violated its rules, penalize them without due process of law and have the HIO provide this information to the USDA. The USDA will then publish the McGartlands' names on the FOIA Electronic Reading Room Enforcement List, misleadingly identifying them as persons responsible for violating the Act and identifying Contender Farm's horses as being found in violation, thereby sanctioning them with a public reprimand.

77.     This happened in 2008, when Mike McGartland was ticketed by a DQP working for the HIO NHSC. The horse was disqualified and a "ticket" was issued. But no penalty was assessed. Nonetheless, Mike McGartland's name has been published as having received a one month suspension. FOSH is an HIO that maintains a website that publishes information it receives about HPA violations. The 2008 incident is still published in FOSH's data link. FOSH and the USDA cooperate in this publishing effort, with the USDA providing information about enforcement actions and coordinating with FOSH's work. Such a false publication presents an actual or imminent injury that is concrete and particularized, that is directly traceable to the conduct of the USDA, and that is redressable by a judgment in their favor.

78.     SHOW commenced operation as a certified HIO in 2009, and included in its rulebook a ticketing, penalty and appeal procedure. Entrants into events were required to agree to the provisions in the rulebook. That same year the USDA proposed a new working agreement requiring HIOs to adopt uniform suspension penalties into the HIOs' rulebooks. Several HIOs, including SHOW, rejected the proposal and the operating agreements terminated at the end of 2009. As a result, in 2010, the USDA decided to compel HIOs to enforce the Act by requiring them to assess uniform mandatory minimum suspension penalties.

79.     On February 2, 2010, the USDA announced that it would begin making available FOIA Electric Reading Room Enforcement Lists "by posting more information on violations and enforcement of the Horse Protection Act (HPA)." The USDA decided the "Department will now be providing Horse Industry Organizations (HIO) suspension lists on its website, which will allow …the general public to examine these lists without submitting a Freedom of Information (FOIA) request." According to the Agency, "We will publish…the name, city, and state of the individual violators."

80.     Because several HIOs, including SHOW, refused to incorporate the USDA's protocol for assessing uniform penalties, on May 27, 2011, the USDA announced "Proposed Rules," which would require HIOs "to assess and enforce minimum penalties for violations of the Horse Protection Act (the Act) and the regulations." 76  Fed. Reg. 30,864 (May 27, 2011). The USDA proposed to "require HIOs to submit to the Department all decisions on penalty appeals…so we can monitor the appeal process." 76 Fed. Reg. 30867.

81.     However, the Agency did not give notice it would publish this enforcement information on its website and identify  people as HPA violators.  Further, the USDA certified the regulations would contain no new record keeping requirement under 44 U.S.C. §3501 *et seq*. 76 Fed. Reg. 30868.  The USDA, in connection with the rulemaking procedures, did not provide notice or solicit comments  by providing in the Federal Register "a brief description of the need for the information and the proposed use of the information," as required by 44 U.S.C. §3507(a)(1)(D)(i)(III). The USDA did not publish notice that it would use the HIOs' ticketing and penalty information to publish lists on its website identifying thousands of people as having violated the HPA. This is a violation of the APA's rulemaking requirements. 5 U.S.C. §553.

82.     On June 7, 2012, the USDA adopted the new regulations.  77  Fed. Reg. 33,607-33,619. The USDA's position was that it had authority to "impose whatever requirements on the HIOs that [it] determines to be necessary to enforce the Act and the regulations."  *Id.* at 33,609.  The USDA claimed that "DQPs find violations of the Act by inspecting horses, and thus penalties will be assessed and enforced on the basis of the inspections."  *Id*. at 33,610. The new rule would "strengthen our enforcement of the Act by ensuring that minimum penalties are assessed and enforced consistently" by all HIOs. *Id*. at 33,607.

83.     The new regulations required HIOs to include in their rulebooks penalties to be assessed against those entrants who had a horse fail a DQP inspection and enforce the penalties the USDA prescribed in paragraphs (c) and (d).  9 C.F.R. §11.25(a). HIOs were to provide appeals from DQP tickets and "submit to the Department all decisions on penalty appeals within 30 days of the completion of the appeal." 9 C.F.R.  §11.25(e). The new regulations did not authorize the USDA to publish information provided by HIOs, or to use the information HIOs provided to create lists that misleadingly implied that those identified had been lawfully determined to have violated the Act.

84.     The new regulations required that HIO penalties be enhanced based on prior offenses. For example, the minimum suspension penalty for a horse determined to be bilaterally sore would be one year for the first offense, two years for a second offense, while for a third or subsequent offense the suspension would be four years. 9 C.F.R. §11.25(c). In order for HIOs to know when a person was under suspension, so that he or she would be denied entry by the HIO into its events, and so the HIO could know when an enhanced suspension penalty should be assessed because of prior HIO offenses, the USDA would have to identify those people who were currently suspended or had prior HIO violations.

85.    The USDA gathered penalty records from the HIOs and used them to publish several database lists on the FOIA Electric Reading Room database ("HIO Penalty Lists").  The USDA began to "make lists of people who have been disqualified through USDA action and people who have been suspended through HIO action available on the Horse Protection Web site."

86.    The USDA initially provided a link to a Searchable HPA Suspensions list, which on June 12, 2015, contained 2,421 entries of "Responsible Persons Found in Violation." The USDA provided three other types of lists about HIO enforcement: (1) "Fines: | 2014 | | 2013 | | 2012 | | 2011 | | 2010," (2) "Suspensions: Currently Active: | 2014 | | 2013 | | 2012 | | 2011 | | 2010" and (3) "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010." The HIO Penalty Lists consisted of 16 different links to HIO Penalty Program data on the FOIA Electronic Reading Room database.

87.    The "USDA Horse Protection Program Fine Report" for 2010-2014 included the name of the "Fined Person," the fine amount, the HIO ticket date and number, the horse's name and the HIO's name.  On the June 21, 2015, report, of the 115 people listed, 99 were fined by SHOW.

88.    The "USDA Horse Protection Program Active Suspension Report" identified people currently under an HIO suspension. A June 21, 2015, copy identified 90 individuals under the heading "Suspended Person."   SHOW assessed 70 of those suspensions. In July 2016, these separate lists were consolidated into one list.

89.    The USDA's lists of "Responsible Parties for Horses Found in Violation: | 2014 | | 2013 | | 2012 | | 2011 | | 2010|" contained information under the heading "USDA HORSE PROTECTION PROGRAM Responsible Parties for Horses Found in Violation." Each yearly report listed the person's name under "Responsible Party." The "Violation" is specified. The horse is identified, along with the date of the show, as is the HIO that assessed the penalty. On June 21, 2015, the

yearly reports totaled about 869 pages, with about 12,139 entries naming the "Responsible Party,"

identifying a "violation" and naming a horse.

**B.   The HIO Penalty Program Has Been Declared Invalid And the USDA Has Been Enjoined From Enforcing It Against The Plaintiffs.**

90.     SHOW refused to adopt the new regulations by incorporating the penalty provisions into

its rulebook. Instead, on June 26, 2012, SHOW filed a lawsuit against the USDA challenging the

validity of the new rules. While the lawsuit was pending, the USDA gave SHOW notice it would

be decertified for not amending its rulebook. On January 9, 2014, the USDA filed an administrative

Complaint against SHOW to decertify it. Formal Enforcement Proceeding are authorized only for

violations of HPA §1824, and then only pursuant to a complaint filed under §1825. SHOW did

not, and could not, violate §1824. The USDA published the Complaint on the Searchable

Violations List and Enforcement Actions List available at the FOIA Electronic Reading Room.

The publication falsely and misleadingly indicated that SHOW violated the HPA.

91.     In *Contender Farms, L.L.P. v. U.S. Dept. of Agriculture*, 779 F. 3d 258, 262 (5th Cir. 2015),

the Court held that the HPA "plainly prohibit[ed]" the USDA's approach to HPA enforcement,

observing that "by looking to the plain language of §1823(c)," it is clear that "nothing in § 1823(c)

contemplates USDA involvement in the *enforcement* procedures of HIOs." The Court held that

"the Regulation establishes a parallel enforcement scheme" to §1825, unsupported by the "plain

language" of the statutory text.  *Id.* at 271-75.  The USDA's effort to make HIOs assess penalties

for violations of the HPA "contravened the statute's plain language" because the "Regulation

addresses an area that is plainly outside the USDA's statutory authority."  *Id.* at 274.

92.     On April 22, 2015, the district court entered a Final Judgement in *SHOW, Inc. et al v. U.S. Department of Agriculture*, Civ. No. 4:12-cv-429-Y, ECF No. 110, granting Plaintiffs' motion for summary judgment and providing that "Defendant is ENJOINED from enforcing the rule at issue herein regarding '[m]inimum penalties to be assessed and enforced by HIOs that license DQPs' that was adopted on June 7, 2012, made effective on July 9, 2012, and is located at 9 C.F.R. §11.25."

## C.   The USDA Continues To Act Unlawfully As To SHOW.

93.      As a result of the decision in *Contender Farms v. USDA*, the USDA's administrative complaint against SHOW was dismissed with prejudice on April 14, 2015.  Nonetheless, the USDA continued to falsely and misleadingly identify SHOW on its website as an HPA violator against whom the Agency had taken an enforcement action, adversely affecting SHOW by stating that SHOW had violated the HPA.

94.     The invalidation of the HIO enforcement scheme solved only part of the problems created during its short-lived implementation. The HIO Penalty Lists continued to be published. Since the USDA's HIO Penalty Lists identifying violators, violations and suspensions were no longer used by HIOs to exclude people from entering a show, or to enhance penalties based on prior offenses, their only purpose was to impose sanctions by public reprimand on people misleadingly identified as having been determined to have violated the Act.

95.     The *Contender Farms'* decision recognized that "nothing in the HPA *prohibits* HIOs from adopting [penalty] procedures," even though the Act prohibits the USDA from regulating these penalty programs. 779 F.3d at 272.  After the decision, SHOW continued its voluntary penalty program through 2015. Though the USDA has no authority to regulate or control SHOW's

ticketing and penalty program, the USDA continued to demand SHOW's ticketing and penalty records.

96.     On June 9, 2015, Paul Warren, a USDA representative, appeared at SHOW's office and demanded that SHOW turn over all the tickets it had issued for April and May, 2015.  Mr. Warren said IES needed the copies immediately, because the USDA was investigating a complaint alleging that SHOW was destroying some tickets rather than enforcing them.

97.     On August 24, 2015, Mr. W. Harris, an IES employee, delivered a memo to SHOW's office  requiring SHOW to turn over all listed documents concerning its upcoming activities as the HIO under contract with the Celebration for its upcoming event scheduled for August 25 through September 5, 2015.

98.     On August 26, 2015, SHOW complained to IES about the demands made on it, but apparently not on any other HIO, and requested the Agency identify any legal authority for its demands.  No response was received.  As a result of the USDA actions in investigating SHOW for allegedly improperly destroying tickets and because of the continued publication of the HIO Penalty Lists that misrepresent what SHOW has done in a private capacity, SHOW eliminated its private penalty program from its March 1, 2016, rulebook.

99.     The USDA's actions in demanding SHOW's penalty records, which it has used to publish misleading enforcement lists, are final agency actions that adversely affect SHOW. The publications falsely identify people as having violated the HPA, and mischaracterize SHOW as having determined that the identified persons violated the Act.  The Agency has decided it has the right to publish the misleading HIO Penalty Lists. It has decided that those about whom it publishes this information, including SHOW, have no right to challenge the action.

## VIII. THE FOIA ELECTRONIC READING ROOM
### ENFORCEMENT LISTS POLICY

100.    Part and parcel with the three unlawful enforcement schemes described above, APHIS has adopted policies that unlawfully authorize it to publish the enforcement action lists on its FOIA Electric Reading Room website. This fourth unlawful enforcement scheme is referred to as the "FOIA Electronic Reading Room Enforcement Enforcement Lists Policy." This fourth USDA enforcement program uses the FOIA Electronic Reading Room Lists to impose additional penalties by publication.

**A.    APHIS's Policy For Distributing HPA Enforcement Action Information.**

101.    In 1996, the USDA's Office of Chief Information Officer ("OCIO") issued Departmental Regulation 3300-001, establishing the policies for the USDA's use of telecommunications services. The regulation required the USDA to improve its information systems "by implementing the requirements of the Paperwork Reduction Act (PRA)."

102.    Pursuant to that directive, APHIS adopted procedures it would follow under the Freedom of Information Act ("FOIA"). That policy included not commenting on open investigations. APHIS described the types of enforcement action under the AWA and HPA in order of severity, the least severe being the Official Warning Letter (7060) to the most severe, the Decision and Order. Official Warning Letters notified an individual of an alleged violation, and copies could only be "obtained through a Freedom of Information Act (FOIA) request. In contrast to a Warning Letter, "[a] Decision and Order is issued by the ALJ based on the evidence presented by APHIS and the  respondent. The respondent has the right to appeal this decision. A copy of the Decision and Order is available on the USDA ALJ web site."

103.    On January 21, 2009, President Obama issued a Memorandum directing agencies to be open and transparent in disseminating government information. 74 Fed. Reg. 4685. 2009 WL 166656 (Pres.). On June 19, 2009, under the guise of responding to the President's directive,

APHIS announced a new policy to reduce its backlog of FOIA requests. This new policy involved disseminating false to the public without a specific FOIA request.  APHIS' written policy directed that specific information be publically available in its FOIA Electronic Reading Room. The policy for deciding what information to make publically available without a written FOIA included the category of "records that have been released in response to multiple requests for information under the FOIA or are likely to be requested again."

104.    APHIS' policy makes available on its FOIA Electric Reading Room website documents that "consist of any records that have been processed and disclosed in response to a FOIA request that APHIS determines have become – or are likely to become – the subject of multiple requests for substantially the same records." In applying this policy, APHIS decided to make publicly available in the FOIA Reading Room all HPA  "Enforcement Actions" and "Horse Protection Act information – Horse Industry Organization Suspension Lists and Audit Reports." As a part of APHIS's "HPA Enforcement Actions" the USDA publishes "HPA Inspections and Enforcement Information," including any "Official Warning Letter (7060)."  The enforcement records about the Plaintiffs fall into this category and are publically available without a FOIA request.

105.    Beginning in February 2010, APHIS began posting penalty information provided by HIOs, giving "the name, city, and state of the individual violators." APHIS provided 19 links to lists identifying penalties that had been assessed under the HIO Penalty Program.  APHIS said that "[t]he proactive posting of these suspension lists…will aid us in our ongoing efforts to enforce the Horse Protection Act…." The USDA allows access to the HIO Penalty Lists without the necessity of an FOIA request.

**B.   The FOIA Electronic Reading Room Enforcement Lists Policy is Unlawful.**

106.   The Paperwork Reduction Act ("PRA"), 44 U.S.C. §3501 *et seq*., sets forth the requirements and restrictions on agency dissemination of information using electronic publication. The PRA ensures that collection and dissemination of agency information be "consistent with applicable laws, including laws relating to – (A) privacy and confidentiality, including section 552a of title 5," the Privacy Act, and "section 552 of title 5," the Freedom of Information Act ("FOIA").   PRA §3501(8)(A) and (C).   Defendant's dissemination of HPA enforcement information on its FOIA Electronic Reading Room Enforcement Lists violates the FOIA or the Privacy Act.

107.   The PRA regulates agency "information systems" to protect people and businesses from burdensome or unlawful recordkeeping requirements and provides the procedures for authorizing recordkeeping requirements. 44 U.S.C. §3501(3)(A), (8), (10), and (12-13). Under the PRA, the Office of Management and Budget ("OMB") is authorized to promulgate regulations to guide the agencies in complying with the PRA and federal laws to ensure the integrity and accuracy of publically disseminated information. Defendant's dissemination of HPA enforcement information on its FOIA Electronic Reading Room Enforcement Lists violates this requirement because it violates the FOIA and  the Privacy Act.

108.   The OMB Director oversees agency compliance with PRA, the FOIA and the Privacy Act. 44 U.S.C. §3504(g)(2). OMB Circular No. A-130(Revised), November 28, 2000, provides guidance for agency dissemination of information to the public, and it applies to dissemination of information to the public that is not subject to an FOIA request. OMB Circular No. A-130, ¶6.e. The Circular recognizes that the "individual's right to privacy must be protected in Federal Government information activities involving personal information."

109.    OMB Circular No. A-130, ¶7(g) and ¶8 (a )(i) require that agency policy "[c]onsider the effects of their actions on the privacy rights of individuals, and ensure that appropriate legal and technical safeguards are implemented." OMB Circular A-130, ¶9 requires that agencies must

> (a) Ensure that information is protected commensurate with the risk and magnitude of the harm that would result from the loss, misuse, or unauthorized access to or modification of such information; (b) Limit the collection of information which identifies individuals to that which is legally authorized and necessary for the proper performance of agency functions; [and] limit the sharing of information that identifies individuals…to that which is legally authorized….

Defendant's FOIA Electric Reading Room Enforcement Lists Policy is not legally authorized or necessary for the proper performance of the Agency's functions and contravenes the provisions cited from OMB Circular A-130.

110.    On February 22, 2002, OMB issued the "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Dissemination by Federal Agency Publication," directing all agencies to develop information management procedures consistent with the guidelines and the PRA. 67 Fed. Reg. 8452-01, 2002 WL 245939(F.R.). Agencies should ensure the dissemination of information that is "accurate, clear, complete and unbiased…."  The USDA's Office of the Chief Information Officer issued guidelines, pursuant to OMB Circular 130, directing the USDA's offices to disseminate only information "in an accurate, clear, complete and unbiased manner" in compliance with the Privacy Act, FOIA, and OMB Circular A-130. The guidelines do not affect dissemination of information made under the FOIA or Privacy Act, which contain their own statutory procedures. The USDA's FOIA Electronic Reading Room Enforcement Lists are not disseminated in response to FOIA or Privacy Act requests.  They are unlawful because they are not accurate, they mislead the public, they are biased and incomplete, and they serve only to penalize by publication people who have not been lawfully determined to have violated the HPA. *See* OMB Guideline V. 8.

111.    PRA § 3506 requires that the agency's Chief Information Officer shall ensure compliance with the agency's responsibilities under the PRA. 44 U.S.C. §3506(a)(2)(A) and (3). With respect to personal privacy, "each agency shall… assume responsibility…for compliance with…sections 552 and 552a of title 5…." 44 U.S.C. §3506(g)(2). Section 552 refers to the Freedom of Information Act, and §552a refers to the Privacy Act.

112.    The USDA's Office of the Chief Information Officer is responsible for ensuring the Agency's policies are consistent with the PRA and "privacy Requirements." The PRA "is the law and failure to comply with the requirements of the Act is breaking the law." The "USDA agencies and offices will strive to ensure that the information they disseminate is substantially accurate, reliable, and unbiased and presented in an accurate, clear, complete, and unbiased manner." If the Agency violates the law, the "USDA leaves itself open to lawsuits from individuals in the public."

113.    The USDA violates these requirements. The USDA's FOIA Electronic Reading Room Enforcement Actions Lists are substantially incorrect. They disseminate information identifying individuals as HPA violators, when those identified have not been lawfully determined to have violated the HPA. The enforcement lists do not make clear that those identified have not been afforded due process of law, or that the decisions were made without notice and opportunity to respond.  The enforcement lists are incomplete because they do not inform the public that those identified as violators have not been charged by a complaint, determined liable and penalized in Formal Enforcement Proceedings. The enforcement lists are biased because they serve to make the USDA look like it has caught thousands of HPA violators, when it has not, thus, falsely inflating its enforcement figures. The lists are merely false bragging about the Agency's vigorous enforcement and transparency.

114.    The USDA, in adopting the FOIA Electronic Reading Room Enforcement Lists Policy, violates the FOIA, which requires governmental agencies to release, upon a proper request, information and records in the agencies' files that are not otherwise protected from disclosure by the exceptions to dissemination enumerated in the Act.  One category of documents that must be made available to the public is "final opinions, including concurring and dissenting opinions, as well as other orders, made in the adjudications of cases," and this is the only enforcement action information that can be released without a FOIA request.  5 U.S.C. §552(a)(2)(A).  The information made available under the FOIA Electronic Reading Room Enforcement List Policy, complained of herein, is not the result of authorized and lawful adjudications. The information on the enforcement actions lists may not be disseminated without an FOIA request. because the information is in "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" subject to FOIA §552(b)(6) and (b)(7)(C)("records or information compiled for law enforcement purposes [that] could reasonably be expected to constitute an unwarranted invasion of personal privacy").

115.    When the USDA receives a FOIA request for personal or investigation law enforcement information, it must weigh the interest of the public in disclosure against the privacy interests of any person who might be identified in the released records. The Agency must balance these competing interests on a request-by-request basis.  If information is withheld based on Exemptions (6) or (7)(C), the decision can be administratively and  judicially reviewed. If the agency weighs the interest of the public or requestor as favoring disclosure, a person or business with interests in nondisclosure can challenge the agency's decision in district court in a reverse FOIA case.

116.    The USDA's FOIA Electric Reading Room publishes the Department of Justice Guide to the Freedom of Information Act ("DOJ Guide").  Under Exemption 6, the DOJ Guide requires that

if the files requested by an FOIA request contain personal privacy information, the USDA must weigh the public verses the privacy interests "by balancing the privacy interest that would be compromised by disclosure against any public interest in the requested information."

117.    There is a presumption weighing in favor of public disclosure. However, FOIA Exemption 7(C) provides protection for personal information in law enforcement records. As the DOJ Guide makes clear:

> Exemption 6 routinely requires identification and balancing of the relevant privacy and public interests. Exemption 7(C) can be more "categorized" in its application. Indeed, the Court of Appeals for the District of Columbia Circuit held in <u>SafeCard Services v. SEC</u>, [926 F.2d 1197 (D.C. Cir. 1991)], that based upon the traditional recognition of the strong privacy interests inherent in law enforcement records, and the logical ramifications of the <u>United States Department of Justice v. Reporters Committee for Freedom of the Press</u>, [ 498 U.S. 749 (1989)], the "categorical withholding" of information that identifies third parties in law enforcement records will be appropriate under Exemption 7(C).

The Fifth Circuit agreed, as the DOJ Guide notes, in *Thomas v, DOJ*, 260 F. App'x  677, 679 (5th Cir. 2007) (recognizing that "[t]he Supreme Court has held as a categorical matter that a third party's request for law enforcement records about a private citizen can reasonably be expected to invade that citizens privacy.")

118.    The Defendant disseminates information about the Plaintiffs on its FOIA Electronic Reading Room Enforcement Lists contained in or derived from law enforcement records, justifying this policy as a "proactive disclosure" under FOIA §552(2)(D).  Proactive disclosure authorizes an agency to make available "copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records."

119.    Paragraph (3)(A) requires the agency to make records available "upon any request" that reasonably describes the records requested and is made in accordance with established rules. Thus,

records made available under proactive disclosure must first have been made available pursuant to a FOIA Request.

120.    No law enforcement records about the Plaintiffs have been made available pursuant to a FOIA request. FOIA §552(2)(E) requires the USDA to index records released pursuant to a FOIA request. That index is available on the FOIA Electronic Reading Room. That index reflects that only one FOIA request has been made to the USDA regarding the McGartland's law enforcement records, and that pursuant to that 2012 request no records were produced.  However, the USDA subsequently identified the McGartlands as violators on the FOIA Electronic Reading Room Enforcement Lists, even though that information had never been released pursuant to an FOIA request.

121.    The USDA's FOIA Electric Reading Room Enforcement Lists policy is unlawful The dissemination of information about the Plaintiffs under that policy violates FOIA §552(a)(2) because the information disseminated has not been made available previously pursuant to a written FOIA request. As a result, no decision has been made in response to a request that balances the Plaintiffs' personal and privacy interests against the public interest in the information, as required by Exemptions 6 and 7(C). Nor have the records identified on the enforcement lists been requested multiple times, and there is no reason to believe that multiple requests for law enforcement information about the Plaintiffs will be made in the future.

122.    The FOIA Electronic Reading Room Enforcement Lists (identifying Plaintiffs as violators of the HPA, based on a Complaint filed against SHOW or decisions made and penalties assessed using the Protocol for Foreign Substance Penalty, the IES Investigative and Enforcement Process and the HIO Penalty Program) provide information without a FOIA request, thus, violating the FOIA. The policy and publication of the lists are final agency actions from which relief can be

granted under APA §704. The policy and actions taken are arbitrary and capricious; they are contrary to law and outside the USDA's authority; they do not follow proper procedures; and they violate Plaintiffs' rights.  The policy and publication of the lists should be declared invalid and their future use enjoined as provided by APA §706(2).

## C.   The USDA Unlawfully Discloses The McGartlands' Personal Information.

123.    On June 8, 2015, the McGartlands saw on the USDA's website that they were identified as having violated the HPA. The USDA was immediately contacted and informed of the McGartlands' concern that it had published a list that identified them as having violated the Act. The McGartlands pointed out that the disclosure was false and that the HPA did not authorize the Agency to release allegations about those it investigated.  They requested that the USDA remove the website and inform the world that it was a mistake to have said the McGartlands violated the Act.

124.    On June 12, 2015, the McGartlands again wrote the USDA complaining of the lists the Agency was publishing that identified them as having violated the Act, and pointing out that the USDA was violating HPA §1825(b) and the Privacy Act, 5 U.S.C. §552a.  The McGartlands requested the Agency stop making false statements about them. The disclosures about the McGartlands on the lists were materially false and misleading.

125.    No USDA regulations require exhaustion of administrative remedies for parties complaining of or seeking relief from an unauthorized disclosure that violates §552a(b). The McGartlands have exhausted any administrative avenue for relief and further effort would be futile, as evidenced by the USDA continuing to disclose materially inaccurate information about the McGartlands.

126.    The USDA's databases publicizing its enforcement actions are compiled from information accumulated in its "Investigative and Enforcement Records Regarding Regulatory Activities, USDA/APHIS" system of records. ("System of Records" or "USDA/APHIS-1"). Accumulation and dissemination of information in this system of records is governed by the Privacy Act, 5 U.S.C. §552a. The USDA has adopted regulations covering the accumulation and dissemination of information in this system.  See 7 C.F.R. §1.110 *et seq.*

127.    USDA/APHIS–1 describes the System of Records that includes the documents and information the USDA has published about the McGartlands. The publication of the lists and the disclosures about the McGartlands are not authorized by the Routine Uses of records. Indeed, this information about the McGartlands is exempt from disclosure in response to a FOIA request under §552, or even a request made by the McGartlands under §552a.  5 U.S.C.§552a(k)(2), 7 C.F.R. §1.123 and USDA/APHIS – 1 (records authorized by 15 U.S.C. §1821 *et seq.*)

128.    The Privacy Act and FOIA Exemption 7(C) protect from disclosure information compiled for law enforcement purposes where release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(7)(C). There is no question that through the Agency's disclosures the McGartlands have been targets of USDA law-enforcement investigations and unlawful enforcement actions, and that those disclosures have subjected the McGartlands to embarrassment and potentially more serious reputational harm.

129.    Under the PRA, OMB guidance policy and Privacy Act §552a(e)(1), the agency is required to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."  There is no authorized purpose in the HPA justifying the issuance of warning

letters or maintaining or disclosing them on lists using false and misleading headings as public notice of an administrative determination that an individual has violated the HPA.

130.     The USDA's actions in disclosing private and investigative information, including the assessment of sanctions, and publicizing them, are reviewable under APA §702. It is the Agency's intent to penalize the Plaintiffs through adverse publicity, by making materially false and misleading disclosures. In imposing penalties that were not lawfully assessed and publishing them, the USDA has violated the clear and mandatory statutory command in HPA §1825(b) that no penalty shall be assessed except after notice and hearing and by order of the Secretary.

131.     The USDA's actions in disseminating private information about the McGartlands on FOIA Electronic Reading Room Lists are reviewable under APA §704, because they are final agency actions that mark the consummation of the agency's decisionmaking process. The decisions that the McGartlands violated the HPA under the Protocol for Foreign Substance Penalty and the IES Investigative and Enforcement Process are final decisions on the basis of which penalties have been assessed. Because the penalties included the issuance and publication of a Form 7060, the investigations were closed.  The decision to release information about the investigations is a final agency decision.

132.     The Form 7060, and its publication on lists describing the USDA's enforcement actions, is a penalty by publication. Defendant acknowledges this is "part of its effort to make its actions transparent and accessible to the public, by highlighting enforcement actions taken in response to violations of the … Horse Protection Act."  Defendant does so because acting "quickly against violators serves as a better deterrent to not only a specific violator, but other potential violators as well." Enforcement by "naming and shaming" is the antithesis of law. The USDA's use of the Form 7060 as a penalty is the "imposition of penalty or fine" that should be determined on the

record. 5 U.S.C. §551(10)(A),(C) and (G). The actions taken by the USDA in issuing and publishing the Form 7060 about the McGartlands are invalid under APA §706(2) (A), (B), (C) and (D).

133.    The USDA's actions, in disseminating materially false information about the McGartlands, determine rights or obligations from which legal consequences flow. The USDA has determined, over the McGartlands' protest, that it has a right to publish the FOIA Electronic Reading Room Lists without a FOIA request, thus avoiding its obligation to balance the public's interest in disclosure against the McGartland's privacy interests.  By publishing the information about the McGartlands on the FOIA Electronic Reading Room Lists, the USDA avoids its legal obligation to ensure the information is accurate and reliable.

134.    The USDA has determined it has a legal right to disclose personal information about the McGartlands from its system of records, even though the records disclosed are the product of the Agency's unauthorized and unlawful enforcement schemes.  The USDA has also determined that the McGartlands do not have a right to keep materially inaccurate disclosures regarding them from being published on the database.

135.    The disclosures about the McGartlands indict them by innuendo and are individualized and accusatory. The disclosures about them have the consequence of denying the McGartlands the protections against having penalties assessed other than after notice, a hearing and by an order of the Secretary as required by HPA §1825(b).

136.    Because the USDA disseminates the Form 7060 and identifies the McGartlands as HPA violators without the necessity of an FOIA request, the McGartlands are denied the right to challenge the Agency's decision to disseminate personal information about them in a reverse FOIA lawsuit under the exemptions in 5 U.S.C. §552(b)(6) and (7)(C).

137.    This Court should hold unlawful and set aside the USDA's actions in disclosing personal information about the McGartlands without their consent because these actions are arbitrary and capricious, not in accordance with law, in excess of the USDA's statutory jurisdiction, authority and limitations and carried out without observing procedures required by law. 5 U.S.C. §706(2)(A),(B),(C) and (D).

**D.    The Publication Of The HIO Penalty Lists Is Unauthorized And Unlawful.**

138.    The USDA's publication of the HIO Penalty Lists contravenes the plain language of §1825(b): "No penalty shall be assessed unless such person is given notice and an opportunity for a hearing before the Secretary with respect to such violation."  There is no authority under the HPA to publish the HIO Penalty Lists, which misleadingly identify people as responsible for violations of the Act.   HIOs cannot lawfully determine that entrants in events whose horses are noncompliant have violated the HPA and enforce a lawful penalty for violating the HPA.

139.    Under Department regulations that were invalidated in *Contender Farms v. USDA,* SHOW was required to provide the USDA its private records about tickets issued to entrants and HIO penalties assessed against those whose horses were disqualified based on the opinion of a SHOW DQP. The USDA's dissemination of information, taken from these records on the HIO Penalty Lists, which falsely characterizes those penalized by SHOW as having been determined to have violated the HPA, adversely affects SHOW by misleadingly characterizing it as determining that those listed have violated federal law.

140.    The publication of the HIO Penalty Lists, based on the USDA's HIO Penalty Program, misleads the public into believing that the USDA and SHOW have made a final determination that those penalized by SHOW have been lawfully determined to have violated the HPA. SHOW does not, and cannot, as a private entity, enforce federal law.

141.    SHOW has been required to provide the USDA records about its penalty assessment activities. The USDA's use of these records to misleadingly publish lists with inaccurate information about those penalized is not authorized by law and is unlawful under 44 U.S.C. §3501 *et seq.*.

142.    The HIO Penalty Program, which the USDA uses to publish lists identifying people as HPA violators, compels horse show participants to avoid the USDA's actions by seeking uninspected events and avoiding inspected events where HIOs, like SHOW, are employed by management. The publication of lists falsely identifying people as responsible for violations causes participants who are regulated by the HPA to alter their conduct in order to avoid potential unlawful determinations of liability for violating the HPA.

143.    Because the USDA disseminates information that SHOW was required to provide, without the necessity of an FOIA request, SHOW has been denied the right to challenge the dissemination of the information under the FOIA provisions in 5 U.S.C. §552(b)(6) and (7)(C), which protect its interest in unwarranted invasions of privacy and prohibits virtually all dissemination about agency investigation files and materials that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Reverse FOIA actions are usually filed by corporations or other businesses that have supplied an agency data on its operations, seeking to prevent the agency that collected the information from revealing it to third parties. See *CAN Fin. Corp. v. Donovan*, 830 F. 2d 1132, 1133 n. 1 (D.D.C 1987). Denial of this legal right to challenge the release of SHOW's ticketing and penalty information prevents SHOW from challenging under the FOIA that the information was produced under invalid regulations and is disseminated to falsely portray thousands of people as having violated the HPA.

144.    The USDA's decision to eliminate its alleged backlog of FOIA requests by making HIO penalty decisions available on the FOIA Reading Room Lists without an individual FOIA request is a blanket decision without weighing the public interest in disclosure over the private interest in nondisclosure. This decision denies SHOW the right to have the USDA weigh SHOW's interest in non-disclosure against the interests of a requestor for such information. The USDA's action in disseminating SHOW's ticketing and penalty information without an individual FOIA request denies SHOW the right to administratively challenge the agency's FOIA decision to release such information or to have a court weigh SHOW's section (6) and (7)(A) exemption claims against the agency's decision to disclose.

145.    This Court should hold unlawful and set aside Agency actions complained of by the Plaintiffs because they are arbitrary and capricious, not in accordance with law, exceed the Agency's statutory jurisdiction and authority and are carried out without following procedures required by law.  5 U.S.C. §706(2)(A), (C) and (D).

## XI. RELIEF REQUESTED

146.    Plaintiffs seek a declaration holding unlawful and setting aside Defendant's alternative enforcement programs, which are not in accordance with the Formal Enforcement Proceedings, and under which the USDA decides that people have violated the HPA, penalizes them for the violation and falsely and misleadingly publishes their names on database lists as having been determined to have violated the Act.

147.    Plaintiffs seek an order enjoining the USDA from publishing any FOIA Electronic Reading Room Enforcement Lists about enforcement actions other than those opinions  and orders issued after Formal Enforcement Proceedings under HPA §1825(b).

148.     Under the APA, HPA and Privacy Act, the McGartlands request this Court declare that the USDA has violated and is violating the Privacy Act by disclosing the McGartlands' personal information in violation of 5 U.S.C. §552a(b). The McGartlands request that the Court enjoin such violations from occurring in the future, and order that all USDA lists identifying the McGartlands as having been the subjects of investigations into HPA violations, or identifying them as having been penalized with a public reprimand or Form 7060, be removed from any USDA's website.

Respectfully Submitted:

| | |
|---|---|
| David Broiles | /s/Karin Cagle |
| 2400 Indian Cove | 1619 Pennsylvania Ave. |
| Fort Worth, Texas 76108 | Fort Worth, Texas 76104 |
| Phone: 817-247801 | Phone: 817-721-5127 |
| Email: davidbroiles@gmail.com | Email: kcaglelawyer@gmail.com |
| Texas State Bar No. 03054500 | Texas State Bar No. 24043588 |

## CERTIFICATE OF SERVICE

I certify that I served Defendant's counsel the foregoing document via ECF filing to Peter Wechsler at peter.wechsler@usdoj.gov and to Nathan Swinton atNathan.M.Swinton@usdoj.gov.

/s/ Karin Cagle
Karin Cagle